UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| BERNADETTE BILLY-LERA | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JOHN W. SNOW, Secretary, | ) |
| U.S. Treasury Department, | ) |
| Defendant. | ) |

Civil Action No. 05-1273 (JR)

---

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56, Federal Rules of Civil Procedure, defendant respectfully submits this Motion for Summary Judgment as to Count One of the Complaint which alleges "discrimination in the form of retaliation, harassment and a hostile work environment. " Complaint at p.1. As set forth in the Memorandum of Points and Authorities in support of this motion, there are no material facts in genuine dispute and defendant is entitled to judgment as a matter of law. Wherefore, defendant respectfully requests that Count One be dismissed with prejudice .

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, D.C. Bar No. 451048
United States Attorney

_____
RUDOLPH  CONTRERAS, D.C. Bar No.  434122
Assistant United States Attorney

_____
RHONDA C. FIELDS
Assistant United States Attorney
555 Fourth Street, N.W.
Civil Division
Washington, D.C.  20001
(202) 514-6970

Of Counsel:
Robert M. Mirkov
Office of Chief Counsel - I.R.S.
General Legal Services
950 L'Enfant Plaza, SW - 2nd Floor
Washington, DC   20024

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
BERNADETTE BILLY-LERA          )
                    Plaintiff,  )
                                )
        v.                      )        Civil Action No. 05-1273 (JR)
                                )
JOHN W. SNOW, Secretary,        )
U.S. Treasury Department,       )
                    Defendant.  )
_____)

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant respectfully submits this memorandum of points and authorities in support of

its motion for summary judgment.

**BACKGROUND**

Plaintiff is a GS-13 Revenue Agent employed by the Internal Revenue Service (IRS).

Complaint at ¶1.

On or about June 21, 2001,  plaintiff filed an EEO complaint.  Complaint at ¶6, Billy-

Lera affidavit ROI at 171, ¶6.  The Complaint alleged discrimination based on national origin,

race and sex.  Billy-Lera affidavit, ROI at 172, ¶7.  The alleged discriminating officials were

three prior supervisors, Robert Mosely, Tess Tillotson and Jeannie Fisher.  *Id*. at ¶9.

Evelyn Stephens is named as the alleged discriminating official in the instant matter.

Complaint at ¶¶6-21.  From approximately July 25, 2001 until November 12, 2001, Ms. Stephens

was detailed to be the International Manager of the International Compliance income tax group in

Washington, D.C.  Stephens Dec. at ¶¶ 5-6.   Robert Mosely was plaintiff's Acting Manager just

1

before Ms. Stephens became Acting Manager.    During the transition, Ms. Stephens attended a

meeting between plaintiff and Acting Manager Robert Mosely in order to observe and become

acquainted with plaintiff's work load.  *Id.* at ¶¶ 7-8. During the meeting there was a heated

discussion between plaintiff and Mr. Mosely  concerning plaintiff's outstanding relocation

advance and her travel voucher for a trip to San Francisco, CA.  *Id.* and meeting notes, ROI at p.

77.  Mr. Mosely left the meeting directing plaintiff to revise/correct the voucher for his approval.

Stephens Dec. at ¶ 8.   Following Mr. Moseley's departure from the meeting, plaintiff advised

Ms. Stephens that she had filed an EEO complaint against Mr. Moseley.  *Id.*  at ¶9; Billy-Lera

aff, ROI at p.171, ¶ 6.


**Three September 14, 2001 Travel Vouchers**

        While Ms. Stephens was acting, she approved three travel vouchers which plaintiff

indicates were submitted on September 14, 2001[1] and were approved approximately one month

later. Billy Lera aff.,  ROI p. 173, 179.  The vouchers included travel expenses between

Washington, D.C. and New York before and after flights to and from plaintiff's audit locations.

Stephens Dec. at ¶¶10-13.  One of the vouchers previously had been submitted to Mr. Mosely.

That voucher had been the subject of the meeting observed by Ms. Stephens in which Mr.

Mosely had told plaintiff to remove the New York expenses.  *Id.* at ¶ 12.  Ms. Stephens asked for

an explanation of the expenses and required plaintiff to submit an explanation in writing.  *Id.* at ¶

14.   Plaintiff advised Ms. Stephens that previous supervisors had approved her practice of

---

        [1]  Although plaintiff's affidavit states September 14, 2002, it is clear from the
documentation that she is referring to September 14, 2001.  See ROI at pp. 358-375, 382.

2

traveling to New York since it allowed her to take direct flights to her audit sites. *Id.* at ¶14. She explained the lack of lodging expense in New York by advising Ms. Stephens that she had been staying with relatives. *Id*. Ms. Stephens also noted duplicate meal expenses on one voucher which she asked plaintiff to correct. *Id.* at ¶ 11. One voucher was approved with the New York expenses because plaintiff told Ms. Stephens that the credit card company was threatening to or had cancelled her government credit card. *Id.* at ¶ 15. Ultimately, Ms. Stephens did not press the issue of the removal of the New York expenses from the other vouchers because she had obtained a memorandum from plaintiff stating that previous supervisors had approved the practice, she had documented her direction to plaintiff to stop the practice, and she had other pressing issues to address. *Id.* at ¶ 15.

Ms. Stephens was selected to be the permanent manager of the group later in November 2001. *Id.* at ¶ 18. However, she stayed in Pittsburg on use or lose annual leave, and did not report to Washington D.C. until mid-January 2002. *Id.*

**Contacted at home:**

Plaintiff claimed that in December 2001, Ms. Stephens "called and harassed" her while she was on sick leave. Billy-Lera aff, ROI at p. 177.

During December 2001, both plaintiff and Ms. Stephens were out of the office on leave. Stephens Dec. at ¶¶ 20-21. A representative of a taxpayer had called the office with a complaint concerning one of plaintiff's cases. *Id.* at ¶ 22. The acting manager, Ms. Tillotson, and Territory Manager, Ms. Fisher, attempted unsuccessfully to contact plaintiff concerning the case file. Fisher aff, ROI at 415 and e-mail, ROI at 338-345. Plaintiff had been instructed to bring all of her case files to the office prior to going on extended sick leave to ensure the cases were

available for any necessary action.  Fisher aff, ROI at 415.  Ms. Stephens was contacted at home

in Pittsburgh since Ms. Fisher and Tillotson could not find the case file.  Stephens Dec. at ¶ 22.

Ms. Stephens called plaintiff at her home to inquire about the location of the files.  Plaintiff

stated that she had the tax return and case file at her home.  *Id.*   Tax returns and case files are

required to be maintained in the office when a revenue agent is not working on them.  When

someone is on extended leave, the files should be in a locked cabinet in the office.  *Id.*  Ms.

Fisher attempted to go to plaintiff's home to pick up the file, but was unable to contact her to

arrange the pick up.  Fisher aff, ROI at 415.  Ms. Stephens also called plaintiff at her home

during December 2001 in response to plaintiff's call to Stephens concerning requesting

additional sick or annual leave.  Stephens Dec. at ¶ 22.

Plaintiff returned to work on January 14, 2002, after 10 weeks of sick leave.  Billy-Lera

aff., ROI at 180.  She had been on leave since the week of November 11, 2001. ROI at 397-406.

Ms. Stephens reported back to work at about the same time, on January 14, 2002.

Stephens Dec. at  ¶ 23.

Plaintiff also claims that Ms. Stephens contacted her when she was at home and during

non-working hours as follows: April 2, 2002 and May 13, 2002. Billy-Lera aff at p.3; complaint

at ¶13.

**Requesting case files**

Revenue agent managers require access to case files to check that agents are following

proper procedures, to check the substance and accuracy of the work, and to check that the work is

done in a timely manner.  Stephens Dec. at ¶ 24.  A manager is required to document her

involvement in the case file on the activity record and is supposed to document any action or recommendation. *Id.*

Plaintiff claims that on February 26, and March 1, 2002, Ms. Stephens came to her desk and asked for a case file and "hovered" over her. Billy Lera aff, ROI at p. 172, 176.

