## TIME & ATTENDANCE SHEET

EMPLOYEE: Bernadette Billy-Lera

PAY PERIOD: 15

|  | Beginning Balance | Earn | Used | Ending Balance |
|---|---|---|---|---|
| ANNUAL |  |  |  |  |
| SICK |  |  |  |  |
| CREDIT |  |  |  |  |

| DATES |  | EMP. Init | TIME IN | TIME OUT | AMNT & TYPE OF LEAVE | COMMENT |
|---|---|---|---|---|---|---|
| SUN | 7/29 |  |  |  |  |  |
| MON | 30 |  |  |  | London |  |
| TUES | 31 |  |  |  |  |  |
| WED 8/ | 1 |  |  |  |  |  |
| THUR | 2 |  |  |  | ↓ |  |
| FRI | 3 |  |  |  |  |  |
| SAT | 4 |  |  |  |  |  |
| SUN | 5 |  |  |  |  |  |
| MON | 6 |  |  |  |  |  |
| TUES | 7 |  |  |  | (415) 392-7755 |  |
| WED | 8 |  |  |  | Sir Frances Drake Hotel |  |
| THUR | 9 |  |  |  | San Francisco, CA |  |
| FRI | 10 |  |  |  |  |  |
| SAT | 11 |  |  |  | ↓ |  |

PLEASE RETURN TO Ernie BY 10:00am on Thursday

Judy
12/11/02

388

**Examination Branch**
**Time & Attendance Sheet**
**Group 1110/2110**

Employee: _B. Billy-LeeA_
Pay Period: _16_

|  | BEG. / END. BALANCE | EARNED | USED |
|---|---|---|---|
| ANNUAL |  |  |  |
| SICK |  |  |  |
| CREDIT |  |  |  |
| COMP |  |  |  |

| DATES | EMP. INITIALS | TIME IN | TIME OUT | AMOUNT & TYPE OF LEAVE | COMMENT |
|---|---|---|---|---|---|
| SUN | Aug 12 |  |  |  |  |
| MON | 13 | 9:00 | 5:30 | AL |  |
| TUES | 14 | 8:00 | 4:30 | 8CL ⟶ 8hrs flex/lost |  |
| WED | 15 |  |  | 4 hrs SL |  |
| THUR | 16 |  |  | 3hr 8hr In office |  |
| FRI | 17 |  |  | In office |  |
| SAT | 18 |  |  |  |  |
| SUN | 19 |  |  |  |  |
| MON | 20 |  |  | field |  |
| TUES | 21 |  |  | Sheraton |  |
| WED | 22 |  |  |  |  |
| THUR | 23 |  |  |  |  |
| FRI | 24 |  |  |  |  |
| SAT | 25 |  |  |  |  |

YEAR 2001

_389_

Complete the end of week date MM/DD/YY and it will change all other days and all other forms
The other pages of the file are protected.  Print out using "entire workbook"

**Group 2811 Sign In Log**

**Week Ending Saturday
September 8, 2001**

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday 09/02/01 | | | | | |
| Monday 09/03/01 | | HOLIDAY | | | |
| Tuesday 09/04/01 | 8 | 4:30 | | | |
| Wednesday 09/05/01 | 8 | 4:30 | | | |
| Thursday 09/06/01 | 6:30 | 10:30 | In Office  8hrs. flexi at home | | |
| Friday 09/07/01 | 8:00 | 4:30 | flexi | | |
| Saturday 09/08/01 | | | | | |

| Manager Signature |
|-------------------|
| |

*390*

Group #11 Sign In Log

Week Ending Saturday
9/15/01

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday | | | flexi | | |
| Tuesday | | | flexi | | |
| Wednesday | | | flexi | | |
| Thursday | 9:45 | | (partial flexi 7:30am) | | |
| Friday | | | | | |
| Saturday | | | | | |

What time, S

| Manager' Signature |
|--------------------|
| |

391

*Bernadette*

**Group 2011 Sign In Log**

**Week Ending Saturday**
*10-.13- 0 1.*

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|---|---|---|---|---|---|
| Sunday | | | | | |
| Monday 10- 8 | | | *Holiday* | | |
| Tuesday 10- 9 | | | | | |
| Wednesday 10-10 | | | *8 plus 1 credit hr* | | |
| Thursday 10-11 | | | *Flexi place* | | |
| Friday 10-12 | | | *Flexi place* | | |
| Saturday | | | | | |

| Manager' Signature |
|---|
| |

*392*

*Bernadette*

**Group 2511 Sign In Log**

**Week Ending Saturday**

*10-20-01*

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday 10-15 | | | | | |
| Tuesday 10-16 | 2 credit hrs | Flexi Place | | | |
| Wednesday 10-17 | | Flexi Place | | | |
| Thursday 10-18 | 8:00 | 4:30 | | | |
| Friday 10-19 | | | | | |
| Saturday 10-20 | | | | | |

*What time?*

| Manager Signature |
|-------------------|
| |

*393*

*Bill : Lisa*

Group #911 Sign In Log

Week Ending Saturday
*10 - 27 - 01*

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday *10-22* | | | | | |
| Tuesday *10-23* | | | *Flexi place* | *1 credit hrs taken* | |
| Wednesday *10-24* | | | | | |
| Thursday *10-25* | | | | | |
| Friday *10-26* | | | | | |
| Saturday | | | | | |

*when??*

Manager Signature

*394*

Billy - Lera

**Group #11 Sign In Log**

**Week Ending Saturday**
**11- 2- 01**

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday 10/29 | | | Flexi place | | |
| Tuesday 10/30 | 8:00 | 5:30 | 1 LE W | | |
| Wednesday 10/31 | 8:00 | 3:30 | 1 CLT | | |
| Thursday 11/1 | 8:00 | 1:30 | 3 AL | | |
| Friday 11/2 | | | 8 AL | | |
| Saturday | | | | | |

No entry
9:30 am 11/1/
ens

| Manager' Signature |
|--------------------|

395

Group #11 Sign In Log

Week Ending Saturday
11-10-01

Billy - Dora

news
Called 4SL
@ 9.15 am
11/5/01

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday 11/5 | | | 4 / S/L per Bernie/dol pm 11/5/01 | | |
| Tuesday 11/6 | | | | | |
| Wednesday 11/7 | | | | | |
| Thursday 11/8 | | | | | |
| Friday 11/9 | | | | | |
| Saturday | | | | | |

Manager' Signature _____ 11/5/01 due to close week

396

Billy Lera

**Group #11 Sign in Log**

**Week Ending Saturday**
11 - 17 - 0.1

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday | | | | | |
| Tuesday | | | *Holiday* | | |
| Wednesday | | | | | |
| Thursday | | | S/V | | |
| Friday | | | | | |
| Saturday | | | | | |

Manager Signature

*391*

Group #11 Sign In Log

Week Ending Saturday
11-24-01

Billy Lera

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday | | | | | |
| Tuesday | | | S/L | | |
| Wednesday | | | S/L | | |
| Thursday | | | S/L | | |
| Friday | | | Thanksgiving | | |
| Saturday | | | S/L | | |
| | | | | | |

Manager Signature

398

Group #11 Sign In Log

*Billy Lene*

Week Ending Saturday
12-01-01

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday | | | | | |
| Tuesday | | | | | |
| Wednesday | | | | | |
| Thursday | | | | | |
| Friday | | | | | |
| Saturday | | | | | |

Manager' Signature

*399*

Group #11 Sign In Log

Week Ending Saturday
12-8-01

Billy Lere

| Date | Time In | Time Out | Comments Phone # if | | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|--|---------------|------------------|
| Sunday | | | | | | |
| Monday | 2/3 | | | | | |
| Tuesday | 12/4 | | | | | |
| Wednesday | 12/5 | | | | | |
| Thursday | 12/6 | | | | | |
| Friday | 12/7 | | | | | |
| Saturday | | | | | | |

