UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BERNADETTE BILLY-LERA            )
                   Plaintiff,            )
                         )
     v.            )            Civil Action No. 05-1273 (JR)
                         )
JOHN W. SNOW, Secretary,            )
U.S. Treasury Department,            )
               Defendant.            )
                         )

DECLARATION OF EVELYN STEPHENS

In accordance with the provisions of 28 U. S. C. §1746  I,  Evelyn Stephens, do hereby make the following declaration, under penalty of perjury:

1. I am employed by the Internal Revenue Service (IRS) as a Supervisory, Internal Revenue Agent.

2. I have been employed with IRS since January 4, 1974.

3. I was selected for my current position in November 2001.

4. Prior to my current position I worked in the IRS office in Pittsburgh, PA in several different positions, including Supervisory Internal Revenue Agent.

5. I was selected for a detail assignment position as International Manager for the International compliance income tax group in Washington, D.C., in July, 2001.

6. Robert Mosley had been Acting Manager immediately before I became Bernadette's Acting Manager on approximately July 25, 2001. I remained her Acting Manager until approximately November 12, 2001 when I returned to my premanent position as Manager in Pittsburgh, PA.

7. Upon reporting to the International Area in Washington, D.C. in July, 2001, I sat in on

an Inventory Validation List review (ILV) which Mr. Mosley was conducting with Bernadette.

8. I was sitting in on the meeting/discussion as an observer and to familiarize myself with Bernadette's inventory. After the workload review, Robert attempted to discuss with Bernadette her travel voucher/s and an approximately $2,000 outstanding relocation advance dating from 1995. See notes of meeting, ROI at p. 77; travel advance screen, ROI at p. 78, and September 4, 2002 e-mails re Travel and Moving Vouchers, ROI at p. 80. One of the issues concerning the travel voucher was questionable expenses incurred in traveling from the Washington D.C. area to New York to take a flight to California. The discussion became heated, unproductive and unprofessional. Robert left the room telling Bernadette to revise/correct her voucher for his approval. See Mosely e-mail dated September 4, 2001, ROI at 356-57.

9. After Robert left the room, Bernadette told me that she had filed an EEO complaint against Robert. She shared some other work experiences and relationships with other previous managers and acting managers. After listening to Bernadette, I told her to try to put the past behind her and consider her assignment to my group as a new beginning. I further tried to give her words of encouragement from a manager's position on approving travel vouchers or any other document. I told her when a manager signs and approves a voucher, they are agreeing with it. I shared an experience of mine, where I had been questioned concerning a travel voucher even though I have many years of service and as a manager. My point was that there might be questions on travel and other documents regardless of years of service or position. I was optimistic that Bernadette and I would have a healthy working relationship.

**Three travel vouchers in 2001**

10. Later on, while I was still the acting manager I received for approval three travel

vouchers. The vouchers had expenses for travel between Washington, D.C. and New York before and after flights to and from Bernadette's audit locations. These were the same type of expenses which Mr. Mosely had been questioning. Additionally, I noted what appeared to be duplicate expenses. I asked Bernadette to remove the duplicate expenses and explain the expenses incurred between Washington, D.C. and New York.

11. One of the vouchers was for travel to London from July, 19, 2001 to August 3, 2001. ROI at 358-368. It was dated 9/9/01 by the traveler. *Id.* at 358, block 12. It reflected that Bernadette had flown to New York on July 19, 2001 and had taken a taxi to Brooklyn. *Id.* at 359. The next day, there was an expense for a taxi to JFK airport. *Id.* Although there was a claim for meal expense on July 19, there was no lodging expense. *Id.* The return leg of the trip reflected arrival by plane in New York on August 2, 2001 and a taxi to Brooklyn. *Id.* at 359-60. No meal or lodging expense was reflected for August 2. *Id.* at 360. On August 3, 2001, there was a claim for a taxi to La Guardia Airport and then a flight back to Washington. Upon closer examination, I also noted that meal expenses had been duplicated. Bernadette had claimed her entire hotel bill for $3095.22, as well as the daily rate for meal expenses of $229. *Id* at 359. However, her hotel bill included meal expenses. *Id.* at 361-363. I returned the voucher to Bernadette on 10/10/01 for correction. *See* notes, ROI at 383.