On June 4, 2002, Ms. Stephens allegedly came to plaintiff's cubicle "and was intimidating and forceful in asking for two cases." *Id.* "She insisted that she needed the case immediately. When I reached into my cabinet she was very close to me, physically touching me. I asked for her to move over but she still refused to move. I left her standing in my cubicle and went to speak to the acting area compliance director. . . ." *Id.*

**Unannounced reviews of her work:**

Plaintiff alleges retaliation because Ms. Stephens made unannounced reviews of her work on five occasions: March 1, 2002, March 15, 2002, May 15, 2002, June 4, 2002, and August 15, 2002. Billy-Lera aff at p. 2. ¶1; Complaint at ¶6.

**Petty memoranda**

Plaintiff alleges that Ms. Stephens issued to her petty memoranda and e-mails on the following days: in 2001-- October 1 and October 30; in 2002 -- February 22, March 15, June 11,12, 13, 27, September 18, October 1, 2002, Billy-Lera aff, ROI 172, ¶1; Complaint at ¶10.

**Travel**

Plaintiff claims additional retaliation concerning travel in 2002: a) a travel advance request submitted on March 27, 2002 for travel beginning on April 4, 2002 and approved on April 3, 2002. The travel which began on April 4, 2002 was to Hong Kong. See ROI at pp.173, 310 ; b) Ms. Stephens's disapproval of reimbursement of a $56 cash  transaction fee incurred on

plaintiff's personal credit card for the Hong Kong trip, ROI at p. 179; c) a September 17, 2002 travel advance request denied on September 18, 2002. Billy Lera aff. at ROI p. 173, 179.

**Assignments**

Plaintiff complains that Ms. Stephens failed to assign to her cases of a complexity that are consistent with her grade. Complaint at ¶15. Billy Lera aff. at ROI p. 173, 180. She complains that she was not given an opportunity to act as manager in Ms. Stephens's absence while a GS-12 co-worker and other employees not in her group were called upon to act as manager. Complaint at p. 16; Billy Lera aff, ROI at p. 173-174, 181. She also complains that in January 2002, she was directed to work a case that was in her case inventory. Complaint at ¶17; Billy-Lera aff., ROI at p.4, 182.

**Administrative leave**

Another alleged act of retaliation was Ms. Stephens' denial of administrative leave for an appointment with an Employee Assistance Program (EAP) counselor on March 4, 2002. Complaint at ¶ 18; Billy Lera aff, ROI at p 183.

**Performance appraisal**

Plaintiff claims retaliation in relation to her April 30, 2002 performance appraisal, contending it was late and unfair. Complaint at ¶19. Billy-Lera aff, ROI at p. 184-186. Plaintiff received a numerical rating of 3 (fully successful) for two critical elements while her previous manager had rated her 4 (exceeds fully successful) on those elements. *Id.* at 184. Plaintiff's overall performance rating from Ms. Stephens was "Exceeds Fully Successful." *Id.* at 451.

Plaintiff also contends that her mid-year evaluation in August 2002 was unfair. Complaint at ¶20. Ms. Stephens gave plaintiff a memorandum dated July 30, 2002 in which

plaintiff was rated 3 (fully successful) on four job elements and 4 (exceeds fully successful) on one job element. ROI at p. 271, 187.

**EPF Review/Proposed Letter of Reprimand**

Plaintiff claims retaliation because Ms. Stephens in August 2002 restricted the amount of time plaintiff was allowed to review her employee performance folder (EPF), and because items were in the EPF which had not been discussed with plaintiff. Complaint at ¶21. Plaintiff claims that in August 2002 she was only given 150 minutes to review her folder. ROI at p. 188-189. She also claims retaliation because Ms. Stephens' recommended official letter of reprimand for insubordination, was in plaintiff's EPF. Billy-Lera aff, ROI at p. 188, 276.

**Frequently Interrupted work and exhibited overt hostile public behavior**

Plaintiff also claims that Ms. Stephens frequently interrupted her work and exhibited "hostile public behavior." Complaint at ¶12. She claimed that she "often received telephone calls from Ms. Stephens demanding me to come to her office to discuss urgent issues." Billy-Lera aff, ROI at p. 172.

**Maligned**

Plaintiff also claims retaliation because Ms. Stephens "maligned" her by falsely stating that plaintiff has a larger than usual number of over-age cases in her inventory. Complaint at ¶9.

Plaintiff first contacted the EEOC on May 20, 2002, concerning her claims of retaliation. ROI at p. 2.

## STANDARD OF REVIEW

### Summary Judgment

Summary judgment may be granted when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir. 1995).  A genuine issue is one that could change the outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 243 (1986).  While all evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party, *see, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), a complaint should be dismissed if it "appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

### Discrimination/Retaliation Claims –Title VII Standard

Like claims of discrimination, claims of retaliation are governed by the McDonnell Douglas burden-shifting scheme.  *Holcomb v. Powell*  433 F.3d 889, 901 (D.C.Cir. 2006).  The ultimate issue in an employment discrimination/retaliation case is whether the plaintiff has met her burden of demonstrating that the action she complains of was motivated, at least in part, by intentional discrimination or retaliation.  Where, as here, a plaintiff offers no direct evidence of discrimination, plaintiffs have sought to create a triable issue of discrimination or retaliation by relying on the familiar framework first enunciated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803-805 (1973).  *See also Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000).  It should be remembered, however, that at all times the

burden of proof remains with the plaintiff even when the plaintiff's case is built on inferential

evidence under the *McDonnell Douglas* analysis.

Under the *McDonnell Douglas* test, plaintiff has the initial burden of proving by a

preponderance of the evidence a prima facie case of discrimination/retaliation. *Texas Dep't of*

*Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). If the plaintiff is able to establish a

prima facie case, then the Court should weigh defendant's legitimate, nondiscriminatory reason or

reasons with any evidence plaintiff presents that defendant's stated reason merely was a pretext

for discrimination. *Id*. At all times, plaintiff retains the ultimate burden of persuasion to

demonstrate that she was in fact the victim of intentional discrimination or retaliation. *Burdine*,

450 U.S. at 252-53.

> If the defendant produces such evidence [of a nondiscriminatory reason], the
> McDonnell Douglas framework--with its presumptions and burdens-- disappears,
> and the sole remaining issue is discrimination vel non. . . . At this point, "to
> survive summary judgment the plaintiff must show that a reasonable jury could
> conclude from all of the evidence that the adverse employment decision was made
> for a discriminatory reason." . . . By "all of the evidence," we mean any
> combination of (1) evidence establishing the plaintiff's prima facie case; (2)
> evidence the plaintiff presents to attack the employer's proffered explanation for
> its actions; and (3) any further evidence of discrimination that may be available to
> the plaintiff, such as independent evidence of discriminatory statements or
> attitudes on the part of the employer. . . .

*Holcomb v. Powell,* 433 F.3d 889, *896-897, 2006 WL 45853,**5 (D.C.Cir.2006)(internal

citation omitted).

A plaintiff must present substantial and credible evidence of discrimination in order to

survive a motion for summary judgment*. See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir.

1999) ("Accepting [some] conclusory allegations as true, therefore, would defeat the central

purpose of the summary judgment device, which is to weed out those cases insufficiently

meritorious to warrant the expense of a jury trial."); *Carpenter v. Federal Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999) (if plaintiff merely shows that the legitimate nondiscriminatory reason offered by the employer is a pretext for a decision intending to cover up an unsavory reason -- but one that is not illegal under the antidiscrimination law,  the plaintiff is not entitled to try issues of fact, and summary judgment for the employer is appropriate.); *Hastie v. Henderson*, 121 F.Supp.2d, 72, 77 (D.D.C. 2000) aff'd, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001)("To defeat a motion for summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation, but rather must point to 'genuine issues of material fact in the record.'"); *Woodruff v. DiMario*, 164 F.Supp. 2d 1, 5 (D.D.C. 2001). Additionally, there will be "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Weigert v. Georgetown University*, 120 F.Supp.2d 1, 22 (D.D.C. 2000), *quoting, Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133 (2000).