Manager' Signature

400

Group #11 Sign In Log

Week Ending Saturday
12-15-01

Billy, Lerd

| Date | Time In | Time Out | Comments Phone # if | | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|--|---------------|------------------|
| Sunday | | | | | | |
| Monday 12/10 | | | | | | |
| Tuesday 12/11 | | | | | | |
| Wednesday 12/13 | | | | | | |
| Thursday 12/14 | | | | | | |
| Friday 12/15 | | | | | | |
| Saturday | | | | | | |

Manager' Signature

401

_Betty Ter_

**Group #11 Sign In Log**

**Week Ending Saturday**
12-22-01

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday 12/17 | | | | | |
| Tuesday 12/18 | | | | | |
| Wednesday 12/19 | | | | | |
| Thursday 12/20 | | | | | |
| Friday 12/21 | | | | | |
| Saturday | | | | | |

| Manager' Signature |
|--------------------|

402

_Billy Fera_

| | Group #11 Sign in Log |
| --- | --- |
| | Week Ending Saturday |
| | 12-28-01 |

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
| --- | --- | --- | --- | --- | --- |
| Sunday | | | | | |
| Monday 12/24 | 12 | | | | |
| Tuesday 12/25 | | | _Holiday_ | | |
| Wednesday 12/26 | | | | | |
| Thursday 12/27 | | | | | |
| Friday 12/28 | | | | | |
| Saturday | | | | | |

| Manager' Signature |
| --- |
| |

403

Billy - Lora

**Group 2011 Sign in Log**

**Week Ending Saturday**
1-4-02.

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday 12/31 | | | A/L | | |
| Tuesday 1/1 | | | Holiday | | |
| Wednesday 1/2 | | | | | |
| Thursday 1/3 | | | A/L | | |
| Friday 1/4 | | | | | |
| Saturday | | | | | |

| Manager Signature |
|-------------------|
| |

404

*Prepared by Secretary*

*This is each RIA's responsibility*

*- Billy Lera*

| | Group #11 Sign In Log<br>Week Ending Saturday<br>1 - 12 - 02 | | | | Type of<br>Leave | Employee<br>Initial |
|---|---|---|---|---|---|---|
| | | | | Comments<br>Phone # if | | |
| Monday<br>1 - 7 | | | | | | |
| Tuesday<br>1 - 8 | | | | | | |
| Wednesday<br>1 - 9 | | | | | | |
| Thursday<br>1 - 10 | | | | | | |
| Friday<br>1 - 11 | | | | | | |
| Saturday<br>1 - 12 | | | | | | |

Manager' Signature

*405*

*Billy Lena*

**Group #11 Sign In Log**
*5/11*
**Week Ending Saturday**
*1-19-02*

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday 1-14 | 8:00 | 4:30 | | | |
| Tuesday 1-15 | 8:00 | 4:30 | *NEW* | | |
| Wednesday 1-16 | 8:00 | 3:30 | *Tele ICRT* | | |
| Thursday 1-17 | 8:00 | 4:30 | | | |
| Friday 1-18 | | | *Flexi place* | | |
| Saturday | | | | | |

Manager' Signature

*406*

Billy Lera

Group #11 Sign In Log
4H 1111
Week Ending Saturday
1-26-02

| Date | Time In | Time Out | Comments Phone # if | Type of Leave | Employee Initial |
|------|---------|----------|---------------------|---------------|------------------|
| Sunday | | | | | |
| Monday | | | Holiday | | |
| Tuesday | | | Alexi | | |
| Wednesday | | | | | |
| Thursday | | | | | |
| Friday | | | | | |
| Saturday | | | | | |

| Manager' Signature |
|---|

407

# MEMORANDUM

To: Evelyn Stephens, Manager Group 1111

From: Bernadette Billy-Lera, Revenue Agent, Group 1111

Subject: ~~████████████~~ 199912

Date: January 31, 2002

Cc: Letitia Thomas, ERCS Coordinator

I do not have physical possession of the above case. In addition, I did not make a request; this case was NEVER assigned to me.

I would like to know why was this case featured on my 4502 without the proper protocol.

I was on sick leave for ten (10) weeks and upon my return on January 14, 2002 no cases were assigned to me.

Please make all corrections to delete this case from my inventory.

If you have any questions please do not hesitate to call me. Thanking you in advance.

Bernadette,
I do not know how the case appeared on your 4502. Hopeful the ERCS Coordinator and/or secretary have the answer. However, I do know how it's charged to you now. It is because you charged 2 hours to the case. If no time was applied I must wonder. I have not reviewed 4502 prior to January. In January you charged the time. See email sent today.

**Stephens Evelyn M**

| | |
|---|---|
| **From:** | Stephens Evelyn M |
| **Sent:** | Friday, February 01, 2002 8:18 PM |
| **To:** | Billy-Lera Bernadette |
| **Cc:** | Thomas Letitia; Payton Linda B |
| **Subject:** | 1999 Case on ERCS |

Bernadette,
The case with initials RT 9912 is currently on your 4502 in status 12 because you charged time to it last cycle.  How it got on your 4502 I do not know.  If a case is on your 4502 and you did not work on it, why would you charge time to it?  I did not assign this case to you or updated it to you.  If you did not request it or establish it, I cannot explain it.  I do know we cannot delete cases off the system. They must be closed in some manner, surveyed or examined.

Letitia will you check the system and see how this case appeared on Bernadette 4502?  Can you look in the background of this case on the system, date entered the 4502 cycle.

Linda, will you check ALL group input documents for this case (ALL YEARS) to see if an input error occured.  Check the December input because Bernadette indicated it was not on her IVL in December.

It is possible during the ERCS update, the system errored.

*Evelyn M. Stephens*
*International Manager  1111I2111*
*202-374-1683*

1

*409*

Case assigned to RA

RA closed case to Mgr as survey require
assignment
Case assigned 6/6/01 per 3210
acknowledged attached.

RA is requiring to acknowledge the
case is her responsibility due in her
control.
It appears
PSP dejl and properly update to group
in 6/01.

RA acknowledged receipt and has had
the case in her possession since 6/6/01.

410

DOCUMENT TRANSMITTAL

●: EXAM GROUP 1110
   CP:IN:D:C:EX:HQ:1110
   Attn:
   950 L'ENFANT PLAZA SO., SW
   WASHINGTON, DC 20024

Release Date: 03-15-2001 | Page 1 of 1

Transmittal Code:

Number: 01-18529

Comments: 1997 TAX YEAR ALREADY ASSIGNED TO   YOUR GROUP

| QTY | Form | Returns Transferred to Org 1110 Case File Identification | | Rec'd. |
|-----|------|------|------|------|
| 1 | 1120 | HOLDINGS LTD    199812    02 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

FROM:
   PSP
   S:C:ST:I:E
   950 L'ENFANT PLAZA SO.S.W.
   WASHINGTON, DC 20024

Releasing Official:
   YVETTE SMITH

Received and verified:
   *B. Bailey Free*

Date Acknowledged: 6/6/01

● rm 3210          Part 1 - Recipient's Copy          Department of the Treasury

411

MEMORANDUM

To: Evelyn Stephens

From: Bernadette Billy-Lera

Subject: ████████████99812████████████

Date: January 23, 2002

This morning I again received the above case for processing. To date the case still does not reflect being in my inventory. Per IDRS the case is not assigned to any one or any group. See my memo dated January 16, 2002.

Again I will reiterate the statute expires in September. I did not initiated opening this case. Form 5345 ERCS input document, which you issued to me with this case, is out dated. This is a personal computerized form. The Service does not use this form. On the otherhand, however, Form 5345 is used when an Agent is requesting controls of a return he/she is requesting for audit. I did request this case.

Today you showed me an AIMS report showing this case was assigned to me as of January 17, 2002. To date there is no ERCS control of this case being established to me or to our group.

Per you instruction I am surveying this case.

If you have any questions please do not hesitate to speak to me.