12. Another of the vouchers was for travel to San Francisco, California from August 5-August 11, 2001. See ROI at 369-372. The type of voucher used is called a "TRAS" voucher. [TRAS vouchers are typed into the computer by the Revenue Agent and are used for domestic travel. Manual vouchers are used for international travel.]  A voucher for this trip previously had been submitted to Mr. Mosely and had been the subject of conversation at the meeting between

Mosely and Bernadette which I observed in which he told Bernadette to remove the NY expenses. ROI at p. 77.

      i. The voucher had for Sunday, August 5, 2001 an automobile transportation expense of $22.43, tolls of $3.00, and meal claim of $34.50 but no lodging expense. The description of the auto expense was "rode with someone private auto - 65 mi[les] at .345 [totaling $25.43]. . . . Departed 1:00 pm Destination Brooklyn" Id. at 369. The voucher then reflects that the next day, August 6, Bernadette took a taxi to the airport and flew to California.. *Id*. On August 10, Bernadette took a taxi from the airport in NY to Brooklyn for $35 and on Saturday, August 11 returned by taxi to LaGuardia for $45 .75 to take a flight to National Airport.  *Id*. at 370-371; and see notes re meeting ROI at 77.

      ii. Another version of the voucher indicated that the travel was from August 6, 2001 to August 11, 2001. It collapsed the cost claimed for Sunday, August 5 into Monday August 6 as $3.00 in tolls and $22.43 for gas along with a taxi to Kennedy Airport, and appears to reflect that she rode to the airport in the taxi with someone. *Id*. at 373. On the return leg, on August 10, the voucher added in a trip to and from the taxpayer representative's office.  *Id*. at 374-75

13. The third voucher involved travel to Honolulu August 19-August 31, 2001. Notes, ROI at 382.  This trip also included travel between DC and NY before and after travel between NY and the audit site.

14. I asked for an explanation of the New York expenses. Bernadette told me that her previous supervisors had approved this practice since it allowed her to take direct flights to the audit sites. She also advised me that she had been staying with relatives. [This explained the lack

of lodging expense.] I asked Bernadette to put her explanation in writing. I also told her in the future to refrain from traveling from NY rather than from Washington area airports. See October 1, 2001 e-mail and memorandum ROI at 380, 381. I did not believe that Bernadette's practice of traveling to New York to take direct flights was cost effective for the IRS when considering the transportation and meal expense cost to and from New York plus the extra time the revenue agent spent in traveling to and from and staying overnight in New York. Due to these cost considerations, the practice also had the appearance of impropriety since it could appear that she might be making the stop overs in New York solely for the private purpose of visiting with relatives.

15. I asked Bernadette to remove some of the NY expenses from her TRAS voucher and she agreed to do so. I told her I would approve the voucher after those expenses were removed. ROI at 380. Bernadette was supposed to have revised the TRAS voucher as I requested and then re-entered it into the computer. On October 2, 2001, I was advised that I could not approve the TRAS voucher because Bernadette had not signed it. See ROI at 385., 386. I approved one of the manual vouchers even though Bernadette did not make the requested corrections because she told me that the credit card company was threatening to or had cancelled her government credit card due to non-payment, and due to the cut-off of travel due to fiscal year end. Bernadette did not make all of the changes to the vouchers which I requested. However, ultimately I did not press the point about the previous expenses to New York, since Bernadette sent me a memorandum stating previous supervisors had approved the practice, and I had documented my direction that she stop the practice. Additionally, as the acting manager I had many other pressing issues to address.

**Relocation Expense memorandum**

16. Another matter which I addressed with Bernadette while I was acting was to follow up on her outstanding relocation expense.  Mr. Mosley had asked her to resolve the issue. By memorandum dated October 25, 2001, I had asked for an update with supporting documents. See October 25, 2001 memorandum, ROI at 320. I followed that with an additional request for the information in a memorandum dated October 30, 2001. ROI at 386-87, 323

17. My temporary appointment as Acting Manager ended about November 14, 2001. and I went back to Pittsburgh, PA.

18. Sometime near the end of November 2001 I was selected to be the permanent manager of the International Group in Washington. However, I stayed in Pittsburgh and did not report back to Washington until mid-January, 2002 since I took my use or lose annual leave.