**Retaliation Claim**

A prima facie case alleging retaliation or reprisal is established when the plaintiff demonstrates that (1) she engaged in protected behavior; (2) the employer's challenged action would have been material to a reasonable employee, and (3) there is a causal link between the adverse action and the protected activity.  *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985); *Rochon v. Gonzales*,  2006 WL 463116, *8 (D.C.Cir.2006).

## ARGUMENT

## FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

In order to pursue a cause of action in federal court for employment discrimination/retaliation under Title VII, a plaintiff is required to exhaust her administrative remedies. *Bayer v. U.S. Dept. of Treasury*, 956 F.2d 330, 332 (D.C.Cir.1992). To properly raise a claim under Title VII, a federal employee must contact an EEO counselor within 45 days of the plaintiff's notification of the allegedly discriminatory/retaliatory event. *Park v. Howard University*, 71 F.3d 904, 907 (D.C.Cir.1995); 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.105(a)(1). This 45-day time limit is not jurisdictional, but operates as a statute of limitations defense. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). *Armstrong v. Reno*, 172 F Supp. 2d 11, 20 (D.D.C. 2001). See also *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (filing period begins at time of alleged discrimination, not when its effects are later felt).

On May 20, 2002, plaintiff first contacted an EEO counselor concerning her retaliation claims. ROI at pp 2, 11. Therefore, for plaintiff's Title VII claims, any alleged individual acts of retaliation that occurred prior to April 5, 2002 are barred because plaintiff did not consult with an EEO counselor within 45 days of the incident, as required by 29 C.F.R. § 1614.105(a)(1). The individual alleged acts barred include:

- Approval of three September 2001 vouchers in October 2001;

- Unannounced work reviews March 1 and March 15, 2002;

- "Petty memos" October 2001, February 22 and March 15, 2002;

11

- Standing over her February 26 and March 1, 2002;

- Contacted at home December 2001 and April 2, 2002;

- Approval of travel April 3, 2002;

- Directed to work a case in her inventory in January 2002;

- Denied administrative leave March 4 and April 2, 2002.

Therefore, these claims of retaliation, based on acts before April 5, 2002, should be dismissed.

### PLAINTIFF FAILS TO MAKE OUT A *PRIMA FACIE* CASE OF RETALIATION BECAUSE ACTS WERE NOT "MATERIAL TO A REASONABLE EMPLOYEE"

In order to establish a claim of retaliation, a plaintiff must demonstrate that the

"'employer's challenged action would have been material to a reasonable employee,' which in

this context means it well might have 'dissuaded a reasonable worker from making or supporting

a charge of discrimination.'"  *Rochon v. Gonzales,*  2006 WL 463116, *8 (D.C.Cir.2006).  Where

the retaliation claim pertains to an employment action, this test has been formulated as requiring

some form of legally cognizable adverse personnel action by the employer.  *Brown v. Brody*, 199

F.3d 446, 453 (D.C.Cir. 1999); *Weigert v. Georgetown University*, 120 F.Supp.2d 1, 17-18

(D.D.C. 2000 ) ("An employee claiming retaliation under the ADA also must show that she

suffered a 'materially adverse employment action.'")

To establish an "adverse personnel action" there must be a significant change in the

complainant's employment status--such as failing to hire, firing, failing to promote, or a decision

causing a significant change in benefits. *Id.*

Courts have further defined the concept of an "adverse personnel action" as one involving

a **material** change in the aggrieved employee's employment status.  A materially adverse change

can be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F. 2d 132, 136 (7th Cir. 1993); *compare with Flaherty v. Gas Research Institute* (7th Cir. 1994)(a "bruised ego" is not enough), *Koscis v. Multi-Care Mgt., Inc.,* 97 F. 3d 876, 887 (6th Cir. 1996)(demotion without change in pay, benefits, duties, or prestige insufficient), *Harlston v. McDonnell Douglas Corp.,* 37 F. 3d 379, 382 (8th Cir. 1994) (reassignment to more inconvenient job insufficient).

To guard against "judicial micromanagement of business practices," courts do not recognize "interlocutory or mediate decisions having no **immediate** effect upon employment" as adverse personnel actions. *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001)(the ultimate result of a performance evaluation is often speculative and should not be considered an adverse action if it does not affect an employee's grade or salary)(emphasis added) *citing to Mungin v. Katten, Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997). In short, to be considered adverse a personnel action must have a "direct, measurable, and immediate effect," upon the complainant. *Principi*, *supra* at 819.

The alleged acts of retaliation in this case, had no material adverse affect on plaintiff's grade, salary or benefits, and they would not otherwise have been material to a reasonable employee. Plaintiff's claims of miscellaneous alleged retaliatory actions on the part of the defendant are quite similar to some of the claims that were rejected by this Court in *Forkkio v. Tanoue*, 131 F.Supp. 2d 36 (D.D.C. 2001) *affirmed* 306 F.3d 1127 D.C. Cir. 2002). In *Forkkio*, the Plaintiff alleged that various actions or decisions on the part of the plaintiff's supervisor

13

constituted racial discrimination, including: sending an electronic mail message that implied that he had performance problems, and asking for reports and updates and information concerning plaintiff's duties.  In rejecting Forkkio's allegations, this Court held that: "Not only do these actions not rise to the level of adverse actions, they are precisely the kind of 'minor and even trivial employment actions' that are not properly the subject of Title VII discrimination suits." *Id.* at 45.  The same may be said of plaintiff Billy-Lera's allegations.

## PLAINTIFF'S ALLEGATIONS AND
## LEGITIMATE NON-DISCRIMINATORY REASONS

**Contacted at home:**

Plaintiff complains that Ms. Stephens contacted her when she was at home and during non-working hours as follows: December 2001, April 2, 2002 and May 13, 2002. Billy-Lera aff at p.3; complaint at ¶13.  She claimed that in December,  Ms. Stephens "called and harassed" her while she was on sick leave. Billy-Lera aff, ROI at p. 177.  Plaintiff complains that she asked Ms. Stephens not to call her at home when she was on leave and in the evenings and that Ms. Stephens told plaintiff she would call her at any time for business reasons. Billy-Lera aff., ROI at 174.

Other than the simple fact that the calls were made, plaintiff has not shown how the business related calls were harassment.  Plaintiff worked flexiplace (at home) over approximately 75% of her tour. Stephens Dec. at ¶ 19.   Ms. Stephens made telephone calls to plaintiff's home for business reasons.

14

As was indicated above, Ms. Stephens called plaintiff in December 2001 to locate a case file for Ms. Stephens's supervisor and the Acting Manager. *Id.* at ¶22. They had been contacted by a taxpayer's representative and needed the case file to respond to his concerns. Although the file was supposed to have been left secured at the IRS office, plaintiff had the file at home. *Id.* Plaintiff admits that the calls and messages she received at home in December pertained to the supervisors' attempts to obtain possession of the case file. Billy-Lera letter, ROI at p. 46. She also admits that she had called Ms. Stephens and left a message about sick leave extension, and that Ms. Stephens returned her call. *Id.* at 45-46. Nothing about the calls reflects any retaliatory animus. Ms. Stephens was following up on a matter about which her supervisor, Ms. Fisher, had contacted Ms. Stephens at home. Stephens Dec. at ¶22

There is a hand written memorandum from plaintiff to Ms. Stephens dated April 2, 2002. ROI at 213. It indicates that Ms. Stephens left a <u>message</u> on plaintiff's home telephone on April 1, 2002 at 6:15 about a form 9512-A. *Id.* There is no evidence that merely leaving the message was harassment.

No evidence about a May 13, 2002 telephone call was apparent in the ROI.

Other than making merely conclusiory statements, plaintiff has not established that any messages or telephone calls to her home were for retaliatory purposes.

**Requesting Case files**

Plaintiff claims that on three occasions in 2002, Ms. Stephens came to her desk or cubicle and asked for a case and

15

on February 26 "While I was retrieving the case file from my desk Ms. Stephens stood over my shoulder in an intimidating manner. * * *Later that afternoon she came to my desk and hovered over me again." Billy Lera aff, ROI at p. 176;

on March 1, 2002, Ms. Stephens "hovered over my shoulder as usual and I told her I did not appreciate her behavior." Billy-Lera aff at p. 2 ¶1;

on June 4, 2002, Ms. Stephens "was intimidating and forceful in asking for two cases." *Id*. at p.2-3 ¶1. "She insisted that she needed the case immediately. When I reached into my cabinet she was very close to me, physically touching me. I asked for her to move over but she still refused to move. I left her standing in my cubicle and went to speak to the acting area compliance director. . . ." *Id*.