412

# AFFIDAVIT
# OF
# JEANNIE FISHER
# (Principle Management Official)
# AND
# ATTACHMENT

AFFIDAVIT         DISTRICT OF COLUMBIA         CITY OF WASHINGTON

1. Please list the city, state and county where you are currently employed. Washington, DC.

2. Please state your name, place of employment, position title, series and grade.

   Jeanetta (Jeannie) B. Fisher

   Territory 1 Manager, SB/SE Compliance, Area 15, IRS

   IR-0340-SM

3. How long have you been employed with the Internal Revenue Service? 15 years. How long have you been assigned to your current position? 2 years, 10 months.

4. Please state your employment background for two (2) years prior to your current position. Examination Branch Chief, GS-0512-14

5. What is your supervisory/working relationship with the Complainant and the duration of this relationship? 2nd level supervisor since January 2000

6. Are you aware of the Complainant's previous participation in the EEO complaint process? Yes. If so, specifically when and how did you become aware?

   1) Contact by EEO counselor to prior Acting Manager, somewhere around Jan/Feb. 2001 – allegation of harassment regarding attempts to conduct a workload review, directing employee to report to office, and case activity.

   2) Meeting with EEO by prior Acting Manager, Feb. 2001 – discrimination charges in reference to workload review completed in January 2001.

   3) October 2001 – Unsworn declaration to Ms. Wolf, EEO Investigator– various issues.

   4) February 2002 – Complaint to Director Commission Complaint Unit

   5) April 2002 – contact by Gregory Jones to current manager - allegation of discrimination – travel vouchers

   6) July 3, 2002 – contact from EEO to Area Director – alleged harassment

   7) July 16, 2002 – ECMS control to AD – correspondence to Headquarters

   8) August 9, 2002 – meeting with SB/SE EEO regarding:

        June 2, 2002 – letter to Bob Wenzel

        June 17, 2002 – complaint to John Robinson

        June 19, 2002 – memo left on SB/SE EEO Specialist's desk in NCFB

Page 1 of 6

413

Whether the Complainant was subjected to harassment since May 2001 in retaliation for her previous participation in the EEO complaints process, when her manager:

    (1) subjects her to unannounced audits, restricts her travel on audits to foreign countries, and fails to assign her cases requiring international travel.

1. Were you aware of the alleged harassment? No. Managers do not conduct "audits" on employees. Managers are required to conduct a variety of reviews in order to provide documented feedback regarding performance, manage the cases assigned to their group and facilitate closure of examinations. Travel to foreign countries is very expensive. The cost of travel is balanced with the need for examination of actual books and records and the expected benefit from personal inspection verses other means of verification/audit. Case assignment to the groups is based upon the examination plan for the fiscal year. Case assignment to individual agents is based upon matching skills and grade with issues, workload volume and attempts to group examinations in common geographic areas for travel/budget purposes.

2. Have you observed any harassment by alleged harasser? No

3. What is your policy regarding harassment? When was it implemented? How and when was this conveyed to employees? Area 15 policy is consistent with SB/SE and the overall organization: zero tolerance. Annual briefings are conducted with all employees regarding harassment (sexual or otherwise) and Code of Conduct.

4. Have there been any other complaints of harassment in office? When? Describe. What was done? Complaints have arisen from the Collection Division regarding the assignment of work and the restrictions on travel as a result of the Collection Re-engineering initiative and the assignment of work based upon nationally defined RISK factors. When the prior A/C International was reorganized and aligned with SB/SE Operating Division, the employees of the former A/C International had a significant adjustment to a different reporting structure and being held responsible for the same policies, guidance and direction as other domestic areas. In the past they were not in the same line of authority, i.e. A/C Collection and, as such, did not always receive the guidance and policy direction as the domestic districts.

    (2) writes her petty memoranda, stands over her desk while she is working, interrupts her frequently, exhibits intimidating behavior, most recently on June 4, 2002, frequently

414

asks her to come to her office; and contacts her at her home while she is on leave and/or during non-work hours.

1. Were you aware of the alleged harassment? I am aware of incidents of June 4 that were acts of insubordination by the employee and were witnessed by other employees, including the Vice President of NTEU. I am also aware that this employee was contacted at home in December 2001 in an attempt to retrieve a case file in order to respond to the Taxpayer's representative. Contact was made by the Acting Manager and also by me with no response by the employee. She made contact with the current manager (Ms. Stephens) via voice mail and the manager returned the call to the employee's home. The employee had been directed to bring all inventory to the office prior to extended sick leave. This was to ensure that the cases were available for any necessary action. If so, when did you become aware of the alleged harassment? I received a phone call from the employee's attorney (Mark Leman on 12/11/01 at 1:59 PM) stating that the requested information was in a cabinet at her home for which she had lost the key. When did the Complainant report the harassment to you or other management? I have not seen the documents or information given to various offices. The Complainant did not report harassment to me or to other management in Area 15 to my knowledge.

2. What actions did you take as a result of the complaint of harassment? There was no harassment of the employee rather actions by the Acting Manager to answer a very irate taxpayer and to address a short statute on a case that had been on-going for some time. Questioning of the alleged harasser? Ms. Stephens was on leave; however, she told me that she had called Bernadette in response to Bernadette's voice message and that Bernadette said that someone could come by her home and pick up the case file. I attempted to do so as I live in the Bowie area, but was unable to contact Bernadette to arrange for the pick up. Disciplinary actions against the harasser? No. Monitoring of the alleged harasser after incident(s)? No.

3. Have you or other management, if known, had other reports of alleged harassment by this harasser? Regarding Ms. Stephens, yes, there is a current EEO mediation regarding reasonable accommodations for medical conditions. Has the Complainant complained about harassment from other individuals? Yes, the employee has had

issues with every manager assigned in the past two years.  Past remedial actions?
None – no basis.

4.  Have you observed any harassment by alleged harasser? No

5.  What is your policy regarding harassment?  When was it implemented?  How and
when was this conveyed to employees? Answered under claim (1).

6.  Have there been any other complaints of harassment in office? Current mediation in
process regarding reasonable accommodations.

(3) delays in approving her travel advances, most recently on March 27, 2002, and
denies her travel benefits.

1.  Were you aware of the alleged harassment?  I was aware of the employee's allegation
that the approval was delayed. As to travel benefits, I am only aware of several travel
vouchers that have been returned to the employee due to duplication of expenses and
failure to comply with the travel IRM or local direction. If so, when did you become
aware of the alleged harassment? When the manager received a telephone call from
EEO Jones. When did the Complainant report the matter to you or other
management? Sometime following April 16 when the employee returned from Hong
Kong.

2.  What actions did you take as a result of the complaint of harassment? Reviewed
TRAS and recordation submitted by the employee. Investigation? Revealed that the
employee submitted travel plans close to 45 days prior to departure, but submitted
travel advance request on March 28, 2002, 5 business days prior to travel date.
Manager approved advance 4 business days later, the day following her return to the
office. Questioning of the alleged harasser? No.  Disciplinary actions against the
harasser? No evidence of harassment or disparate treatment.

3.  Have you or other management, if known, had other reports of alleged harassment by
this harasser? No. Has the Complainant complained about harassment from other
individuals? Yes. Past remedial actions? Provided the employee with manual
guidelines, contact with travel officials in Beckley, secured advise from General
Legal Services, etc.

4.  Have you observed any harassment by alleged harasser? No.

Page 4 of 6

416

AFFIDAVIT          DISTRICT OF COLUMBIA          CITY OF WASHINGTON

5. What is your policy regarding harassment? When was it implemented? How and when was this conveyed to employees? See answer under Claim (1)

6. Have there been any other complaints of harassment in office? No.

(4) fails to assign her cases consistent with her grade level.

1. Were you aware of the alleged harassment? I have no knowledge regarding this claim. If so, when did you become aware of the harassment? When did the Complainant report the harassment to you or other management? She did not. See answer under Claim (1) on how cases are assigned.