**Contact at home**

19. Since I reported as an Acting Manager, Bernadette has worked flexiplace (at home) over 75% (approx.) of her tour. I seldom initiate a call to her, but if I do it is for business reasons and as her manager

20. While I was on leave from November 2001 to mid-January 2002, Tess Tillotson was the Acting Manager for the Group. Ms. Tillotson was not in my group and not under my supervision. The territory manager, Ms. Fisher assigned Ms. Tillison to be Acting manager while I was on leave. I advised the group that Ms. Tillison would be acting.

21. Bernadette was on extended leave beginning on about November 11, 2001.

22. I telephoned Bernadette while she was on leave during December 2001, while both of us were on leave, regarding a case the acting manager could not locate. A taxpayer's

representative was calling the office complaining about the length of time Bernadette was taking to conclude the examination. While I was on annual leave, in Pittsburgh, PA, Bernadette's Acting Manager, Tess Tillotson, and the Territory Manager, Jeannie Fisher, called me for information and to check with me on the location of the case. I also received e-mails from both of them regarding the telephone calls from the taxpayer's representative, also called the Power of Attorney (POA), and the location of Bernadette's cases. They thought I had knowledge of the location of her cases in the office. I called Bernadette to inquire about the case files and explained the situation. When she and I spoke, I explained to Bernadette that the POA was calling, inquiring about an examination she was conducting and the file had to be retrieved in order for the Acting Manager to respond to the POA. Bernadette informed me that she had the tax return and file at her home. We attempted to, but could not, make arrangements to get the file from her to the office in a timely manner. I called the POA and asked him to wait until January 2002 for a response and he agreed.  Tax returns/cases are required to be maintained in the office when you are not working on them.  Particularly, when one is on extended leave, case files should be locked in the provided cabinet in the office. In addition, Bernadette called me at home in Pittsburgh while I was on leave to request additional sick and/or annual leave. I returned her call and did not have a problem with her contacting me at home while I was on leave , even though I was not her manager at that time.

     23. Plaintiff and I returned to work at about the same time, January 14, 2002.

**Case Reviews**

     24. A manager reviews the case files of Revenue Agents for many reasons, because the manager is responsible for insuring that the agents are following proper procedures, is

responsible for insuring the substance and accuracy of the work, and is responsible for ensuring that work is done in a timely manner. For example: When an agent recommends that a case be closed the manager must review the case for accuracy and completeness of the file and to insure that appropriate tax liability has been calculated and the return is in compliance with the tax law. A manager will also do an in-progress review of a case to see how the agent is progressing in the examination (audit) such reviews may be done to offer guidance and assistance to an agent or to obtain answers for taxpayers. Managers also get aged case reports which indicate how long an agent has been working on a case. A case will be reviewed if it appears that there may be a problem with its age, to ascertain what the agent has been doing and give guidance as is appropriate. Also, there is a statute of limitations beyond which the IRS may not assess unpaid taxes. Therefore a manager is required to review cases to determine whether proper procedures have been complied with to either meet the statute of limitations or obtain waivers from a taxpayer. Indeed, "blowing" a statute on a case, i.e. letting the statute run without appropriate action, is punishable by being placed on leave without pay. A manager is required to document his/her involvement in the case file on the activity record and document any action and recommendation, per RRA '98. Revenue agents are supposed to keep the documentation in their files updated and in accordance with IRS policy, rules and regulations. Case files and work-papers are required to be prepared as action is taken on a case. Every case action should be documented and in condition for review. When I obtain a file from any revenue agent assigned to me, if I observe in a review of a case deficiencies or other issues with the file which need to be addressed, I make notes concerning those issues and share my concerns with the revenue agent. I review in-process cases of everyone in the group at random when the cases cross my desk. I

believe that is a part of my job as a manager to give ongoing feedback, guidance and direction to the agents and to insure that the work is being done properly.  I do not have to "announce" that I may review or spot check any revenue agent's case file.