Supervisors of Revenue Agents need physical possession of the case files to insure the work of the agents is timely, substantively correct, and complies with IRS rules, regulations and procedures, and to make required notations in the file. Stephens Dec. at ¶ 24. Ms. Stephens does not remember all of the three alleged incidents of "hovering"over plaintiff. *Id. at ¶ 34.* In 2002, Ms. Stephens' office was on a different floor than plaintiff's. Plaintiff was located in one of the cubicles on the promenade level where other revenue agents were located. *Id.* Ms. Stephens had occasion to walk to plaintiff's cubicle to ask for a case file for business reasons, and she has stood waiting to receive a file from her. *Id.* Ms. Stephens does remember the June 4, 2002 incident because plaintiff clearly was insubordinate to her on that occasion. On June 4, 2002, Ms. Stephens went to plaintiff's work cubicle to request the file to make required manager documentation on the case activity record acknowledging receipt of a Form 872, statute of limitation extension for a short statute case. *Id.* By plaintiff's own admission, she refused to give Ms. Stephens the file and walked out of her cubicle. Billy-Lera aff, ROI at 172-173. Ms. Stephens described the incident as follows:

**The first time I asked for the file, you replied you would give it to me later in the day**.  I responded that I had other things planned and wanted to document the activity record at that time.  You then replied you had to stamp the Form 872 and do something else.  I replied I would wait, **while I was waiting you stamped the Form 872, locked your files, picked up your water bottle and walked out of your cubicle**. . . .When you returned, I asked you again for the case file to document the case activity record on a short statute case.  **You refused to give me the file a second time**.

June 5, 2002 memorandum,  ROI at 346 (emphasis in original);  Stephens Dec at ¶34 and *see also* Tenny Dec., ROI at 439.

The June 4, 2002 incident resulted in Ms. Stephens writing the admonitory June 5, 2002 memorandum to plaintiff, ROI at 346-47, and  recommending that plaintiff be given an official reprimand for insubordination.  Stephens Dec. at ¶ 50.

By plaintiff's own admission Ms. Stephens was in plaintiff's cubicle for the legitimate purpose of obtaining case files.  Merely standing in someone's office awaiting a response to a request for a file is not harassment.  That on June 4, 2002, Ms. Stephens "insisted" that she needed a file immediately is far from an adverse or  material action.

**Unannounced reviews of her work:**

Plaintiff alleges retaliation because Ms. Stephens made unannounced reviews of her work on five days: August 15, 2001, March 1, 2002, March 15, 2002, May 15, 2002 and June 4, 2002 (over a ten month period).  Billy-Lera aff , ROI at at p. 172; Complaint at ¶6.   Plaintiff states that she does not "appreciate her [Stephens's] derogatory petty notes in my activity records and attachments to my cases." ROI at 174.

As indicated above, supervisors of revenue agents are required to review the work of the agents for accuracy and completeness of the file, to insure the appropriate tax liability has been

17

calculated, and that the return is in compliance with tax law. The managers are responsible for

ensuring the work is done in a timely manner and in accordance with IRS rules, regulations and

policies. As would be expected in tax calculation, audit and audit related work, the revenue

agents are required to maintain timely workpapers and document their activities and the audit

trail. Stephens Dec. at ¶24. When Ms. Stephens obtained a file from any revenue agent, if she

observed deficiencies or other issues with the file which needed to be addressed, she would make

notes and share her concerns with the revenue agent. Also, she reviewed in-process cases of

everyone in the group at random when the cases crossed her desk. *Id.* This was done to give

ongoing feedback, guidance and direction to the agents. *Id.* Ms. Stephens was not required to

announce that she might review or spot check any agent's case file. *Id.* See al Tillotson Dec. at

1, ¶(1)(a).

"Certainly employers are permitted to criticize an employee's work without giving rise to

a federal cause of action." *Burton v. Batista*, 339 F.Supp.2d 97, 111 (D.D.C.2004).

> Being closely supervised or "watched" does not constitute an adverse employment
> action that can support a claim under Title VII. *See, e.g., Chika v. Planning
> Research Corp.*, 179 F.Supp.2d 575, 587 (D.Md.2002) (allegations of close
> monitoring and repeated questioning about work fail to state a claim); *Boykins v.
> Lucent Tech.*, 78 F.Supp.2d 402, 414 (E.D.Pa.2000) (allegation of being "watched
> over" does not constitute an adverse action); *Flanagan-Uusitalo v. D.T. Indus.,
> Inc.*, 190 F.Supp.2d 105, 117 (D.Mass.2001) (allegation of excessive scrutiny not
> enough to establish adverse action); *McCoy v. Macon Water Auth.*, 966 F.Supp.
> 1209, 1221 (M.D.Ga.1997) (being watched and having to report to particular
> supervisor are not adverse employment actions).

*Id.*, 339 F.Supp.2d at 111.

**Petty memoranda:**

Plaintiff alleges that Ms. Stephens retaliated by issuing to her petty memoranda and e-mails on the following days: in 2001 – October 1, and October 30; in 2002 – February 22, March 15, June 27, September 18, October 1, June 11 and 13 (E-mails)  Billy-Lera aff at p. 2 ¶1; Complaint at ¶10.

Several memoranda were written to plaintiff  regarding her outstanding advance and preparation of travel vouchers.  Ms. Stephens documented her communications with plaintiff on the subject for several reasons: because of the age (since late 90's) of the outstanding advance, the sensitivity of the subject, plaintiff's tone and responses to Ms. Stephens when she orally tried to discuss the subject, and to document Ms. Stephens' action to follow-up on the issue pursuant to instruction from her manager, Jeannie Fisher. Stephens Dec. at ¶43.   Plaintiff told Ms. Stephens that the relocation advance was none of her business and refused to provide her the status and name of the person she was working with in the budget office to settle the issue.  After plaintiff was told she was required to provide Ms. Stephens the information, she provided the person's name.  *Id.*  Ms. Stephens perceived that plaintiff  became hostile and unprofessional in her oral communication with Ms. Stephens on all issues. Thus, several memoranda were issued to plaintiff regarding the outstanding relocation advance and travel vouchers. *Id.*  Also, plaintiff's travel vouchers and/or travel advances were an on-going subject of errors, tardiness, and questions, thus prompting the issuance of memoranda. *Id.*

The October 1, 2001 memorandum confirmed Ms. Stephens' direction to plaintiff to fly from  Washington, D.C. area airports when making flights, rather than flying out of New York. Stephens Dec. at ¶ 44; ROI at p. 82.  Plaintiff had advised Ms. Stephens that previous supervisors had allowed her to go to New York to take direct flights to her destinations.  However, Ms.

19

Stephens' review and consideration of all the costs and plaintiff's time, lead her to believe that it was not necessarily cheaper, and she asked plaintiff to remove meals and expenses for the period in New York, which plaintiff agreed to do.  Stephens Dec at ¶14-15; ROI at pp 81, 83-85.

Also among the "petty" memoranda about which plaintiff complains are two dated October 30, 2001 and February 22, 2002.  The two memoranda are part of  a series of memoranda concerning the outstanding relocation advance balance which plaintiff's supervisors had been attempting to have her resolve. Stephens Dec. at ¶45; ROI at pp 319-325.  The October 30, 2001 memorandum also discusses a travel voucher issue.  ROI at pp 321-22.