(5) Ms. Billy-Lera alleges Ms. Stephens was harassing her by denying her the opportunity to act as manager during the absence of Ms. Stephens.

1. Were you aware of the alleged harassment? No.

(6) forced her to work a case that had never been assigned to her in January 2002.

1. Were you aware of the alleged harassment? No.

(7) refused to grant her administrative leave to speak with an Employee Assistance Program (EAP) counselor in March 2002.

1. Were you aware of the alleged harassment? No.

(8) gave her a late, unfair annual appraisal on April 30, 2002, covering the rating period February 2001 through January 31, 2002, that was not based on prior case reviews or a self-assessment.

1. Were you aware of the alleged harassment? No. I am aware via documentation that the employee was given an opportunity to prepare a self-assessment. I am also aware of the documentation in the EPF that was used to prepare the annual appraisal in FY2002.

(9) gave her an unfair mid-year evaluation with no narrative in August 2002.

1. Were you aware of the alleged harassment? I have no knowledge of the mid-year as it does not require 2nd level approval.

(10) in August 2002, restricted the amount of time she was allowed to review her Employee Performance Folder (EPF) and included memoranda in the file that were never discussed with her.

1. Were you aware of the alleged harassment? No.

417

AFFIDAVIT          DISTRICT OF COLUMBIA          CITY OF WASHINGTON

2. Are there any other witnesses you suggest be interviewed and about what? Yes. I suggest that an interview be conducted with Carl Tinny regarding the incidents of June 4 noted above.  With Linda Payton, Group Secretary, and a representative sample of Ms. Stephens' employees regarding any personal knowledge of alleged harassment of Ms. Billy-Lera.  Ms. Payton sits just outside Ms. Stephens' office and would have the most knowledge. Mr. Richard Valdez, Area Director retired May 28, 2002 and Mr. Ronald Pinsky, SB/SE Counsel and Acting Area Director from June 2002 through October 2002 could also provide background and personal knowledge relative to complaints and/or allegations by Ms. Billy-Lera.

------------------------------------------------------------------------------------------------

I have read the above statement, consisting of 6 pages, and it is true and complete to the best of my knowledge and belief.  I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

(Deponent's Signature)

Subscribed and sworn to
before me at Washington, DC
on this 14th day of November, 2002

(Investigator's Signature)

Page 6 of 6

4/8

Back to Document

### TRAVEL ADVANCE REQUEST RECORD
### ***MEMO COPY***

### DATE OF REQUEST  11/14/2002

BERNADETTE S BILLY-LERA                          SSN:

                                                 OFFICE:        S39Q
                                                 ACTIVITY:      7G

TRAVEL PERIOD FROM: 04/04/2002 TO: 04/16/2002

BALANCE DUE U.S. ACCORDING TO ACCOUNTING
RECORDS:                                              $    2,000.00
BALANCE DUE U.S. ACCORDING TO TRAVELER'S
RECORDS:                                              $        0.00
AMOUNT OF TRAVEL ADVANCE REQUEST:                     $    4,000.00
                                                      $    4,000.00

TRAVEL AUTHORIZATION NUMBER:  GTO #2
TRAVEL AUTHORIZATION DATE:  01/01/1991

PURPOSE: CASE TRAVEL

FOLLOW PROCEDURES OUTLINED IN IRM 1763 SECTION 316(2)TO
RESOLVE OUTSTANDING ADVANCE DISCREPANCIES.

SUBMITTED IN COMPLIANCE WITH THE FAMILY SUPPORT ACT OF 1988.

TRAVELER'S SIGNATURE:  /s/BERNADETTE S BILLY-LERA
DATE OF SIGNATURE:        03/28/2002

APPROVING SIGNATURE:   /s/EVELYN M STEPHENS
TITLE:            SUP IRA
DATE OF APPROVAL:      04/02/2002

DATE OF TRANSMISSION:      04/03/2002

Back to Document

# UNSWORN DECLARATION
## OF
## CARL TENNY
### (Witness)

Subject: Discrimination Complaint of Bernadette Billy-Lera, TD No. 02-2421T

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

In accordance with the provisions of 28 U. S. C. 1746, I, the undersigned, Carl Tenny, do hereby make the following unsworn declaration, under penalty of perjury, pertinent to the above stated subject:

1. **Please list the city, state and county where you are currently employed.**

   **Washington DC.**

2. **Please state your name, place of employment, position title, series and grade.**

   **Carl M Tenny, Internal Revenue Service, Revenue Agent, 512, GS-13**

3. **Please identify your working relationship, past and present, to the Complainant.**

   **I have been working for Area 15, International Washington DC office since 1993. I met the Complainant when she was assigned to Area 15 approximately 4 years ago and have been in the same group as the Complainant for approximately 1 and ½ years. I am a co-worker of the Complainant and also serve as the NTEU Chapter 83 vice-president and union steward.**

4. **How long have you been employed with the Internal Revenue Service? How long have you been assigned to your current position?**

   **I have been employed with Internal Revenue Service since 1988. I have been assigned to my current position for approximately 1 and ½ years.**

5. **Please state your employment background for two (2) years prior to your current position.**

   **Before arriving in Area 15 International, Washington DC, I was employed as a Internal Revenue Agent for the Brooklyn, New York District IRS Office.**

Whether the Complainant was subjected to harassment since May 2001 in retaliation for her previous participation in the EEO complaints process, when her manager:

(1) subjects her to unannounced audits, restricts her travel on audits to foreign countries, and fails to assign her cases requiring international travel;

(2) writes her petty memoranda, stands over her desk while she is working, interrupts her frequently, exhibits intimidating behavior, most recently on June 4, 2002, frequently asks her to come to her office; and contacts her at her home while she is on leave and/or during non-work hours;

Page 1 of 4

438

(3) delays in approving her travel advances, most recently on March 27, 2002, and denies her travel benefits;

(4) fails to assign her cases consistent with her grade level;

(5) denies her the opportunity to act as manager;

(6) forced her to work a case that had never been assigned to her in January 2002;

(7) refused to grant her administrative leave to speak with an Employee Assistance Program (EAP) counselor in March 2002;

(8) gave her a late, unfair annual appraisal on April 30, 2002, covering the rating period February 2001 through January 31, 2002, that was not based on prior case reviews or a self-assessment;

(9) gave her an unfair mid-year evaluation with no narrative in August 2002; and

(10) in August 2002, restricted the amount of time she was allowed to review her Employee Performance Folder (EPF) and included memoranda in the file that were never discussed with her.

1. **Ms. Bernadette Billy-Lera has alleged that Ms. Evelyn Stephens is the harasser. What is your relationship with the alleged harasser (friend or just a co-worker)? How long have you known the alleged harasser? Where is your office in relation to the office of the alleged harasser and the Complainant?**

   My relationship with the alleged harasser is that she is my immediate supervisor. I have a professional friendship with her, as her subordinate. I have known Evelyn for approximately 1 and ½ years. I work flexi place, but when I am in the office, I work 3 three floors below the alleged harasser, and work in an open cubicle setting on the same floor as the Complainant.

2. **What did you see or hear? When did this occur? Describe the alleged harasser's behavior toward the complainant and toward others in the workplace.**

   I am not sure of what particular incident you are referring to. I did witness an incident, which occurred approximately 4 to 5 months ago (June or July 2002) where the alleged harasser requested a case file from the Complainant. The production of the case file was not timely. The alleged harasser then went to the Complainant's desk to ask again for the case file, but the Complainant was not present at her desk. The alleged harasser requested I accompany her to the Complainant's desk to act as a witness. The Complainant shortly returned to her desk, with both the alleged harasser and myself waiting for her by her cubicle. The Complainant became upset that the alleged harasser demanded production of the case file, and then came to her desk to retrieve it. The Complainant then assured the alleged harasser that the case file would be timely produced by mid that afternoon. I did not sense any unprofessional behavior from the alleged harasser during this incident. This is the extent of my first hand knowledge of this incident. I have not witnessed any other behavior (which could be construed as harassment) from the alleged harasser toward myself, or any other employee in the workplace.