25. Work load reviews are required to be done at least once a year. A work load review is done on the entire inventory of cases assigned to the agent.

**2001 case reviews**

26. While I was Acting Manager and later when I became the permanent manager of the group, I had occasion to review Bernadette's work. For example:

a. I asked Bernadette for a case which I needed to review because the taxpayer had requested a managerial conference. ROI at 156-57.

b. I also asked Bernadette to give me the oldest case in her inventory (1,114 days) so that I could review it. ROI 158, 155.

c. October 19, 2001: When a taxpayer does not file a tax return a "substitute for return" (SFR) is prepared from IRS information and third party tax information supplied to IRS concerning that taxpayer. The SFR allows IRS to calculate tax liability based on the third party information. If the SFR reflects tax liability, the taxpayer ultimately may receive a notice from the IRS whish sets forth the SFR information and demands payment of the tax due. When an SFR is prepared by a Revenue Agent, it must be reviewed and approved by a supervisor. Bernadette gave to me for approval an SFR dated October 19, 2001. ROI at 104. All of the required procedures had not been followed and required forms were not attached. I noted this and discussed it with Bernadette.

d. October 22, 2001: I received another case which Bernadette submitted to me for

approval to survey, i.e. close out without auditing. See ROI at 105-107. Such action must be approved by a supervisor. When I reviewed the file in order to make an approval decision, I found that there was no cover work-paper and the file was not assembled correctly. I had several questions and attempted to contact Bernadette by telephone, but had to leave a message. I noted that prior to submitting the file to me, there had been no action on the '98 return since June, 2001. I disagreed with Bernadette's recommendation to survey the case because is was a substitute for return matter. SFR's are not surveyed, because the information is not from the taxpayer but from third party filings such as wage and earnings statements, interest and dividend reports from brokers and banks, etc. I assigned the matter to another agent who subsequently concluded the matter with a substantial return of taxes to the U.S.

    e. Another case which I reviewed, also was reviewed because it was submitted for closure. ROI at 108-114.

    f. My note of October 19, refers to a standard operating procedure that Bernadette should have followed. ROI at 115-116.

    g. On October 15, 2001, I issued to Bernadette a memorandum reminding her about cases with short statutes of limitations dates. An employee can be disciplined for letting a statute of limitations expire without proper protection for the service's interest such as timely obtaining a signed waiver from the taxpayer.

    h. Another file, see ROI at 118-128, also was reviewed because of a closure recommendation. On October 31, 2001 Bernadette recommended closing the case, change no change, meaning there was no change in tax liability. ROI at 123. When I reviewed the

file I made various notes about deficiencies in the file such as failure to follow the statute

procedures, work papers not indexed, etc.  Each examination file is required to have a

clear audit trail and documentation to show the steps taken and conclusions reached.

i. In January 2002, I reviewed a case in which the statute of limitations was about

to expire. Based on my review of the file, I directed BL to close the file. It appeared from

the file that the case had not been processed in a timely manner. See ROI at 141-142.

j. A time report run by me on January 18, 2002 reflected that the last time any

work was done on and charged to the case was on July 12, 2001. ROI at 143.

k. On about 1/25/02 I reviewed a case for closure on 1/24/02. ROI at 145-147. I

noted things that should have been done such as most workpapers were not dated and

closing documents and letter (5344 and 3198) were missing.

l. January 30, 2002, the IRS Processing Unit rejected one of Bernadette's cases for

closure because penalties on the taxpayer's accounts needed to be addressed. ROI at 159.

**Assignments: Cases and Acting Manager**

27. I assign cases (work) based on the grade of the case agent considering the current

inventory level, age of cases open in her inventory, collateral duties and priorities, and

knowledge of work schedule or plans.

28. All cases are assigned to my group from our Plan and Special Program Section

(PSP).  Based on what's received, I assign the cases based on the employee's grade level, current

inventory level-- which are cases under examination, age of cases, statute of limitations, joint

committee status (when a case is over a million dollar refund) and claims (taxpayer files for a

refund).  I assign Bernadette cases based on what I receive from PSP, based on the above factors.

At the time in question, Bernadette had had a top priority case – a case involving over $1million in refunds -- in her inventory for over three years.  This is a major factor in assigning new cases.