On February 21, 2002, Ms. Stephens' supervisor, Ms. Fisher, sent to Ms. Stephens a memorandum concerning obtaining resolution of plaintiff's relocation advance.  ROI at p.318.  It directed Ms. Stephens to "direct her [plaintiff] to resolve this issue promptly.  She should respond to you regarding confirmation of contact and action taken to resolve this amount."  *Id.*  On February 22, 2002, Ms. Stephens sent plaintiff a memorandum asking her to identify who she was in contact with concerning resolution of the advance.  ROI at 319.  Attached to the memorandum were prior memoranda she had sent plaintiff concerning the advance.  ROI at pp320-323.  On April 19, 2002,  Ms. Stephens sent plaintiff yet another memorandum asking her to pay the advance.  ROI at p. 324.   As of July 10, 2002,  the advance had not been paid.  ROI at p. 333. Stephens Dec. at ¶46.

The March 15, 2002 memorandum responded to a memorandum plaintiff had sent to Ms. Stephens. ROI at 203-204.  In the memorandum, Ms. Stephens discussed the issuance of

plaintiff's performance evaluation.   She also discussed plaintiff's lack of timeliness in requesting travel funds, and communications with tax representatives.  *Id.*; Stephens Dec. at ¶47.

The June 11 and 13, 2002 e-mails from Ms. Stephens are in response to e-mails from plaintiff.  ROI at 57-58.  They are about Ms. Stephens' review and questioning of plaintiff's need to travel to Canada to conduct an audit.  Plaintiff's examination of prior years had resulted in "no change," and Ms. Stephens found "nothing in the file to justify a follow-up audit."  June 13, 2002 e-mail, ROI at p. 58; Stephens Dec. at ¶48.

The June 27, 2002 e-mail asked plaintiff to bring a case and case review to Ms. Stephens' office for discussion and notes that Ms. Stephens had been unable to contact plaintiff by telephone at home that morning.  ROI at p.  207, 304.  Stephens Dec. at ¶ 27.

The memorandum dated June 5, 2002 concerned the June 4, 2002 incident in which plaintiff refused to give Ms. Stephens the case file.  Stephens Dec. at ¶ 50.

Plaintiff has identified nothing in the tone or words of any memorandum or e-mail which reflects retaliatory harassment.  Rather all the memoranda and e-mails were issued for legitimate supervisory inquiry into and oversight of  business matters.

**Travel:**

Plaintiff claims that Ms. Stephens delayed travel advances, and denied her "travel benefits." Complaint at ¶14.  She also alleges that Ms. Stephens  limited or restricted her overseas travel.  Complaint at ¶¶7-8.  As alleged retaliatory acts, plaintiff points to a) late approval of  three travel vouchers submitted on September 14, 2001 and approved approximately one month later, b) late approval of a travel advance request submitted on March 27, 2002 for travel beginning on

April 4, 2002 and approved on April 3, 2002; c) disapproval of reimbursement of a $56

transaction fee incurred on plaintiff's personal credit card, and d)  a September 17, 2002 travel

advance request denied on September 18, 2002.   Billy Lera aff. at ROI p. 173, 179.

**Three Travel Vouchers**

While Ms Stephens was the acting manager, she received for approval three travel

vouchers. Stephens Dec. at ¶ 10.   The vouchers had expenses for travel between Washington,

D.C. and New York before and after flights to and from plaintiff's audit locations.  Stephens Dec.

at ¶¶ 10-13.  These were the same type of expenses which Mr. Mosely had been questioning. *Id*. at

¶ 10.   Additionally, she noted what appeared to be duplicate expenses on one voucher.  *Id*. at ¶

11.  She asked plaintiff to remove the duplicate expenses and explain the expenses incurred.in

New York.  *Id*. at ¶¶10-11.

Plaintiff told Ms. Stephens that her previous supervisors had approved the practice of

traveling through New York because it allowed her to take direct flights to the audit sites.

Stephens Dec. at ¶ 14.  She also advised Ms. Stephens that she had been staying with relatives. *Id*.

[This explained the lack of lodging expense.] Ms. Stephens asked plaintiff to put her explanation

in writing.  She also told plaintiff  in the future to refrain from traveling from New York rather

than from Washington, D.C. area airports.  *Id* ; see October 1, 2001 e-mail and memorandum ROI

at 380, 381.  Ms. Stephens did not believe that plaintiff's practice of traveling to New York to

take direct flights was cost effective for the IRS when considering the transportation and meal

expense cost to and from New York plus the extra time the revenue agent spent in traveling to and

from and staying overnight in New York.  Stephens Dec. at ¶ 14.  Due to these cost

considerations, the practice also had the appearance of impropriety since it could appear that she might be making the stop overs in New York solely for the private purpose of visiting with relatives. *Id.*

Ms. Stephens asked plaintiff to remove some of the NY expenses from her TRAS voucher and she agreed to do so. *Id.* at ¶ 15. She told plaintiff she would approve the voucher after those expenses were removed. ROI at 380. Plaintiff was supposed to have revised the TRAS voucher as requested and then re-entered it into the computer. *Id.* On October 2, 2001, Ms Stephens was advised that she could not approve the TRAS voucher because plaintiff had not signed it. See ROI at 385, 386. Ms. Stephens approved one of the manual vouchers even though plaintiff did not make the requested corrections because plaintiff told Ms. Stephens that the credit card company was threatening to or had cut off her government credit card due to non-payment, and due to the cut-off of travel due to fiscal year end. Stephens Dec. at ¶15. Plaintiff did not make all of the changes to the vouchers which Ms. Stephens requested. However, ultimately Ms. Stephens did not press the point about the previous expenses to New York, since plaintiff sent her a memorandum stating previous supervisors had approved the practice, and she had documented her direction that plaintiff stop the practice. *Id.* Additionally, as the acting manager Ms. Stephens had many other pressing issues to address. *Id.*

Plaintiff's memorandum explaining the New York expenses is dated October 1, 2001. ROI at 384. Ms. Stephens approved the vouchers on October 1, 5, and 11 – shortly after having received the written explanation from plaintiff. See ROI at 93-94, ¶¶ 4, 7. Thus, the delay in the approval of the three vouchers resulted from Ms. Stephens' need to obtain the explanation for the New York expenses and attempt to obtain corrections on the vouchers.

Plaintiff indicates that she submitted a request for a travel advance on Wednesday, March 27, 2002 for travel scheduled to start on April 4, 2002. The Travel Advance Request Record reflects that the advance was signed by plaintiff on March 28, 2002. ROI at 419. Ms. Stephens was on leave on Friday March 29 and on Monday March 30. Stephens Dec. at ¶ 40. When she came back on Tuesday, either she had a question or did not get around to approving it until Wednesday, April 3, 2002. *Id.* The IRS travel regulations put travelers on notice that requests for advances (SF 1038) must be submitted through supervisory channels and the completed form should be received by the Fiscal Management Office at least two weeks before travel is to begin. ROI at 512. Stephens Dec at ¶ 40.

The travel voucher submitted after the trip contained an unallowable expense. Ms. Stephens asked plaintiff to remove the expense but she refused. Stephens Dec. at ¶ 41. The expense claimed was a $56 charge for getting cash with a personal credit card. Ms. Stephens consulted with the Travel Office in Beckley, WVA and reviewed the Travel Manual before asking plaintiff to remove the $56 from her voucher. *Id.* Plaintiff made some other corrections but would not remove the cash advance expense charge from the voucher. To avoid further delay in processing, Ms Stephens noted on the voucher that she had not approved the expense and forwarded it for processing. *Id.* Moreover, the Travel Office reviews vouchers and if there are unallowable expenses, even though the manager may have approved the voucher, they will make the adjustment. Therefore, the $56 should not have been allowed by the travel office even if Ms. Stephens had not noted her disapproval of it. Stephens Dec. at ¶ 41.

September 17, 2002 travel advance request denied on September 18, 2002: In September 2002, Ms. Stephens denied a travel advance request because she wanted additional information

24

from plaintiff.  Stephens Dec. at ¶ 42.  Ms. Stephens had requested a cost comparison of types of

travel to Harrisburg, Pa. and an itinerary for a trip to South Carolina.   ROI at 209-12.

In 2002, Ms. Stephens did not approve plaintiff's requested trip to Canada to examine a

taxpayer who had previously been examined. Stephens Dec. at ¶ 38.  Plaintiff requested to travel

to Canada to audit a taxpayer when she previously had completed the examination of one year and

had closed the case "No Change" or "Change, No Change" meaning no tax due but a change to

taxable income.  *Id.*  Because of the results of the previous examination and the burden it would

place on the taxpayer to start another examination where IRS made no significant changes, Ms.