439

UNSWORN DECLARATION

3.  Did the Complainant talk of the alleged harassment to you?  If so, describe the conversation and date of occurrence.

    Not that I recall.

4.  Did you observe any inappropriate behavior by the alleged harasser toward the Complainant?  If so, describe and give dates of occurrence.  Did you observe the Complainant's reaction?  If so, describe.

    See answer to No.1.

5.  Has the alleged harasser harassed you?  If so, describe.  When?  Did you complain to management?  What actions did management take?  Were the actions sufficient to stop the harassment?

    I don't believe the alleged harasser has harassed me.

6.  Have you observed any inappropriate behavior by the alleged harasser towards anyone else?  Describe.  Identify person.  Date of occurrence.

    None that I can recall.

7.  Have you received any information/training from management regarding harassment?  If so, describe.  When.

    Yes, I believe I received some sexual harassment training at a CPE several years back and also during one of my recent group meetings.

8.  Describe the general atmosphere of the office (in terms of offensive behavior, unprofessional behavior, demeaning attitudes and communications, etc.).

    The office is very professional in terms of the conduct of the employees.  I do not sense any harassment.

9.  Do you know of any other relevant information?

    No.

10. Are there other persons who have relevant information?

    Not to my knowledge.

---------------------------------------------------------------------------------------

440

UNSWORN DECLARATION

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___12/4/02___ at ___WASHINGTON, DC___
                  (Date)                    (City & State)

_____
            SIGNATURE

441

3. Did the Complainant talk of the alleged harassment to you?  If so, describe the conversation and date of occurrence.

Not that I recall.

4. Did you observe any inappropriate behavior by the alleged harasser toward the Complainant?  If so, describe and give dates of occurrence.  Did you observe the Complainant's reaction?  If so, describe.

See answer to No.1.

5. Has the alleged harasser harassed you?  If so, describe.  When?  Did you complain to management?  What actions did management take?  Were the actions sufficient to stop the harassment?

I don't believe the alleged harasser has harassed me.

6. Have you observed any inappropriate behavior by the alleged harasser towards anyone else?  Describe.  Identify person.  Date of occurrence.

None that I can recall.

7. Have you received any information/training from management regarding harassment?  If so, describe.  When.

Yes, I believe I received some sexual harassment training at a CPE several years back and also during one of my recent group meetings.

8. Describe the general atmosphere of the office (in terms of offensive behavior, unprofessional behavior, demeaning attitudes and communications, etc.).

The office is very professional in terms of the conduct of the employees.  I do not sense any harassment.

9. Do you know of any other relevant information?

No.

10. Are there other persons who have relevant information?

Not to my knowledge.

--------------------------------------------------------------------------------

440

# Performance Appraisal and Retention Standard Rating

*(Review instructions on the reverse before completing form)*

| 1. Name of employee (Last, first, middle) | 2. POI | 3. Period covered | 4. Reason for Appraisal |
|---|---|---|---|
| Billy Lera, Bernadette | 2862 | From: 2/1/01   To: 1/31/02 | [X] Annual Rating  [ ] Departure Rating |
| 5. SSN | | 6. Organization code | [ ] Merit Promotion |
| | | SB/SE S:C:15:Terr.1:1111 | [ ] Other |
| 7. Position title | 8. SPD or PD # | | 9. Pay plan, series/ grade |
| Internal Revenue Agent | 91993 | | 512 GS-13 |

| 10. Critical Job Elements | | Job Element Rating | | | | | | 11. Retention Standard Rating |
|---|---|---|---|---|---|---|---|---|
| | | N/A | 1 | 2 | 3 | 4 | 5 | |
| I. Employee Satisfaction - Employee Contribution | | | | | X | | | [ ] Not applicable |
| II. Customer Satisfaction - Knowledge | | | | | | X | | [X] Met |
| III. Customer Satisfaction - Application | | | | | | X | | [ ] Not Met |
| IV. Business Results - Quality | [ ] Measured  [ ] Unmeasured | | | | | X | | **12. Average of Critical Elements** |
| V. Business Results - Efficiency | [ ] Measured  [ ] Unmeasured | | | | X | | | 3.6 |

**13. Summary Level:**

[ ] Outstanding    [X] Exceeds Fully Successful    [ ] Fully Successful    [ ] Minimally Successful    [ ] Unacceptable

**14. Annual Rating**

Rater *Evelyn D. Stebens (Group Manager) March 4, 2002*
Evelyn D. Stebens

Name/title/signature/date *(I certify that records of tax enforcement results were not used to prepare this appraisal)*

Reviewing Official *Jeannie Fisher   Territory Manager*   3/14/02

Name/title/signature/date *(I certify that records of tax enforcement results were not used to prepare this appraisal)*

This appraisal has been discussed with me and I have been given a copy.

Employee signature/date

| 15. Revalidation | ...covered | To: |
|---|---|---|

*Provided to RA 4/30/02. She stated she was not going to sign. She wanted to discuss. Will write a rebuttal...*

Rater _____  ...not used to prepare this appraisal).

Name/title/signatur...

Reviewing Official...

Name/title/signatur...  ...not used to prepare this appraisal).

This appraisal ha...  ...py.

Employee signatur...

16. Merit Promotion...  ...revalidation).

Name/title/signatur...

# Performance Appraisal and Retention Standard Rating
*(Review instructions on the reverse before completing form)*

| 1. Name of employee (Last, first, middle) | 2. POI | 3. Period covered | 4. Reason for Appraisal |
|---|---|---|---|
| Billy Lera , Bernadette | 2862 | From: 2/1/01  To: 1/31/02 | ☒ Annual Rating  ☐ Departure Rating |
| 5. SSN | 6. Organization code | | ☐ Merit Promotion |
| | SB/SE S:C:15:Terr.1:1111 | | ☐ Other |
| 7. Position title | 8. SPD or PD # | | 9. Pay plan, series/ grade |
| Internal Revenue Agent | 91993 | | 512 GS-13 |

| 10. Critical Job Elements | Job Element Rating | | | | | | 11. Retention Standard Rating |
|---|---|---|---|---|---|---|---|
| | N/A | 1 | 2 | 3 | 4 | 5 | |
| I. Employee Satisfaction - Employee Contribution | | | | X | | | ☐ Not applicable |
| II. Customer Satisfaction - Knowledge | | | | | X | | ☒ Met |
| III. Customer Satisfaction - Application | | | | | X | | ☐ Not Met |
| IV. Business Results - Quality  ☐ Measured ☐ Unmeasured | | | | | X | | 12. Average of Critical Elements |
| V. Business Results - Efficiency  ☐ Measured ☐ Unmeasured | | | | X | | | 3.6 |

13. Summary Level: ☐ Outstanding  ☒ Exceeds Fully Successful  ☐ Fully Successful  ☐ Minimally Successful  ☐ Unacceptable

14. Annual Rating
Rater: *Evelyn M. Stephens* Group Manager March 4 2002
Reviewing Official: *Jeanie Fisher* Territory Manager  3/14/02

This appraisal has been discussed with me and I have been given a copy.
I DO NOT AGREE WITH THIS EVALUATION

15. Revalidation of Rating of Record ☐   Period covered From:  To:

16. Merit Promotion Revalidation

Form 6850 (Rev. 7-2001)   Cat. No. 61525M   publish.no.irs.gov   Department of Treasury - Internal Revenue Service
451

Attachment to 6850
Bernadette Billy-Lera

**This evaluation is based on current critical elements received and acknowledged October 4, 2001.**

**Employee Satisfaction-Employee Contribution**
Bernadette interacts with co-workers in and out of immediate work area in a courteous manner. She interacts with co-workers in the Examination Case Processing (ESP) and Planning Special Program (PSP) areas regularly. She is professional in her dealing with taxpayers/representatives. She was observed as professional during telephone conversations with representatives/power of attorneys on overage priority cases.