29. On about August 14, 2001 I had obtained the ILV report for Bernadette's cases. ROI at 155. This report lists all of a Revenue Agent's cases (some with multiple years for one tax payer). Among other information the report reflects the length of time a case has been assigned to the agent [Days Proc] and cumulative hours worked on the case [Cum Time]. Bernadette had approximately 15 cases with 32 tax years in her inventory check this number. One had been assigned 1,114 days; 9 tax years were over 500-873 days old, and 4 were over 200 days old. *Id*.

30. Due to the number of old cases in plaintiff's case load, among my priorities was reviewing the older cases and checking for possible statute of limitations issues.

31. At the beginning of the year 2002, I did not assign Bernadette new cases due to the number of overage cases in Bernadette's inventory.  Taxpayers and/or their representatives were contacting the IRS to convey their frustration with the time it was taking Bernadette to complete their examination. See, e.g. ROI at 338-345.

32. I have not refused to assign cases to Bernadette because they may involve international travel, nor have I refused to allow her to travel to foreign countries if it is required to carry out her duties.  In 2002, I approved her travel to Toronto, Canada in March and to Hong Kong in April.  Moreover, travel cannot be determined merely from the face of a return, which is primarily what I receive when first making assignments.  Whether or not travel is required may depend on factors not reflected on the return such as where relevant documents are maintained or where the taxpayer's representative may be located.

33. In about January 2002 Bernadette inquired about a case in her inventory which she

said had not been assigned to her. She wanted the case "deleted" from her inventory. ROI at 408.

Review of the matter revealed that Bernadette had signed and verified that she had received the

case file on June 6, 2001 and had charged work time to the case. Cases cannot simply be deleted

from the system. They must be examined or surveyed. Therefore I told Bernadette to work the

case. ROI 408-412

34. I do not remember all of the three alleged incidents of "hovering"over Bernadette. In

2002 my office was on a different floor than Bernadette's. She was located in one of the cubicles

on the promenade level where other revenue agents were located. I have had occasion to walk to

her cubicle to ask for a case file for business reasons, and I have stood waiting to receive a file

from her. I do remember the June 4, 2002, incident. Bernadette was insubordinate and did not

give me a case file that I requested. I went to her work cubicle to request the file to make required

manager documentation on the case activity record acknowledging receipt of a Form 872, Statute

of Limitation extension for a short statute case. I asked for the case at approximately 8:45 am and

Bernadette said, "I'll give it to you later." I told her I just needed to document the history sheet

and would give it right back to her. She responded, "I'll give it to you later." I responded, "I have

a meeting to go to later." I was sitting in a chair in her cubicle. She refused to give me the file and

walked out of her cubicle. I went back to my office. When I was entering my office, she was

coming out of the Area Director's Office. I had a workload review scheduled with Revenue

Agent Carl Tenny in the conference room next to the Director's Office. He was the

Vice-President of Chapter 83, and NTEU, so I asked him to accompany me to the Prom Level. I

went to Bernadette's cubicle to ask for the case again. She was not there. We waited about 20

some minutes. Bernadette again refused to give me the file at that time, stating she will give it to

me in 15 minutes. I finally got the case at 2:20 pm. I am required to document the activity of my involvement in cases. Since this case was a short statute case it was a top priority, and I wanted to document my involvement on the case activity record as is required by the Revenue Reform Act of 1998 (RRA'98).

35. I have asked people to act for me when I am out of the office on a temporary basis. None of these acting assignments involved an increase in grade or salary. I have not assigned Bernadette to act for me for the following reasons: She never expressed an interest to act as a manager for me. Bernadette works flexiplace often and is not in the office. I did not know her availability to act because she did not provide me a monthly calendar of her audit plans as requested at the beginning of the year. All other revenue agents in the group provided a calendar except her. Within the last 4 to 6 weeks before December 12, 2002, she started submitting a monthly calendar of her off-site audit plans. When I am going to be out of the office, I first usually ask other managers to act for me in order not to interrupt the revenue agent's work. No one in my group has expressed an interest in acting as manager or volunteered. I think Bernadette is the only one interested in management and I only found that out when I was asked for a reference on a position/program she applied for.