Stephens  made a decision that it was not good business, nor would it be productive for

compliance, to initiate another examination of the taxpayer. Stephens Dec. at ¶ 38; and e-mails

June 11-13, 2002, ROI at p. 58.  Therefore, the trip to Canada was not approved.

**Assignments:**

Plaintiff complains that Ms. Stephens failed to assign to her cases of a complexity that are

consistent with her grade.  Complaint at ¶15.  Billy Lera aff. at ROI p. 173, 180.  She complains

that she was not given an opportunity to act as manager in Ms. Stephens's absence while a GS-12

co-worker and other employees not in her group were called upon to act as manager.  Complaint

at p. 16; Billy Lera aff, ROI at p. 173-174, 181. She also complains that in January 2002, she was

directed to work a case that was in her case inventory.  Complaint at ¶17; Billy-Lera aff., ROI at

p.4, 182.

None of these is an adverse employment action.  This Court has held that denial of

temporary acting designations is not an adverse employment action. *Taylor v. F.D.I.C.*, 132 F.3d

25

753, 764 (D.C.Cir.1997); *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir.2002); *Patterson v. Johnson,* 391 F.Supp.2d 140, 148 (D.C.2005).

All cases are assigned to Ms. Stephens' group from the Plan and Special Program Section (PSP). Stephens Dec. at ¶ 28. Based on what is received, she assigns the cases based on the employee's grade level, current inventory level, age of cases, statute of limitations, joint committee status (when a case involves over a million dollar refund) and claims (taxpayer files for a refund). *Id.* She assigned cases to plaintiff based on the above factors. *Id.* Plaintiff had a top priority case involving more than $1million in refunds in her inventory for over three years. This was a major factor in assigning new cases to plaintiff. *Id.* Plaintiff has submitted no evidence as to the complexity or lack thereof of her cases or the nature of her case load. Plaintiff had been on leave from the office for approximately two months. Defendant submits that in view of the aged cases in her inventory and observed deficiencies in her paperwork, it was good management not to load plaintiff with numerous complex matters. See Tillotson Dec. at p. 2, ¶(1)(c)("To receive new cases a revenue agent must keep their inventory current and flowing to completion.")

The report for plaintiff's cases showed that in 2001, plaintiff had approximately 15 cases with 32 tax years in her inventory. Stephens Dec. at ¶29. One had been assigned 1,114 days; 9 tax years were over 500-873 days old, and 4 were over 200 days old. *Id.* Due to the number of old cases in plaintiff's case load, among Ms. Stephens' priorities was reviewing the older cases and checking for possible statute of limitations issues. *Id.* at ¶ 30. At the beginning of the year 2002, she did not assign plaintiff new cases due to the number of over-age cases in plaintiff's inventory. *Id.* at ¶ 31. Taxpayers and/or their representatives were contacting the IRS to convey their frustration with the time it was taking plaintiff to complete their examination. *Id.*

Additionally, Ms. Stephens did not refuse to assign cases to plaintiff because they may involve international travel, nor has she refused to allow plaintiff to travel to foreign countries if it is required to carry out her duties. *Id.* at ¶ 32.   In 2002, she approved  plaintiff's  travel to Toronto, Canada in March and to Hong Kong in April.   *Id.*  Moreover, when Ms. Stephens receives a tax return to assign, she cannot determine if foreign travel will be required from the face of the tax return. *Id.*  Whether foreign travel will be required depends on factors not necessarily reflected on the return such as where relevant documents are maintained or where the taxpayer's representative may be located.   *Id.* at ¶ 32.

In about January 2002,  plaintiff inquired about a case in her inventory which she said had not been assigned to her.  Stephens Dec. at ¶ 33. She wanted the case "deleted" from her inventory.  ROI at 408.  Review of the matter revealed that plaintiff had signed and verified that she had received the case file on June 6, 2001 and had charged work time to the case. Stephens Dec. at ¶ 33.  Cases cannot simply be deleted from the system.  They must be examined or surveyed.  *Id.*  Therefore Ms. Stephens told plaintiff to work the case.

Ms. Stephens asked people to act for her when she was out of the office on a temporary basis.  None of these acting assignments involved an increase in grade or salary. Stephens Dec. at ¶ 35.  She has not assigned plaintiff  to act for the following reasons: Plaintiff never expressed an interest to act as manager; plaintiff worked flexiplace often and is not in the office; Ms. Stephens did not know her availability to act because she did not provide her a monthly calendar of her audit plans as requested at the beginning of the year. *Id*.  When Ms. Stephens is going to be out of the office, she first usually asks other managers to act for her in order not to interrupt the revenue agent's work.  *Id.*  Sheryl Templeman is a GS 12 Revenue Agent in Ms. Stephens' group.  She

assigned Ms. Templeman to act because she was scheduled to be in the office.  She was acting on an as needed basis only. *Id.*

Moreover, time and attendance records reflect that plaintiff was not available to act during most of the relevant time period.  Plaintiff was on leave, out of the country or on flexiplace on all but approximately seven days,  when someone was assigned to be acting.  See Stephens Dec. at ¶ 37.

**Leave**

Another alleged act of retaliation was Ms. Stephens' denial of administrative leave for an appointment with an EAP counselor on March 4, 2002. Complaint at ¶ 18; Billy Lera aff, ROI at p 183. No copy of a denied leave request in March 2002 is evidenced in the ROI.  Ms. Stephens does not remember plaintiff requesting leave in March.  Stephens Dec. at ¶ 57.  However, plaintiff has stated that during a group meeting around the end of March 2002, plaintiff brought up the topic of taking administrative leave to speak with an EAP Counselor. Billy Lera aff, ROI at p 183. The Union President emphasized that the employees were entitled to administrative leave and did not have to take sick or annual leave.  At the meeting, Ms. Stephens said she was unaware of that, and that it was her understanding that an employee has to take annual or sick leave.  *Id.*   When plaintiff asked for leave to attend an EAP meeting in August 2002, Ms. Stephens allowed her one hour of administrative leave pursuant to the regulations.  ROI at 312-13.

Failure to know the rules applicable to EAP leave is a legitimate non-discrimnatory reason for Ms. Stephens' action.

**Performance Appraisal, Proposal for Formal Reprimand**

The D.C. Circuit has noted that formal criticism or poor performance evaluations are generally not adverse employment actions if they do not affect the employee's grade or salary. *See Brody*, 199 F.3d at 458; *see also Russell v. Principi*, 257 F.3d 815, 819 (D.C.Cir. 2001) (negative performance evaluations are not adverse actions absent some effect on terms, conditions or privileges of employment); *Lewis v. Glickman*, No. Civ. A 96-0358, 1997 WL 276084, at *6 (E.D.La. May 15, 1997) (late receipt of performance appraisal is "of no moment") . *See Weigert v. Georgetown Univ.*, 120 F.Supp.2d 1, 17 (D.D.C.2000) ("Formal criticism and poor performance evaluations do not ordinarily constitute 'adverse actions.' "); *Brodetski v. Duffey*, 141 F.Supp.2d 35, 47 (D.D.C.2001) ("[C]riticism of an employee's performance unaccompanied by a change in position or status does not constitute adverse employment action."); *Burton v. Batista* 339 F.Supp.2d 97 (2004), 110 -111 (D.D.C. 2004)

### Performance evaluation

Plaintiff claims retaliation in relation to her April 30, 2002 annual performance appraisal contending it was late and unfair. Complaint at ¶19. Billy-Lera aff, ROI at p. 184-186. Plaintiff received a numerical rating of 3 (fully successful) for two critical elements while her previous manager had rated her 4 (exceeds fully successful) on those elements. *Id* at 184. Plaintiff's overall performance rating from Ms. Stephens was "Exceeds Fully Successful." *Id.* at 451. Defendant submits that exceeds fully successful, the second highest rating on a scale of 5, is hardly a negative performance rating. Ms. Stephens based her evaluation on the departure evaluation prepared by Mr. Moseley, Ms. Stephens' review of plaintiff's cases and comments and memoranda of the Acting Manager. Stephens Dec. at ¶52. There were errors and omissions in

paperwork in plaintiff's files, much of her work was not timely, there were issues concerning expiration of statute of limitations, and management had been contacted by taxpayer representatives with complaints about her handling of cases.  *Id.* at ¶ 52.