Bernadette participates in group meeting discussions. She is generally cooperative with case requirements, reports, and inter- office local requirements, such as sign-in/out book. Bernadette has not cooperated with manager's request to submit a monthly planning calendar.

She supports a work environment that is fair to all, free from harassment and discrimination.
**Aspect 1A has been exceeded and Aspects 1B and 1C have been met.**

**Customer Satisfaction-Knowledge**
Bernadette consistently displays a working knowledge of tax laws. She has consulted with internal resources, such as counsel, on some unusual technical issues.

Bernadette has demonstrated tax and financial accounting principles needed to reconcile books and records to the return. She is knowledgeable of penalties and they are applied as applicable, assessed or abated. Bernadette recognizes areas of non-compliance and performs balance sheet audits as applicable.

Bernadette generally follows procedural requirements and guidelines per Internal Revenue Manual (IRM). Several cases returned for procedural corrections such as completion of the special handling Form 3198, report of examination changes (RAR), and closing document Form 5344.
**Aspects 2A and 2C have been exceeded and Aspect 2B has been met.**

**Customer Satisfaction-Application**
Bernadette conducts her examinations and reach conclusions considering applicable tax laws. She provides taxpayers and/or representatives her conclusion. She explains her position and reasons for conclusion.

Timely action has been a problem during this rating period and I have been contacted by several representatives because of dissatisfaction with Bernadette's approach and/or action being taken.

452

Attachment to 6850
Bernadette Billy-Lera

## Customer Satisfaction-Application (cont'd)

Bernadette prepares most of her written communication by computer. She also uses the computer to prepare many workpapers. During this period, some workpapers were lost due to computer problems and the information was not backed-up as required. The cases in this situation lacked sufficient details that supported the conclusion but based on discussion with Bernadette, the cases were closed as submitted for the good of the taxpayer and service.
**Aspects 3A and 3B have been exceeded and Aspect 3C has been met.**

## Business Results-Quality

Bernadette uses some of the research tools made available to her. She is independent in her research of unusual and complex technical issues. She considers the taxpayers/representatives points of view. Bernadette is independent in reaching conclusions.

Bernadette generally completes assignment within established guidelines. On several cases, the necessary development and conclusion was not timely to bring the taxpayer into compliance. The software provided for reports of examination changes, Report Generating Software (RGS) has not been observed used. All reports have been hand written.

Bernadette is knowledge of disclosure and privacy rules and guidelines. She takes necessary steps to protect taxpayers and return information. Her work area is cleared of taxpayer information when she is not working in the area.
**Aspects 4A and 4C have been exceeded and Aspect 4B has been met.**

## Business Results-Efficiency

Bernadette completes work assignment with issues and circumstances documented. On several cases, the span of examinations has been extended beyond the usual for the type of case, complexity of the issues, and documentation. The workload review, case review, and statute of limitation reviews indicate management of inventory has not resulted in good customer (taxpayer/representative) relations. Bernadette schedules appointments in the field to perform her audit duties as a revenue agent.

Bernadette is knowledgeable of program priorities. Her manager has been involved in identifying and addressing working priority cases throughout this rating period. Bernadette is knowledgeable of statute of limitation procedures to protect the government's interest. She has been reminded of short statute periods and timely completing the Form 895.

Bernadette gathers information and develops facts on issues of assigned cases. She schedules several days for the initial interview and review of books and records. She requests additional information when necessary and follow-up with a computer generated document request.
**Aspects 5A, 5B, and 5C have been met.**

4/53

| | changing customer needs. Anticipates and meets the needs of customers by delivering and continuously improving quality services. |
|---|---|
| **Problem Solving** | Identifies and analyzes problems; distinguishes between relevant and irrelevant information to make logical decisions; provides solutions to individual and organizational problems. |
| **Technical Credibility** | Performs and continuously learns about current and emerging issues/developments in own field of expertise. Applies this knowledge to make technically sound operational decisions and helps expand knowledge of area throughout the IRS. |
| **Partnering** | Builds strong alliances, engages in cross-functional activities; collaborates across boundaries, and finds common ground with a wide range of stakeholders. Employs contacts to build and strengthen internal support bases. Resolves conflicts and disagreements in a positive and constructive manner. |
| **Communication** | Engages others and facilitates two-way communication through oral and written presentations to individuals and groups. Expresses facts and ideas clearly and in an organized manner. Adapts oral and written communication to the needs, interests and style of the audience. Connects with employees and helps to create a cohesive work environment through effective listening. Uses open communication strategically to achieve an objective. |

# Performance Appraisal

**FILE**

## Complete only if employee served on a performance plan for 60 days or more
### (Please review instructions on reverse before completing form)

| 1. Bernadette Billy-Lera | 2.SSN | 3.Date of appraisal and overall departure rating 2/1/2000 |
|---|---|---|
| | | OP:IN:D:C:EX:1110/2110 |

| 4.Title of current position REVENUE AGENT | | | |
|---|---|---|---|
| 6.Period covered From: 2/1/1999    To:1/31/2000 | 7.Pay plan/series GS/512 | 8.Grade 13 | 9.SPD/PD No. 91993E |

**10. Reason for appraisal**
CE Annual rating      ☐ Departure rating      ☐ Other _____

| 11. Job element of position | Job Element Rating | | | | | | Element | |
|---|---|---|---|---|---|---|---|---|
| | NA | 5 | 4 | 3 | 2 | 1 | Critical | Additional |
| 1. WORKLOAD MANAGEMENT | | | X | | | | X | |
| 2. AUDITING/ACCOUNTING PRINCIPLES | | | X | | | | X | |
| 3. ISSUE IDENTIFICATION | | | X | | | | X | |
| 4. FACT FINDING | | | X | | | | X | |
| 5. TAX LAW | | | X | | | | X | |
| 6. WRITTEN PRODUCT | | | X | | | | X | |
| 7. CUSTOMER RELATIONS | | | X | | | | X | |
| 8. OTHER DUTIES | | | X | | | | | X |
| 9. | | | | | | | | |
| 10. | | | | | | | | |

| 12.Summary Level | 13.Average of Critical Elements 4.0 |
|---|---|
| ☐ Outstanding      X☐ Exceeds Fully Successful | |
| ☐ Fully Successful   ☐ Minimally Successful | 15.Revalidation Period Covered From: 2/1/00   To: 1/31/01 |
| ☐ Unacceptable | |

| 14 Rater Name/Signature/Date(Tax enforcement statistics were not used to prepare this appraisal) *John Hawley GM 1-27-2000* | 15a Rater Name/Signature/Date (Tax enforcement statistics were not used to prepare this appraisal) *R Mos* |
|---|---|
| 14a.Reviewing Official Name/Signature/Date(Tax enforcement statistics were not used to prepare this appraisal) *R. Hanchak* *R. Hanchak  1-31-2000* | 15b.Reviewing Official Name/Signature/Date (Tax enforcement statistics were not used to prepare this appraisal) *2-13-01* |
| 14b This evaluation has been discussed with me and I have been given a copy. *Bernadette Billy-Lera 2/2/2000* Employee signature/Date | 15c.This evaluation has been discussed with me and I have been given a copy. *Bernadette Billy-Lera 2/13/01* Employee signature/Date |

Form **6850** (Rev 2-1999)   Cat No 61525M      publish no irs gov          Department of Treasury - Internal Revenue Service

*45*

**Complete Only if Employee Served on a Performance Plan for 60 Days or More**
*(Please Review Instructions on Reverse Before Completing Form)*