36. Sheryl Templeman is a GS 12 Revenue Agent in my group. I assigned her to act because she was scheduled to be in the office. She was acting on an as needed basis only for short period of time.

37. Acting delegations reflect that the following people acted for me.   ROI at 264-69. (I have identified their positions below); I have also noted Bernadette's out of office status for the pertinent periods:

| Acting Dates | Person acting, position | Bernadette out of office status |
|---|---|---|
| Nov. 13, 2001-Jan 14, 2002 | Tess Tillotson, former acting manager appointed by Jeannie Fisher | Nov 13, 2001- Jan 14, 2002 extended leave |
| Jan 30, 2002 | Robert Stanchik | |
| Jan 31, 2002 | Robert Mosley , former acting manager | |
| Feb.4-8, 2002 | Robert Mosley | Feb. 4,5,8 flexiplace |
| March 18-19, 2002 | Lou Pacho, group manager | March 18-19 in Toronto |
| March 20-22, 2002 | Lou Pacho | March 20-22 in Toronto |
| March 26-29, 2002 | Sheryl Templeman, revenue agent GS-12 | March 26-27 in Toronto March 29 flexiplace |
| April 22-26, 2002 | Sheryl Templeman | April 25-26 flexiplace |
| May 3, 2002 | Sheryl Templeman | May 3, flexiplace |

ROI at pp 397-407; Billy- Lera Time and Attendance Sheets.

**2002 Travel**

38. In about May 2002, Bernadette requested to travel to Canada to audit a taxpayer. She

had completed the examination of one year and had closed the case "No Change" or "Change, No

Change"-- meaning no tax due but a change to taxable income. The subsequent year was not

picked up and made a part of that examination, as required by the IRM on subsequent year

examination. We are required to bring a taxpayer current under examination, meaning if there

was a reason to examine the subsequent year, it should have been part of the previous

examination package. Because of the results of the previous examination and the burden it would

place on the taxpayer to start another examination where we had made no significant changes, I

made a decision that it was not good business nor would it be productive for compliance, per

review of the case and audit pre-analysis, to initiate another examination of this taxpayer. See

ROI at 58.

39. I have not purposely delayed approving travel vouchers, travel advances or any

business progress. If there is a question pertaining to an amount on a voucher or the amount of an

advance, I will ask questions and when my questions are answered and/or clarification is

provided, the travel voucher or advance is approved.

40. Plaintiff indicates that she submitted a request for a travel advance on Wednesday,

March 27, 2002 for travel scheduled to start on April 4, 2002.  The Travel Advance Request

Record reflects that the advance was signed by Bernadette on March 28, 2002. ROI at 419.  I was

on leave on Friday March 29 and on Monday March 30.  When I came back on Tuesday, either I

had a question or did not get around to approving it until Wednesday, April 3, 2002.  The IRS

travel regulations put travelers on notice that requests for advances (SF 1038) must be submitted

through supervisory channels and the completed form should be received by the Fiscal

Management Office at least two weeks before travel is to begin.  ROI at 512.

41. In regards to the travel voucher submitted after the trip, it contained an unallowable

expense. I asked Bernadette to remove the expense but she refused. The expense claimed was a

$56 charge for getting cash with a personal credit card.  This is not an allowable expense.  I

consulted with the Travel Office in Beckley, WVA and reviewed the Travel Manual before asking Bernadette to remove the $56 from her voucher.  She made some other corrections but would not remove the cash advance expense charge from the voucher after I had returned it.  To avoid further delay in processing, I noted on the voucher that I had not approved the expense and forwarded it for processing.  Moreover, the Travel Office reviews vouchers and if there are unallowable expenses, even though the manager may have approved the voucher, they will make the adjustment.  Therefore, the $56 should not have been allowed by the travel office even if I had not noted my disapproval of it.

42.  In September 2002 I denied a travel advance request because I wanted additional information from Bernadette.   Memos, ROI at 207-212.   My previous affidavit also reflects that I disapproved a travel voucher because Bernadette did not apply the approved and issued $1,600.00 travel advance to the travel expenses; the date is not reflected.