Plaintiff 's annual performance evaluation also was not late.  Due to a change in performance elements, performance appraisals were pushed back by two months.  Stephens Dec. at ¶54.  Additionally managers are given a 1 month grace period for completion of the evaluations. *Id.*

Plaintiff also contends that her mid-year evaluation in August 2002 was unfair.  Complaint at ¶20.  Ms. Stephens gave plaintiff a memorandum dated July 30, 2002 in which plaintiff was rated 3 (fully successful) on four job elements and 4 (exceeds fully successful) on one job element.  ROI at p. 271, 187.  Ms. Stephens based her mid-year evaluation on case reviews conducted from February 1 to 30, 2002.  Stephens Dec. at ¶56.

Plaintiff has demonstrated no tangible adverse consequences from any of these actions, and has not shown them to be material.

**Employee Performance Folder Review/ Proposal for Formal Reprimand**

Plaintiff claims retaliation because Ms. Stephens in August 2002 restricted the amount of time plaintiff was allowed to review her employee performance folder (EPF), and because items were in the EPF which had not been discussed with plaintiff.  Complaint at ¶21.  Plaintiff claims that in August 2002 she was only given 150 minutes to review her folder.  ROI at p. 188-189.  She also claims retaliation because a proposed letter of reprimand – Ms. Stephens' recommendation to the territory manager that plaintiff be reprimanded for insubordination -- was in plaintiff's EPF.

Billy-Lera aff, ROI at p. 188, 276.  The territory manager had not approved Ms. Stephens'

recommendation that an official letter of reprimand be issued. *Id.*

Letters of warning, reprimands, and proposals for formal reprimand are not adverse

actions because they do not affect plaintiff's grade,  salary or benefits. *Brown v. Brody,* 199 F.3d

at 458.  Therefore, the appearance in the file of a rejected proposal that an official reprimand be

issued is not an adverse employment action.  "Title VII does not provide relief for victims of

attempted retaliation."  *Stewart v. Evans,*  275 F.3d 1126, 1135 (D.C.Cir. 2002).

Indeed, Ms. Stephens had  issued to plaintiff in June 2002, an admonitory memorandum

concerning exactly the same behavior, subject "Your Conduct and Behavior."  ROI at p. 54-55.

This memorandum also was in plaintiff's personnel file. *Id.* at 55.

The proposed letter of reprimand was in the file because it is Ms. Stephens' practice to

retain a copy of a document in the front pocket of the binder until she gets back a signed copy or

second level management approval.  Stephens Dec. at ¶50.  Also, the EPF is solely the manager's

file; it is not disclosed to ranking committees for use in making selection decisions.  *Id.*

**Frequently Interrupted work and exhibited overt hostile public behavior**

Plaintiff also claims that Ms. Stephens frequently interrupted her work and exhibited

hostile public behavior.  Complaint at ¶12.  She claimed that she "often received telephone calls

from Ms. Stephens demanding me to come to her office to discuss urgent issues."  Billy-Lera aff,

ROI at p. 172.  Plaintiff does not allege that any of the telephone calls was not work related.

Being summoned to a supervisor's office to discuss business matters is a common part of

employment.  Plaintiff also has not presented any objective evidence of any "hostile" behavior on

the part of Ms. Stephens.

31

**Maligned**

Plaintiff also claims retaliation because Ms. Stephens "maligned" her by falsely stating that plaintiff has a larger than usual number of over age cases in her inventory. Complaint at ¶9. Humiliation or a public loss of reputation alone does not constitute an adverse action. *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002). Moreover, it is clear that plaintiff did have a number of aged cases in her inventory. Stephens Dec. at ¶ 29.

Plaintiff's many specific factual allegations do not support her individual retaliation claims. The undisputed facts show that these allegations do not amount to retaliation under Title VII.

**Plaintiff Has Failed to Meet Her Burden of Establishing an Objectively Hostile or Abusive Work Environment.**

Employees are also protected from a hostile work environment stemming from discrimination/retaliation. A violation occurs where a plaintiff's workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). To make a prima facie case of a hostile work environment, a plaintiff must show: (1) that they are a member of a protected class; (2) that they are subject to unwelcomed harassment; (3) that the harassment occurred because of their protected status; and (4) that the employer knew or should have known of the harassment and failed to take preventative action. *Jones v. Billington*, 12 F.Supp. 2d 1 (D.D.C. 1997). Beyond simply a mechanical test, courts judge the workplace conditions by looking at the totality of the circumstances. These factors include the frequency of the conduct in question, its severity, its offensiveness, and its impact on

32

work performance. *See Faragher v. City of Boca Raton*, 524 U.S. 774, 787-88 (1998); *Raymond v. United States Capitol Police Board*, 157 F.Supp. 2d 50, 58 (D.D.C. 2001).

Vital to a claim is the connection between the alleged hostility and a plaintiff's protected status. "Everyone can be characterized by sex, race, ethnicity, and many bosses are harsh, unjust, and rude. It is therefore important in hostile environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination[/retaliation]. Otherwise, the federal courts will become a court of personnel appeals." *Bryant v. Brownlee*, 265 F.Supp. 52, 63 (D.D.C. 2003) (*citing Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)). The Supreme Court has stated its hope that "these standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788.

"[I]n assessing whether plaintiff has established even a *prima facie* case of a hostile working environment, one must look at the entire atmosphere in which plaintiff worked to see if it meets the *Harris* requirements." *Rowland v. Walker*, 245 F.Supp.2d 136, 142 (D.D.C.,2003), *affirmed by* 2003 WL 21803321 (D.C.Cir. Jul 31, 2003) (No. 03-5082), rehearing denied (Oct. 10, 2003). The *Harris* standard has been articulated by the D.C. Circuit as follows:

> " 'When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.' " *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations and internal quotation marks omitted)).

*George v. Leavitt,* 407 F.3d 405, 416 (D.C.Cir. 2005).

> "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the

33

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. The Supreme Court has made it clear that "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

*Id*.

In determining whether plaintiff  established her prima facie case the court in  looking at the evidence must draw all "justifiable inferences" in favor of the non-moving party.  However, "the non-moving party must do more than cast doubt on the facts – he must **provide evidence** that would allow a reasonable juror to find in his favor."  *Rowland v. Walker,* 245 F.Supp.2d at 141. (Emphasis added.)

## PLAINTIFF'S  ALLEGATION

Plaintiff's claim of a hostile work environment is based on individual incidents of alleged retaliation.  As indicated above, none of the incidents amounts to a prima facie case of retaliation. Thus she cannot meet her burden of showing a hostile work environment.

To begin with, as discussed above, the Court concludes that plaintiff cannot sustain her claims of discrimination as to these alleged events, in large part because they were not adverse employment actions.  Hence, they cannot satisfy the requirement that plaintiff show a pervasive, severe and discriminatory [/retaliatory] hostile work environment.

*Lester v. Natsios,*  290 F.Supp.2d 11 , 32  (D.D.C., 2003).

Plaintiff's  alleged incidents also do not establish a work place permeated with discriminatory/retaliatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.  *See*

*Oncale*, 510 U.S. at 2.  Simply alleging acts of retaliation is not sufficient to prove a hostile work environment.

> Moreover, it is not at all clear that mere reference to alleged disparate acts of discrimination against plaintiff can ever be transformed, without more, into a hostile work environment claim. The courts have been reluctant to do so. See, e.g., *Gardner v. Tripp County, South Dakota*, 66 F.Supp.2d 1094, 1100-01 (D.S.D.1998) (retaliation claims distinct from hostile work environment claim; "if the same set of facts could support both claims, state and federal provisions that provide a separate cause of action for retaliatory acts would be rendered superfluous"); *Parker v. State, Dep't of Public Safety*, 11 F.Supp.2d 467, 475 (D.Del.1998) ("... the dangers of allowing standard disparate treatment  claims to be converted into a contemporaneous hostile work environment claim are apparent. Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address ..."). Discrete acts constituting discrimination or retaliation claims, therefore, are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult. See *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Here, plaintiff's reliance on discrete acts that are neither severe and pervasive nor (as the Court has already concluded) discriminatory falls short of the showing she must make to state a viable hostile work environment claim.