## Performance Appraisal

| | |
|---|---|
| 1. Name of Employee Bernadette Billy-Lera | 3. Date of Appraisal and Overall Departure Rating (if applicable) February 3, 1999 |
| 4. Title of Current Position Revenue Agent | 5. Organizational Segment (Office Symbol) OP:IN:D:C:EX:1110/2110 |
| 6. Period Covered From: 2/1/98  To: 1/31/99 | 7. Pay Plan/Series GS 512   8. Grade 13   9. SPD/PD No. 91266 |
| 10. Reason for Appraisal ☑ Annual Rating   ☐ Departure Rating   ☐ Other _____ | |

| 11. Job Element of Position | NA | 5 | 4 | 3 | 2 | 1 | Critical | Additional |
|---|---|---|---|---|---|---|---|---|
| 1. Workload Management | | | ✓ | | | | ✓ | |
| 2. Auditing / Accounting Principles | | | ✓ | | | | ✓ | |
| 3. Issue Identification | | | ✓ | | | | ✓ | |
| 4. Fact Finding | | | ✓ | | | | ✓ | |
| 5. Tax Law | | | ✓ | | | | ✓ | |
| 6. Written Product | | | ✓ | | | | ✓ | |
| 7. Customer Relations | | | ✓ | | | | ✓ | |
| 8. Other Duties + Assignments | | | ✓ | | | | | ✓ |
| 9. | | | | | | | | |
| 10. | | | | | | | | |
| 11. | | | | | | | | |
| 12. | | | | | | | | |

**12. Summary Rating**
☐ Outstanding   ☑ Exceeds Fully Successful
☐ Fully Successful
☐ Minimally Successful
☐ Unacceptable

13. Average of Critical Elements  4.00

**FILE**

15. Revalidation Period Covered From:    To:

14. Rater Name/Signature/Date  John Hawley

15a. Rater Name/Signature/Date

14a. Reviewing Official Name/Signature/Date (Signature indicates the rating is approved and is not based upon tax enforcement statistics.)  Cheryl A Warshauer  2.5.99

15b. Reviewing Official Name/Signature/Date

14b. This evaluation has been discussed with me and I have been given a copy.  Bernadette Billy-Lera  Employee Signature/Date  2/5/99

15c. This evaluation has been discussed with me and I have been given a copy.  Employee Signature/Date

Form 6850 (Rev 11-98)   Cat. No. 61525M

Department of Treasury - Internal Revenue Service

458

Chapter 300

## Sources of Funds

### 310 (11-9-93)
### Travel Advances                                    1763

### 311 (11-9-93)
### General                                            1763

Any employee traveling on official business may receive an advance of funds to cover allowable travel expenses. A supervisor or designated official must approve all requests for travel advances.

### 312 (11-9-93)
### Allowable Expenses                                 1763

Allowable travel expenses include per diem or actual subsistence expenses, mileage for use of a privately-owned conveyance or other transportation expenses, and miscellaneous reimbursable expenses. Miscellaneous expenses may include lien filing or release fees, but employees cannot request a travel advance solely for payment of those fees. Employees who incur travel expenses in addition to lien filing or release fees may get an advance that is large enough to cover both the fees and any other travel expenses. Travelers may receive an advance for cash payments for eligible travel expenses that cannot be paid for by use of a Government Request (GTR) or charge card.

### 313 (6-6-94)
### Application for Advance                            1763

(1) Requesting an Advance

(a) Generally, an advance should cover a single trip or not more than 30 days of travel, except for recurring travelers or unusual circumstances (i.e. trips longer than 30 days). An increase can be requested later if the trip lasts longer. Travelers may request an advance of funds by submitting SF 1038, Application and Account for Advance of Funds. On the advance form, (SF 1038), include the following statement:"SUBMITTED IN COMPLIANCE WITH THE FAMILY SUPPORT ACT OF 1988".Travelers must submit the SF 1038 through supervisory channels to an official authorized to direct travel and approve advances of funds. Exhibit 300-1 provides an example of a SF 1038. Where available, TRAS (Travel Reimbursement and Accounting System) may be used for the application and approval of travel advances. When requesting the advance, the traveler should enter the

balance due the Government from any previous advance(s) for the same purpose (type of travel). The purpose may be either temporary duty travel (both regular and training) or permanent change in station (relocation allowances).

(b) The Fiscal Management Office should receive the completed SF 1038 at least two weeks before the traveler begins travel or incurs any expense, to allow enough time for processing the application and issuing the check. This may vary across regions. Travelers should only request an advance for travel expenses that they expect to incur in the near future.

(2) Approval of the Advance Request—The official who directs the travel and approves the reimbursement voucher usually approves the advance. Refer to Delegation Order No. 95, as revised, for a list of individuals authorized to approve travel advances. However, officials at a lower level may approve advances for actual expense travel. See Delegation Order No.25, as revised.

(3) Getting an Advance from Imprest Funds—Employees may get an advance up to $500 from imprest funds as prescribed in IRM 1724, Imprest Funds Handbook, Chapter 500. However, under limited emergency conditions, officials may authorize an advance up to $1,000. If the advance from the imprest fund is not adequate for the employee's expected travel expenses, the traveler may request an additional advance through normal travel advance procedures described in 313:(1)–(3).

### 314 (6-6-94)
### Amount of Advance                                  1763

(1) Calculating the Amount of the Advance— The traveler should base the amount of the advance on such factors as the nature and duration of the planned travel and whether the employee has the Government Contractor-Issued charge card. The advance should not exceed the traveler's expected travel expenses. The amount of the advance should be calculated by multiplying the number of days in travel status by the expected per diem rate or maximum daily actual expense rate, as applicable and adding any mileage allowances for use of privately-owned conveyances and transportation costs that the traveler may pay in cash. The

512

You should also be aware that non-issuance or non-receipt of the statement does not remove the responsibility of a traveler to track, substantiate, and repay an advance according to the travel and tax regulations. To avoid such extreme measures, supervisors will help the Fiscal Management Office collect overdue advances. The Service may report travel advances that remain outstanding as taxable income on the employee's W-2 as required by the Family Support Act of 1988 and amendments to the Income Tax Regulations (26 CFR part 1) and the Employment Tax Regulations (26 CFR part 31). The amount reported as taxable income is the portion of the outstanding advance that is greater than the substantiated expenses. See text 549 for tax implications to the employee when advances are not repaid promptly.

(3) Employees Transferring to Another Office—An employee transferring to another office must repay any outstanding advance balance before the effective date of transfer, unless the employee has made other arrangements with the Fiscal Management Office. The supervisor of the office from which the employee transfers is responsible for ensuring such repayment. If the transfer is to a different region, the employee must repay the advance to the losing region and get an advance from the gaining region if necessary. If there is not enough time for this procedure, or if some other compelling circumstance exists, a transferring employee may keep an advance, or receive an advance from the losing region. In such circumstances, the losing supervisor will make the necessary arrangements with the Fiscal Management Office and will notify the supervisor of the gaining office. Advances follow the employee automatically under AFS (Automated Financial System).

(4) Employees Separating from the Service—An employee separating from the Service, including transfer to another agency, must repay any outstanding advance balance before receipt of the final salary check. The employee's supervisor will notify (in writing) the agent responsible for local pay check distribution to hold the employee's final salary check. This procedure also applies for separating employees that receive their check by mail or electronic funds transfer (EFT) directly into their bank account.

(5) If you are a "recurring traveler" (one who travels on official business every month), you may retain all or part of the travel advance, with the amount based on specific travel planned to take place during the ensuing month, *provided that*, you submit a voucher promptly every month; your manager approves the retention of the advance and its amount; and you repay all or part of the advance promptly whenever all or part of the advance will not be needed for specific travel planned to take place within the ensuing month.

## 320 (6-6-94)  1763
## Government Contractor-Issued Charge Cards

## 321 (6-6-94)  1763
## General Guidelines

(1) Purpose of the Charge Card Program—The purpose of the charge card program is to provide General Services Administration (GSA) authorized charge cards for frequent travelers to enable the Service to achieve the following cash and resource management objectives:

(a) Reduce and maintain at significantly lower dollar levels funds invested in travel advances

(b) Provide better control of unused common carrier tickets

(c) Reduce the use of GTRs to save the administrative costs associated with GTR processing

(2) Eligibility for the Charge Card Program—All frequent travelers are eligible for participation in the Charge Card Program. The Service defines a frequent traveler as an employee who expects to travel at least twice a year.