**E-mail and Memoranda**

43.  I wrote several memoranda to Bernadette regarding her outstanding relocation advance and preparation of travel vouchers. I documented my communication on the subject for several reasons, because of the age (since late 90's) of the outstanding advance, the sensitivity of the subject, Bernadette's tone and responses to me when I orally tried to discuss the subject, and to document my action to follow-up on the issue per instruction from my manager, Jeannie Fisher. Bernadette told me the relocation advance was none of my business and refused to provide me the status and name of the person she was working with in the budget office. After she was in contact with the Commissioner's office personnel and was told she was required to provide me the information, she provided the person's name. Bernadette became hostile and

unprofessional in her oral communication with me on all issues. Bernadette's travel vouchers and/or travel advances have been an on-going subject of errors, tardiness, and questions. I understand as humans, we all make mistake and that is expected sometimes. However, reviewing Bernadette's vouchers has created doubt as to her understanding and/or her desire to follow the manual and procedures. I have provided her copies of certain sections of the travel manual after discussions. See e.g.ROI at 326-328. All memoranda and e-mails issued to Bernadette by me have been for business purposes and supervisory inquiry into and oversight of business matters.

44. The October 1, 2001 memorandum confirmed my direction to plaintiff to fly from the Washington D.C. area airports when making flights, rather than flying out of New York. ROI at p. 82

45. The memoranda dated October 30, 2001 and February 22, 2002 are part of a series of memoranda concerning the outstanding relocation advance balance which I and plaintiff's other supervisors had been attempting to have her resolve. See ROI at pp 319-325. The October 30, 2001 memorandum. ROI at pp 321-22, also discusses a travel voucher issue.

46. On February 21, 2002, my supervisor, Ms. Fisher, sent to me a memorandum concerning obtaining resolution of plaintiff's relocation advance. ROI at p.318. It directed me to ""direct her [plaintiff] to resolve this issue promptly. She should respond to you regarding confirmation of contact and action taken to resolve this amount." *Id*. On February 22, 2002 I sent plaintiff a memorandum asking her to identify who she was in contact with concerning resolution of the advance. ROI at 319. Attached to the memorandum were prior memoranda I had sent plaintiff concerning the advance. ROI at pp320-323. On April 19, 2002 I sent plaintiff yet another memorandum asking her to pay the advance. ROI at p. 324. As of July 10, 2002 the

advance had not been paid. ROI at p. 333.

47. The March 15, 2002 memorandum responded to a memorandum plaintiff had sent to me. ROI at 203-204. In the memorandum I discuss the issuance of plaintiff's performance evaluation. I also discussed plaintiff's lack of timeliness is requesting travel funds, and communications with tax representatives. *Id*.

48. The June 11 and 13, 2002 e-mails from me are in response to e-mails from Bernadette. ROI at 57-58. They are about my review and questioning of plaintiff's need to travel to Canada to conduct an audit. Plaintiff's examination of prior years had resulted in "no change" and I found "nothing in the file to justify a follow-up audit." June 13, 2002 e-mail, ROI at p. 58.

49. The June 27, 2002 e-mail asked plaintiff to bring a case and case review my office for discussion . It notes that I had been unable to contact plaintiff by telephone at home that morning. ROI at p. 207, 304.

50. I wrote a memorandum to Bernadette on June 5, 2002, concerning the June 4, 2002 incident in which she refused to give me a case file. As the memo states, I finally got the case at 2:20 pm. See ROI at I also recommended that she be issued an official letter of reprimand . I contacted labor relations and prepared the letter to make the recommendation but it was not approved. In the meantime, Bernadette asked to review her Employee Personnel File (EPF). I provided her EPF. I had the draft copy of the letter of reprimand in the front of the binder. Carl Tenny was with her and when she saw it, I told her to disregard it, it was only a draft. It was only a copy in the pocket of the binder; it was not hole punched and filed as was all the other material. I have a practice of placing documents in the pocket pending obtaining an employee's signature and/or second level management approval. Bernadette asked to make a copy and proceeded to

respond as though I had filed it in her binder. I explained to Bernadette that I made the recommendation but it was not approved. The EPF is solely the manager's file. Unlike in years past, the EPF goes to no one but the manager. It is not disclosed to ranking committees for use in making decisions on applications for jobs..