*Lester v. Natsios*  290 F.Supp.2d 11 , 32 -33 (D.D.C., 2003).

In the instant case, plaintiff has failed to meet her burden of proving severe and pervasive retaliatory intimidation, ridicule, or insult.

**Contacts at home in December 2001, April 2, 2002 and May 13, 2002**:  Plaintiff has presented no evidence concerning the content or timing of any of the telephone calls to her home by Ms. Stephens which demonstrate ridicule, insult, or intimidation towards plaintiff.  Plaintiff admits that the telephone calls to her in December 2001 while she was on extended leave were in relation to government business – i.e. seeking to obtain an IRS file which she had at home, and that Ms. Stephens also was responding to a telephone call from plaintiff concerning leave.  ROI at

45-46.  One of the calls, on April 1, 2002[2], was simply a message concerning a form: "Per your message on the above subject to my home on April 1, 2002 registered at 6:15 pm, attached is copy of the position and the announcement number."  Billy-Lera April 2, 2002 Memo, ROI at 213.  The timing of the call, 6:15 pm is hardly an unreasonable time to leave a message for someone.  For example,  Ms. Stephens did not call plaintiff at 3am.  No evidence concerning the alleged May 13, 2002 call appears to be in the ROI..

**Unannounced reviews of her work on August 15, 2001, March 1, March15, May 15 and June 4, 2002**: Plaintiff has provided no evidence that the reviews of her work involved intimidation, ridicule or insult.    At best plaintiff states that she does not "appreciate [Stephens'] derogatory petty notes in my activity records attachments to my cases."  ROI at 174.

The first review complained about was made while Ms. Stephens was Acting Manager in August, 2001.   Then, plaintiff complains about four spot reviews done after Ms. Stephens came on board as the permanent supervisor in mid-January 2002.  See Billy-Lera memo, ROI at 208 ("On March 27, 2002 I gave you a case for statute update and you performed a review on the case without my knowledge.  On May 6 and on May 15, you again spontaneously did the same thing.") The timing of the reviews was based on when the files came into Ms. Stephens' possession for a statute update or other purpose.  The second spot review was done approximately seven months after the first and about one and one half months after Ms. Stephens returned to work in mid-

---

[2]  Although plaintiff's affidavit refers to a call on April 2, 2002, Billy Lera Aff. at p. 3, the only documentation in the ROI pertaining to a call in April relates to a message left on plaintiff's telephone on April 1, 2002.  The message is referred to in a memorandum dated April 2, 2002. ROI at 213.

January.  The next reviews were spaced approximately 15 days to a month apart.  Defendant submits that the number of reviews was not unreasonable.

First, one would expect a new supervisor to review the work of her employees to acquaint herself with their strengths and weaknesses.  Since revenue agents are supposed to maintain their files and workpapers in a timely manner, one reasonable and effective way for management to test their compliance is through unannounced spot reviews of their work.   Second, Ms. Stephens had identified plaintiff as having aged cases and as having paperwork with errors and omissions.   It is a manager's job to ensure the employees are complying with appropriate rules and regulations and insure standards are maintained by giving prompt feedback to employees. Thus it was reasonable that she would spot check plaintiff's work.   Although plaintiff may view Ms. Stephens' notes concerning her assessment of the files as "petty," she has cited to nothing abusive or insulting about the notes showing intent to harass.   If Ms. Stephens were  a stickler for details and proper procedure, having a strict boss is one of the "ordinary tribulations of the workforce"  not sufficient to establish an abusive, hostile environment.

**Petty Memoranda**: Similarly, review of the memoranda complained about shows nothing abusive intimidating or insulting in their tone or content.

Plaintiff has presented no proof that any of the statements, memoranda, or actions of Ms. Stephens  mentioned or alluded to any protected status or protected activity. There is a total absence of proof of discriminatory overtones such as racial slurs, status slurs, or derogatory comments to her about her June 2001 EEO complaint against other supervisors.  Indeed, Ms. Stephens was not even assigned to the Washington D.C. office when the alleged discrimination occurred. *See Rowland v. Walker,*  245 F.Supp.2d at 143. (treatment did not rise to level of

37

discriminatory hostile work environment where statements made no mention of plaintiff's race or gender and there was no evidence "that plaintiff endured jokes, insults, or calumny based on either his race or gender.")

Plaintiff also specifically alleges intimidation or hostility in her complaint in paragraphs 11 and 12 in which she states that Ms. Stephens "stood directly over her desk in an intimidating manner" and "exhibited overt and hostile public behavior toward Billy-Lera." The alleged incidents of standing or hovering were on February 26, March 1, and June 4, 2002. ROI at p. 176. The hostile public behavior is not otherwise described or dated in the ROI.

Although the alleged intimidating "hovering" may have been offensive to plaintiff, it does not amount to the severe or physically threatening conduct required for an actionable hostile work environment claim. *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998)

Appellant has failed to present evidence that any of the alleged acts were done due to discriminatory/retaliatory animus.

> It is [] important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals. *See, e.g., Byrnie v. Bd. of Educ.,* 243 F.3d 93, 103 (2d Cir.2001) ("[The court's] role is to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments.") (quoting *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir.1999) (internal quotation marks omitted)); *see also Rojas v. Florida,* 285 F.3d 1339, 1342 (11th Cir.2002) (federal courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision") (internal quotation marks omitted).
>
> * * *
>
> Facially neutral incidents may be included, of course, among the "totality of the circumstances" that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on

38

sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory. *Compare Howley,* 217 F.3d at 155-56 (holding that fact-finder could reasonably infer that facially sex-neutral incidents were sex-based where the perpetrator had previously made sexually derogatory statements), *and Williams v. Gen. Motors Corp.,* 187 F.3d 553, 560-64 (6th Cir.1999) (where plaintiff was ostracized on multiple occasions, the use of sex-specific slur in some incidents justified the inference that all of the incidents were sex-based, allowing the facially neutral incidents to be considered in hostile work environment analysis), *with Bowman v. Shawnee State Univ.,* 220 F.3d 456, 464 (6th Cir.2000) (objectionable but facially sex-neutral behavior by one person could not be considered in hostile work environment claim where there was no evidence of that person's bias).

*Alfano v. Costello,* 294 F.3d 365, 377-378 (2nd Cir.2002).

## CONCLUSION

Plaintiff has failed to establish a prima facie case of retaliation.  Plaintiff has failed to establish that any of the acts complained of arose from discriminatory/retaliatory animus.  There were legitimate non-discriminatory reasons for defendant's actions.  Plaintiff has failed to establish severe or pervasive retaliatory conduct; thus, plaintiff  has failed to establish that the environment as a whole created by Ms. Stephens can be said to be one of severe hostility that is full of discriminatory/retaliatory intimidation, ridicule, and insult such that the conditions of employment have been altered.  *See Harris*, 510 U.S. at 21.

The record simply is devoid of objective evidence that any of Ms. Stephens' or the Agency's decisions or actions were based on plaintiff's filing of claims of discrimination against other supervisors.

Since there is no genuine dispute as to any material fact, summary judgement should be granted to defendant as to Count One of the complaint.

Respectfully submitted,

_____

KENNETH L. WAINSTEIN, D.C. Bar No. 451048
United States Attorney


_____

RUDOLPH  CONTRERAS, D.C. Bar No.  434122
Assistant United States Attorney


_____

RHONDA C. FIELDS
Assistant United States Attorney
555 Fourth Street, N.W.
Civil Division
Washington, D.C.  20001
(202) 514-6970

Of Counsel:
Robert M. Mirkov
Office of Chief Counsel - I.R.S.
General Legal Services
950 L'Enfant Plaza, SW - 2nd Floor
Washington, DC   20024