(3) Charge Card Program Requirements—Under the Charge Card Program, travelers shall continue to fully follow all travel requirements. Supervisors must still authorize the travel. Use of the charge card does not relieve the employee of prudent travel practices and observance of rules governing official travel as set forth in this Handbook and applicable travel directives.

(4) Responsibilities for Administration of the Charge Card Program

(a) The Director of the Systems and Accounting Standards Division shall designate a Servicewide Program Coordinator to administer the program. The Program Coordinator will answer any questions travelers might have about the credit card. The Program Coordinator may decentralize administration of the program to local offices.

(b) The Assistant Regional Commissioner for Resources Management will synchronize the billing cycles for the charge card and processing cycles for timely filed travel vouchers to enable travelers to promptly pay their charge card bills.

Travel Handbook

(c) Each head of office will achieve the cash and resource management objectives by increasing the use of charge cards by frequent travelers to pay major travel expenses. While the Service does not mandate the use of these charge cards, supervisors should aggressively promote their issuance and use.

(d) The supervisor will identify employees eligible to participate in the Charge Card Program.

(5) Detailed Charge Card Program Information—See Exhibit 300-2 for more detailed information about the Charge Card Program. Exhibit 700-2 provides an illustration of a completed travel voucher for submission of charge card expenses.

## 322  (11–9–93)                        1763
### Using the Charge Card

(1) Expenses Incurred for Official Travel—Travelers will use charge cards issued under the Charge Card Program for expenses incurred for officially authorized Government travel. The employee will use the charge card to pay for official travel expenses to the maximum extent possible, thereby reducing the need for travel advances. The traveler may only use the card for expenses which are official travel expenses. Travelers cannot use the card for expenses which are primarily personal.

(2) Getting Passenger Transportation Services—The employee is responsible for using the charge card to obtain passenger transportation services according to the provisions of this Handbook.

(a) The traveler will present the charge card to the transportation carrier, Scheduled Airlines Traffic Office (SATO), or Travel Management Center (TMC) operated under GSA contract, as payment for transportation services (including services by carriers under contract to GSA). The traveler cannot use the charge card to buy travel services from travel agencies who are not under contract to GSA.

(b) If the employee does not personally pick up the tickets and present the charge card, the travel facility may require the traveler to complete a signature-on-file form. The travel facility uses this form to authorize the charge to the employee's charge card account.

## 321
MT 1763-92
IR Manual

(c) Employees without charge cards will continue to follow current passenger ticket procurement procedures as described in this Handbook.

## 330  (11–9–93)                        1763
### Government Transportation Requests (GTRs)

## 331  (11–9–93)                        1763
### General Guidelines

(1) Using the GTR—U.S. Government Transportation Request (GTR), SF 1169, is only for official transportation and transportation services provided by common carrier: air, bus, rail, or vessel. In addition, travelers must use GTRs for charter services from an air or bus carrier. The terms of the charter must be in writing and signed by both the carrier and the IRS representative. Travelers should not use GTRs in the following situations.

(a) For transportation services costing $10 or less, excluding Federal transportation tax, or excess baggage charges costing $15 or less for each leg of a trip, within the U.S., unless special circumstances justify otherwise (See text 422 for other instances where travelers may use cash.)

(b) For taxicabs, airport limousines, intra-city buses, rental vehicles, or toll road bridge charges

(2) Using GTRs for Personal Travel—Travelers may only use a GTR to cover services related to the performance of official business. At the time the traveler submits a GTR to a carrier, the traveler must pay cash for any additional services desired for personal reasons. A traveler may use GTRs for returning to the official station over weekends or holidays only when such return is to the advantage of the Government. See text 541.1 for a discussion of when a traveler may return temporarily to residence or official station.

## 332  (6–6–94)                        1763
### Issuance of the GTR

(1) Issuing Officers—GTRs are valid only when completed and signed by the issuing officer. In some cases, the issuing officer may also be the traveler. The issuing officer must initial any erasures or alterations affecting the validity for payment. When including employees outside the traveler's office, division, or activity, the issuing officer should issue separate GTRs. Exhibit 300-3 provides detailed instructions for preparation of the GTR.

(f) Only one of two or more employees traveling together on the same trip in the same conveyance will receive reimbursement for mileage. The employee entitled to reimbursement must name the accompanying employees on the travel vouchers. If such employees file travel vouchers, they must report on the voucher their means of transportation and name the employee entitled to claim the mileage. See Exhibit 700–9 for an example.

(2) Reimbursement shall not be allowed for payments made to other Government employees for transportation expenses, except in cases of need. In such cases, travelers must provide a satisfactory explanation on the voucher.

### 722 (11–1–93)                                      1763
### Telephone Calls and Other Communications Services

#### 722.1 (11–1–93)                                   1763
#### Telephone Calls

(1) A frequent traveler (who travels at least twice a year) may wish to use a Government-issued US Sprint card for all long distance telephone calls in connection with official travel, including personal calls home. (The US Sprint card provides access to Government FTS 2000 service.) Requests for US Sprint cards will be forwarded via the local Facilities Management Branch to the National Office Telecommunications staff. The Telecommunications staff will be responsible for monitoring charges.

(2) A travel reimbursement claim for telephone calls, personal or official business, will be allowed on SF 1012, Travel Voucher. Exhibit 700–10 provides an example of a claim for telephone expenses.

(3) The basic charge for placing a long distance call through a hotel switchboard will be allowed on a travel reimbursement claim. A statement of telephone charges, including date, place called, and amount, is required for all long distance calls for which reimbursement is requested. A receipt is required, regardless of amount, unless a coin box telephone is used and that fact is stated on the voucher.

(4) The approving official is responsible for careful review of amounts claimed for telephone calls.

#### 722.2 (11–1–93)                                   1763
#### Reimbursement Claims

(1) A claim on a travel voucher for a telephone call must include the nature of the charge, such as the call was placed through the hotel switchboard or the individual is an infrequent traveler. The voucher claim must include the certification statement that telephone charges were made in the interest of the Government. (Generally, the certification is pre-printed on the travel voucher.)

(2) Amounts claimed for telephone charges will be claimed on SF 1012, Travel Voucher, under "Other," Column (j), and are charged to Sub-Object Class (SOC) 2109. (US Sprint call charges shall not be shown on the travel voucher claim.)

#### 722.3 (11–1–93)                                   1763
#### Other Communications Services

Travelers may receive reimbursement for charges for official commercial telegrams, cablegrams, or radiograms on official business. Travelers must identify the points between which service was provided, the date, the amount paid for each communication, and state that the communication services were required for official business. When required for reasons of security, travelers may identify the origin and destination in confidence to the administrative official rather than provide this information on the official voucher.

### 723 (11–9–93)                                      1763
### Miscellaneous Expenses

(1) Travelers will itemize miscellaneous expenses on travel vouchers in chronological order, showing the amounts incurred for each day. Travelers may show amounts spent for local telephone calls, local public transportation, and on-street parking meter fees in total at the end of the voucher.

(2) Travelers may claim reimbursement for the cost of converting cash to a bank draft or money order or exchange fees for converting foreign currency as an "Other" expense on SF 1012, Travel Voucher, or SF 1164, Claim for Reimbursement for Expenditures on Official Business, as appropriate. When using SF 1164, travelers must attach receipts for all expenses. Local management will determine the reimbursement method for each post of duty.

(3) Receipts are not required for expenses claimed on SF 1012 unless they exceed $25.

### 724 (11–9–93)                                      1763
### Cost Identification

MT 1763–92

### 724
IR Manual