**Performance evaluation**

51. Bernadette is a GS 13, however, the majority of her prepared documents contain errors and/or incompleteness; from time sheets to case related forms. In group meetings and individual discussion, she repeatedly talks about her work experiences. However, her work does not represent outstanding work. I believe I have inherited issues Bernadette has had with previous managers that are the result of her not following procedures, guidelines, and direction of her manager.

52. I based my annual evaluation of Bernadette on the departure evaluation prepared by Mr. Mosely, my review of her case files and the comments and memoranda of the Acting Manager.  As is reflected above, there were errors and omissions in the paper work in her files. Much of her work was not timely.  There were issues concerning statute of limitations expiring. Management was contacted by taxpayer representatives with complaints about her handling of cases.

53. Before doing the performance evaluation, I asked the members of the group to give me self assessments of their work. I did not receive a self assessment from Bernadette.  After I had drafted her performance evaluation I offered Bernadette an opportunity to give me a self assessment concerning her work but she declined to do so. ROI at 270.

54. As to the timing of the evaluation, in about September 2001, the critical elements for revenue agents were changed.  All evaluations were pushed back two months.  Also there is a

30-day grace period for managers to complete evaluations. Thus, although Bernadette contends

that she should have had an evaluation by Jan 21, 2002, the evaluation provided to her on April

30, 2002 was timely. ROI 448

55. I prepared Bernadette's interim evaluation based on my assessment of her work. The

purpose of the interim evaluation is to give an employee an assessment of how the manager

views the employee's work. Her mid-year was based on case reviews from February 1, 2002 -

July 30, 2002, by me and Acting Manager, Maximino Rosado. I based the evaluation on the

cumulative reviews of performance in those six months.

56. The reviews which I conducted of Bernadette' case files and the notes and comments I

put in her files were on going feed back as to my assessment of her work and areas where there

could be improvement.

**Administrative leave to speak with an Employee Assistance Program (EAP) counselor in
March 2002**.

57. I have no knowledge or memory of her requesting administrative leave to speak to a

counselor in March 2002.  I do have notes of a discussion in August 2002 on EAP , ROI at

311-13.

**August 2002, restricted the amount of time she was allowed to review her Employee
Performance Folder (EPF) and included memoranda in the file that were never discussed
with her**.

58. I did not restrict her time to review, our schedules put some restriction on the time

because of prior commitments. Bernadette was allowed to review her binder on several

occasions. After her second time reviewing the binder and making extensive notes, I specifically

asked her to bring her copies of case reviews and documents so we could compare what she may

be missing because all filed documentation in her binder by me have been provided to her. If I

21

had wanted to deliberately keep something from her, I would have removed the draft of the reprimand letter. Carl Tenny was with her on one occasion and another gentleman acting for the chapter president was accompanying her on another occasion. I have not filed anything in Bernadette's binder that she was not provided copies of.  All case reviews are given to the agents to review and see me to discuss, if they chose.  My practice is to retain a copy in the front pocket of the binder until I get the signed copy back from the employee. The memorandum (recommended letter of reprimand) that was in her binder that was not shared with her was a draft for the Territory Manager's signature. It's in reference to the June 5th memorandum regarding insubordination. It's the only thing in the binder that she did not have a copy of and it was not hole punched and filed.

     59. Bernadette's uncooperative behavior and attitude was on-going during 2002. I have tried my best to work with her and be supportive but she has demonstrated that she will do whatever she chooses. I believe my documentation on the outstanding relocation advance; following procedures on travel vouchers, and documentation of her performance are the reasons for her allegations. Bernadette refusing to provide me the case in June of 2002 had to be addressed in writing as I did. On several occasions, I asked for a case and she always tells me

they are at home. I have asked her to keep her cases in the office and only take the one she is working on the days she is working flexiplace. When she returns to the office she has been asked to bring the tax returns and files back to the office. I have asked Bernadette to keep her assigned cases in the office unless she is working on it at the time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 7, 2006 in _Washington, D.C._

(City, State)

_Evelyn Stephens_