AFFIDAVIT

I, Bernadette Billy-Lera, do hereby swear:

INTRODUCTION

I make this affidavit in support of my opposition to the government's motion for summary judgment. Specifically, what follows is a response to the sworn submission of Evelyn Stephens. The numbered paragraphs below in parentheses correspond to the numbered paragraphs in Ms. Stephens' statement.

The theses of my complaint is that Ms. Stephens' harassment of me has made my life absolutely miserable; that Ms. Stephens' harassment of me goes well beyond the routine "bad boss" scenarios that do not rise to the level of being cognizable as civil rights violations under Title VII of the Civil Rights Act of 1964; that Ms. Stephens' actions caused me severe mental anguish that have necessitated my seeing a psychiatrist; that Ms. Stephens' actions directly and adversely affected my credit rating / status under the criteria of all three of the national credit reporting agencies; that Ms. Stephens' physically intimidated me; that Ms. Stephens deliberately -- and illegally -- altered official agency records in her campaign to harass me; and that Ms. Stephens consistently ignored rules that limit her behavior vis-a-vis employees, i.e., rules that were negotiated under the agency's agreement (the NORD agreement) with the National Treasury Employees Union.

1. (#7) In August 2001, Ms. Stephens sat in on an Inventory Validation List ("IVL") review, which Robert Mosley, my Acting Manager, was conducting. After the review Ms. Stephens asked me for two cases and she stated that she wanted to get familiar with

1

EXHIBIT A

my work since most of my cases were considered large cases. She returned the cases to me two days later. She did not get back to me about those cases.

2. (#8) It was not during the IVL review meeting that the discussion regarding travel occurred. On September 4, 2001, I received an e-mail from Mr. Mosley to meet with him regarding travel vouchers. A copy of that e-mail was sent to Ms. Stephens. On that day I asked Ms. Stephens to accompany me to the 1:00 p.m. meeting. During that meeting Mr. Mosley stated that my expenses on a trip to San Francisco was overstated by one dollar, according to his calculation. In addition he asked that I remove expenses that I incurred. He had delayed the processing of my request for a $1,928.74 reimbursement involving overseas travel because of a one-dollar difference of opinion. Moreover, he failed to properly notify me that the voucher was being held up because of his conclusion. By the time this matter was resolved my credit had been damaged.

I told Mr. Mosley that the delay in processing my voucher was unconscionable. He became boisterous and unprofessional. I told him that I would not tolerate him speaking to me in that manner. See page 357 of the Report of Investigation ("ROI"), where Mr. Mosley admitted that he lost his temper. At no time was I unprofessional in the discussion.

3. (#9) After Mr. Mosley walked out of the meeting, Ms. Stephens apologized for his behavior. It was the first time that I had an opportunity to speak with her as my manager. I told her that I had filed an EEO complaint against Mr. Mosley. I also told her that this is the first time in my employment history that I did not get along with my supervisor.

2

4. I told Ms. Stephens that Mr. Mosley did not approve my vouchers in a timely manner and that I was receiving letters from Citibank informing me that my charging privileges would be suspended. On October 16, 2001, my government credit card privileges were suspended for non-payment.  This has also been adversely reflected in my credit history. Ms. Stephens advised me to correct the voucher as if I flew directly to San Francisco on Monday 6, and returned on Friday, so as to eliminate my per diem.  She also suggested that since the cost to New York was *di minimus* that I should include the amount on Monday August 6, 2001 and returned on Friday August 10, 2001.  See page 356, e-mail to Jeannie Fisher and Robert Mosley.  A copy was never sent to me.

Ms. Stephens suggested that I should do a comparison of the cost of traveling directly from the Washington, D.C area to San Francisco than from New York City.  I did and the cost of traveling from New York City to San Francisco was less.  I left the room thinking that I will not have to be in such a stressful and hostile environment again. I was wrong.

THREE TRAVEL VOUCHER in 2001

5. Ms. Stephens procrastinated in approving my travel vouchers.  On September 14, 2001, I submitted three travel vouchers to Ms. Stephens for approval. ROI at page 102-103.  See also, *Internal Revenue Service Interim Travel Handbook* Section 6.17, Section 7.09, C and the Internal Revenue Handbook (IRM) 12.3 states that management must notify an employee at a maximum time period of (7) seven working days for notifying an employee that the travel claim is not proper.

The vouchers were for travel to the following:

3

(1) London from July 19 to August 3, 2001, submitted for approval September 14, 2001. I was informed on October 5, 2001 that there was an error. This was twenty one (21) days after submission.

(2) San Francisco August 5 to August 11, 2001.

(3) Honolulu , August 19 to August 31 2001. There was no error but it took Ms. Stephens 28 days to submit this for processing.

See ROI at page 102- 103.

6. (#11) Prior to Ms. Stephens being my manager, when I left for trips to Europe, I would fly from New York City. I did so based on reasonable accommodations and the time factor of the flights from New York. Second, it was cost effective. Third, there were day flights available, in contrast to the D.C-area airports where there were only late evenings and night flights available.   One must also take into consideration that revenue agents are not reimbursed or accommodated for flying during non-working hours. Therefore, I could not be compensated in earning credit hours or in monetary amounts for traveling during non-working hours.  In addition, when I stopped overnight in New York City I saved the government money because I did not incurred a hotel bill since I stayed with family. See ROI at page 192. The note on page 383 was never given to me. Ms Stephens refers to a voucher from July 19, 2001 to August 3, 2001. This voucher was submitted to Ms. Stephens on September 14, 2001; however in Block 13, ROI at page 358, Ms. Stephens seems to have signed the voucher on October 10, 2001.

For travel to London via New York on July 19, 2001, I am entitled to the per diem compensation because I was in travel status. As explained above, I incurred no lodging

because I stayed with relatives.  On the July 20, 2001, I took a taxi to the airport for

London as indicated in my flight itinerary.

There was mistake on my part for the duplicated expenses for meals incurred.  On

October 11, 2001, I corrected the voucher and resubmitted to Mrs. Stephens.

7.  (#12)  The voucher referred was for travel to San Francisco from August 5 to August

11, 2001.  This voucher was originally submitted to Mr. Mosley, acting manager, on

August 16, 2001.  This voucher was computer generated on our system referred to as

TRAS.  See ROI at pages 369-372.  After I submitted the voucher through TRAS, I

called Mr. Mosley to inform him that I had submitted the voucher.  During the

conversation, he stated he had mistakenly deleted my voucher.  I resubmitted the second

time.  See ROI at pages 376 to 379.

On September 4, 2001, Mr. Mosley told me, **for the first time**, that he was not going to

approve my voucher.  He gave me the original copy and he stated that based on his

calculation of the route I took, it cost the Government an extra $1.00.

Mr. Mosley asked me to exclude the perdiem I incurred in New York.  I refused to do so

and he became loud and boisterous.  Approximately half an hour after the meeting, I was

approached by the then vice president of the union, Carl Tenny.  He asked if he could

speak with me privately.  In the meeting, he told me that he spoke to Mr. Mosley and

they both agreed that I should delete the per diem I incurred in New York and complete

my voucher as if I flew from an airport in the Washington D.C area rather than New

York.  See ROI at page 80 for an e-mail by Robert Mosley that references Carl Tenny.

I told Mr. Tenny that his suggestion was not an option, as it cannot be substantiated. I also told him that I arrived from San Francisco to New York at approximately 11 p.m and based on the travel guidelines I am allowed to spend the night in New York.

I resubmitted the voucher to Ms. Stephens on September 14, 2001. The voucher date was changed because I was instructed to do so by Ms. Stephens. In a conversation on September 4, 2001, Ms Stephens instructed me to include my expenses incurred on Sunday August 5, 2001 to Monday August 6, 2001 because the amount was diminimus. She also instructed me to delete the per diem I incurred for August 5 and August 11 to avoid delay since my charging privileges will be suspended if Citibank did not receive payment. See ROI at page 80.

The voucher Ms. Stephens provided on page 373 to 375 of the ROI was sent in error. It was corrected and resubmitted the same day for approval. For the voucher on the above pages Ms. Stephens did not provide the date of certification because she knows that she received the corrected voucher minutes after I realized the error. See Exhibit A, which is the corrected voucher with certification. Page 77 to which Ms. Stephens referred was never given to me.

8. (#13) With respect to the third voucher with travel to Honolulu, incurred from August 19 to August 31, 2001 was submitted to Ms. Stephens on September 14, 2001. There were no errors but Ms. Stephens's approval was after October 11, 2001. See page 192

9. (#14) On September 28, 2001 I received a message from Ms. Stephens. She left me her home phone number in Pittsburgh. I returned her call and we scheduled a meeting on October 1, 2001 to discuss the travel vouchers I submitted. During that meeting she

6

asked that I travel directly from the Washington, DC area and I agreed. An e-mail was sent to both me and Jeannie Fisher, Territory Manager.

I thought that it was the end of our conversation and would reframe from past practice. However on October 3, 2001 I received a memo from Ms. Stephens. See ROI at page 191. I responded to her memo. Id. at 193.

10. (#15) After I received her memo regarding Performance of Travel, I realized that Ms. Stephens could not be trusted and that she was taking retaliatory measures by unduly procrastinating approval of my travel vouchers.

The travel manual states that management should inform employees of errors on their voucher with 7 seven days. I was informed of errors from 19 to 28 days after submission of my vouchers. On October 1, 2001, per travel voucher dated August 6 to August 11, 2001 while transmitting the corrected voucher for Ms. Stephens' approval, the voucher was "locked" due to systematic problems. Since it was after 5:00 p.m I left a message for Mr. Ellis Moss, the system administrator to unlock the voucher. In addition, I informed Ms. Stephens that the voucher was locked and that I had called Mr. Moss to unlock the voucher. Ms. Stephens did not provide all details to the message by Mr. Moss on page 385 of the ROI. She omitted an important detail. She failed to mention that I was the person who contacted Mr. Moss about the problem.

I made all requested corrections that I was instructed to about the vouchers. Ms. Stephens did not specify the corrections that were not made. As a result, I cannot comment further.

11. (#16) In regard to relocation, I was never reimbursed for my household expenses. I was not informed of the procedures. I was in conversation of having the matter resolved. See ROI at page 195 and at pages 199 and 200 for my responses.

CONTACT AT HOME

12. (#19) Per the NORD agreement, I was within my rights to work flexi place. See ROI at page 14, evidencing that management agreed that I could work flexi place until the underlying issues were settled. I never did any work schedule than was not allowed per the NORD agreement. Ms. Stephens was aware of my work location at all times. On or approximately November 28, 2001, while I was on extended sick leave, I left a message on Ms. Stephens voice mail at work to seek her advice on extended sick leave, since I was not familiar with the procedure. I also sought the advice of the leave bank administrator, who later informed me of the procedure. When Ms. Stephens returned my call a few days later, I informed her that I got the information I needed. I never called Ms. Stephens home during that period.

Despite repeatedly asking Ms. Stephens verbally, by phone and by e-mail not to contact me at home when I am on leave or during non-working hours, she ignored my requests and makes calls to my home at odd hours during the evenings. On April 2, 2002 she called my home at approximately 6:15 p.m. and asked me to return her call between that time and 8:30 p.m. The following day I sent Ms. Stephens a fax from my EAP counselor regarding her call to my home at odd hours. ROI at page 213 - 214.

On May 9, 2002, I was on annual leave and Ms Stephens called my home. On June 27, 2002 she called my home and bullied me regarding a case; she demanded that I come to the office, although I told her that I would be in the office the following day. The

8

following day, June 28, 2002 I was in the office and Ms. Stephens walked passed my

desk. She looked at me but did not acknowledge me. On Monday June 30, 2002, I

received a malicious memo from Ms. Stephens, which stated that I refused to follow

direct instructions by not being in the office. ROI at page 207 - 208.

13. (# 20) On Friday October 19, 2001, I orally informed Ms. Stephens that I will be out

of the office on sick leave from November 11, 2001 to December 16, 2001, because I was

scheduled for major surgery. I followed with a doctor's note prior to being out of the

office. Ms. Stephens never conducted a work-load review prior to me being on sick

leave. In addition, Ms Stephens never informed me that she would be out of the office

during the period that I was out. Typically, when an employee will be out of the office

for a prolong period of time, the manager conducts a work load review and may or may

not assign cases that are of high importance (based on the statute of limitation or the

issues involved). I closed most of the cases in my inventory prior to leaving on sick

leave. Ms. Stephens never informed me not to take case files to my home while I was on

leave. Ms. Stephens has keys to all of my cabinets.

On Friday, December 7, 2001, Ms. Stephens called my home while I was on sick leave.

The answering machine came on as I answered the phone and she refused to speak to me,

apparently because the machine was recording our conversation.

She called my home again. During that conversation, she bullied me regarding a case I

took with me to work on while I was on sick leave. I took the case home with me

notwithstanding the fact that it should have been reassigned to another agent. Ms.

Stephens was well aware that the taxpayer had refused to extend the statute of limitations.

In addition, I had received a favorable memorandum from the Chief Counsel's office and I was working with an issues specialist.

Regarding the above case, I informed Ms. Stephens that I was on my way to New York to be with my family to recuperate, within the half hour. I told Ms. Stephens that after I received a key to my home vault from my sister, I would have the case file forwarded to her. It seems that my explanation was insufficient, because Ms. Stephens called my home yet again on December 7, 2001. Ms. Jeannie Fisher, the Territory Manager, also called my home requesting when it was a good time to come for the case on Ms. Stephens' behalf.

I called both Ms. Stephens and Ms. Fisher on December 21, 2001 and on December 28, 2001 because the case file was available; however neither of them returned my call. In fact, since no one came for the case I bought it to work upon my return on January 14, 2002. Ms. Stephens then took the case on January 14, 2002 and ordered me not to consult with either the issue specialist or the Representative and she ordered me to close the case with the notation "NO CHANGE." I told her if she wanted me to follow her instructions, she should issue a memorandum with her instructions. See ROI at page 142.

CASE REVIEWS

14. (#24) It is true as Ms. Stephens stated that a manager will perform an in-progress review of a case to see how the agent is progressing in the examination. She continued to say that the progress is done to offer guidance and assistance to the agent or to obtain answers to the taxpayers. She also stated that a manager is required to document his/her involvement in the case file on the activity record and document any action and

recommendations taken, per RRA'98. Ms. Stephens commented on "blowing" a statute is punishable by being placed on leave without pay.

15. (#26) Ms. Stephens stated that she asked me for a case to be reviewed for a managerial conference. ROI at page 156-157. The first that I saw these notes was in the ROI. I have orally informed Ms. Stephens and also sent her written documentation that I cannot read her handwriting and I prefer her to type any feedback to me whether it may be positive or negative. Her notes on ROI at pages 156- 157 are not comprehensible and certainly could be useful to anyone. There is no date on these notes. Ms. Stephens should have written a memorandum. All feedback from case reviews done by Ms. Stephens was uniformly negative with biased communication.

16. The case referenced in paragraph 26 (b) of Ms. Stephens statement, that was in IRS review for 1,114 days, was a case that was **reassigned** to me in June 2001. It had not become an old case during my tenure with it. This case was closed in November 2001 because the taxpayer did not respond to my correspondences. This case was closed within the Internal Revenue Manual guidance. The case was a Joint Committee Case (JCC) and could only be closed as such with an agreement from the taxpayer. As stated above, the taxpayer did not respond. Accordingly, the case was closed un-agreed and a report was issued to the taxpayer. There was no memorandum from Ms. Stephens issuing guidance on this case. There is no substantiation that Ms. Stephens wrote in the activity records. Again, the ROI was the first place that I saw her note.

17. (#26 (c) and 26 (d)) Ms. Stephens makes a reference to ROI pages 105 to 107. These pages are based on one taxpayer for whom I had tax returns for three years. The tax returns consisted of the periods ending December 31, 1998, 1999, and 2000.

The taxpayer filed the 1998 tax return. The tax returns for the 1999 and 2000 were filed as Substitute for Return (SFR). An Agent can use his/her discretion to make a determination to survey a tax return that the taxpayer filed with the Internal Revenue Service. I made that decision and it was accepted by the acting manager, Robert Mosley who also suggested filing a Substitute for Return (SFR) on the 1999 and 2000 years. See ROI at page 107, which is also based on the same taxpayer

Ms. Stephens referenced page 105, and labeled this page as Employee A and Employee B. It is unclear what she means. This page is based upon a 1998 tax return, per Ms. Stephens' note, which I never received

Ms. Stephens insisted that agents in her group should use a form that was made-up by the Pittsburg District to update cases to the main system. I refused to do so and instead use the form intended for that use which was accepted throughout the Service. Each time I updated a case Ms. Stephens will have the secretary input the information on the "Pittsburg form." In retrospect, Form 3198 is a closing document that is placed on the case file after closing. I was not closing this case. It was given to Ms. Stephens for approval for SFR. Stephens' affidavit page 9.

18. (# 26(e)) When a case file is sent from the review section it is always accompanied with a memorandum stating errors. Ms Stephens did not substantiate any such memoranda. Ms Stephens references to Employees "C", "D", "E" and "F" which is based on the same taxpayer who filed the amended tax return on page 114.

The amount of the claim was "$108,869.00" and the issue concerns a Foreign Tax credit. See page 112, which referenced employee "D", which is part of the report signed as agreed by the taxpayer's Representative.

Page 113, referenced Employee "E", is also part of the report and the taxpayers Representative signed the agreed report.  The date, July 20, 2001 on the reports on pages 112 and 113 are the same. The Representative' signature is truly the same on pages 112 and 113. Page 114 is the amended return where Ms Stephens deleted the Representative's signature. She also labeled the page as employee "D' and Employee "F". In spite of her misdirection, one can verify that the claim amount of " $108,869" which was allowed in full matched.  The report amount corresponded to the activity records.  Ms Stephens is not telling the truth, based on the information she gave there are discrepancies regarding the number of taxpayers.  I have shown that there is only one taxpayer based on the information Ms. Stephens has documented. Ms Stephens took partial extracts from the file based on the activity records, and of Form 4318 that gives a reviewer a very brief synopsis of the issues examined.

19.  (#26(g))  During my career as an Agent I have always protected the Government's interest and have never been disciplined for the expiration of a statute. It is managerial duty to issue a statute reports to all agents in the group if applicable.

Ms. Stephens; reference to ROI pages 118 – 128 is based on one taxpayer with two examination years.  She referred to the taxpayer as Employee "F" and to the Representative as Employee "L".  After I submitted the case to Ms. Stephens, it was never returned to me for any errors.  Page 124 and Page 125 are the same.  Apparently Ms. Stephens whited-out the dates and wrote Employee"L".  Pages 126 & 127 are also the same.  The case was closed "change no change" based on the examination.  See ROI at page 201- 202.

20.  (#26(i))  The case in question is the case I made reference to which both Ms. Stephens and Ms. Fisher wanted to see while I was on sick leave in December.  I was unable to conduct the audit because my government credit card had been suspended by Citibank in October, when I had scheduled to meet with the issue specialist.  Ms. Stephens was aware of the problem because I related this to her in several conversations and through a memorandum (See attached) dated November 6, 2001 regarding my overage inventory.  Ms. Stephens was quite aware that Chief Counsel and the issue specialist were involved with the case.  The taxpayer's Representative was a procrastinator.

As previously stated, when I returned to work on January 14, 2002, Ms Stephens asked for the case.  I was ordered to close the case "No Change" and not to contact the issue specialist or the taxpayer.  I did as I was told.

21.  (#26(k))  I do not know to which case Ms. Stephens is referring.  If a memo was issued why didn't she include it together with the above pages?

22.  (#26 (l))  This is the only case that returned through case processing.  It is not unusual that once in a while an agent will receive this correspondence from the unit.

Assignment: Cases and Acting Manager.

23.  (#27)  Ms. Stephens failed to assign me cases that were consistent with my grade level, thus depriving me the opportunity to do grade level appropriate work.  Ms. Stephens has instead ensured that only low caliber cases are assigned to me. For an agent of my academic and working credentials, this is an under-utilization of my skills.  It is also demeaning.  The cases were assigned to Grade 11 and Grade 12 agents who were sent to tax shelter training.  I was senior to those agents who were offered the tax shelter

14

training that was never offered to me.  In fact, prior to Ms. Stephens becoming my

manager, I had worked a tax shelter case with the help of a tax shelter specialist.

From my return to work after 10 weeks of sick leave on January 14, 2001 my inventory

was low.  In March and May 2002 I was assigned new cases, which were not in

conformity to my grade level.  These cases were less complex and had asset levels that

were lower that my previous assignments.  By asset level, I mean the company's net

worth.  In a memo dated June 5, 2002 Ms Stephens commented "Bernadette, your

inventory is lean (low), I will be assigning you new cases."

24.  (#28)  The fact that the group receives cases from the Plan and Special Program

Section (PSP) does not change the fact that tax shelter cases were received and none were

issued to me.  The case of which Ms. Stephens referred to with over $1 million in

refunds was not issued by her.  I received the case in June of 2001 and closed this case in

November 2001, prior to going on extended sick leave due to non response from the

taxpayer who had changed Representatives.

25.  (#29)  On August 14, 2001, the IVL was conducted with Acting Manager, Robert

Mosley and Ms. Stephens who had recently reported as my Acting Manager.

The case she referenced with "1,114 days in her inventory" was, as noted about,

transferred to me June 2001, from an agent who retired in May 2001 from the group.  Ms.

Stephen's accusation is absurd on its face because I was not in the group for 5 years.

In addition to that case above, I also received at least three more over aged cases in my

inventory from the same retired agent, who was a grade 13 agent.

It is not uncommon for a taxpayer or a taxpayer's Representative to call an agent's

manager to complain of the audit if it is not in the taxpayer's favor.  For example the first

15

case on pages 338 to 340 in the ROI, is related to the incident of management calling my home while I was on extended sick leave. I will reiterate that a workload review was never been done prior to my being on extended leave

The Representative refused to sign a statute extension, and in addition I received a favorable memorandum from Chief Counsel regarding the issues on the case. In addition, I was coordinating the issue with an issue specialist. As a result, the Representative knew that I was on extended leave because there was a message on my voice mail. And he realized that I would close the case for statute notice and then he would have to go to tax court to defend his client.

Sometimes, as with the second case that is referenced in ROI pages 341 –345, the Representative does not provide the information needed to expedite the examination. Indeed, some of the items on the document request were furnish in un-translated Japanese! As a result, the Representative's action delayed the audit. This was a case where Ms. Stephens spoke to the taxpayer's Representative for almost an hour (56 minutes, by her estimate) but she did not have the courtesy to tell me about this contact. Moreover, she had this contact without the benefit of the case file or prior consultation with me, in violation of office protocol.

25. (#32) The cases referenced to in this paragraph were cases given to me by my prior managers. In accordance to the Internal Revenue Manual Agents should conduct the audits where the taxpayer's books and records are located. I will reiterate the caliber of cases I received from Ms. Stephens is office audit cases. By that I mean the taxpayer can mail the information to the Agent. The cases present no challenge to my experience.

16

26. (#33) Ms. Stephens forced a case onto my inventory that she had never assigned to me in January 2002. On January 31, 2002, I found the case in my inventory that Ms. Stephens claimed that she did not assign to me. ROI at page 233. Ms. Stephens made no attempt to clarify the matter, telling me instead to work all cases in my inventory. An Agent cases are assigned by the group manager. On occasions an Agent may request cases but that request has to be approved by the manager. There are protocols that need to be followed for control purposes and for the Agency's regulation under the Restructuring and Reform Act of 1998. Prior to me going on extended sick leave on November 11, 2001, I did not make requests for the cases, nor were there any records that I have requested any cases.

In January 2002, through a memo and verbally, I informed Ms. Stephens of a case I was assigned on June 6, 2001, that had a Service Center controlled code. On august 15, 2001 during an inventory review I informed both Mr. Mosley and Ms. Stephens that the cases has to be updated to a status code so that it can be included in my inventory. I had performed the clerical duties; however, management did not follow through. In October 2001, I orally reminded Ms. Stephens to update the case. However, the problem was not rectified. On January 16, 2002, I sent a memo to Ms. Stephens alerting her of the on going problem and the status of the case.

I also forwarded a memo together with the case to the PSP section, where the tax returns are classified because there was less than thirteen months on the statute. When a case has less than 13 months on the statute, it is surveyed by management and is not assigned to an agent. The case was returned from PSP and, contrary to office protocol, Ms. Stephens told me it was my responsibility. On February 22, 2002, Ms. Stephens wrote me an

17

unfavorable memo pertaining to this case, even though it was not updated to the group level. The unfavorable memo was placed in my Employee Personal Folder (EPF). As of February 28, 2002 the service Center code was not updated, indicating that the case should not be worked because of its status code. See ROI at page 248.

In February 2000, I closed an old and complex case that had originally been given to me by my former supervisor, John Hawley. Nevertheless, this case was reflected in my inventory on November 2000, on January 16, 2002 and again on September 20, 2002. I informed Ms. Stephens that the case was closed in February 2000. She was informed both orally and through memoranda. See ROI at page 228-229. Nevertheless, Ms. Stephens unfairly criticized my annual performance, in part because of this case.

27. (# 34) Ms. Stephens stands over my desk while I am working and makes frequent requests of me during the day to come to her office under the pretext that she has to discuss urgent business. On February 26, 2002 Ms Stephens came to my desk and asked for a case. While I was retrieving the case file from my desk Ms. Stephens stood over my shoulder in an intimidating manner. I asked her not to stand over my shoulders however she ignored my request.

That afternoon she called me and asked me to come to her office to discuss a case. The discussion was pertaining to a case we had discussed earlier in the day. Later that afternoon at approximately 6:10 p.m. she came to my desk and hovered over me again. I told her that I did not appreciate that demeaning manner and again I was ignored.

On March 1, 2002, Ms. Stephens came to my desk and requested a case. She hovered over my shoulder as usual and I told her I did not appreciate her behavior. She ignored me.

I often receive telephone calls from Ms. Stephens demanding me to come to her office to discuss urgent issues. For Example, at approximately 4:25p.m on October 24, 2002 Ms. Stephens call me and demanded that I come to her office. I told her I was getting ready to leave for the day. Before I had the opportunity to ask her what were the issues she hung up the phone were.

On March 27, 2002, I gave Ms. Stephens a case for update and she performed a case review on it without my knowledge. On May 6 and May 15 2002 she did the same thing. Such spontaneous evaluation is not appropriate because, according to office protocol, agents should be given time to prepare for such reviews.

On June 4, 2002 Ms. Stephens came to my cubicle and was intimidating and forceful in asking for two cases. I informed her that I needed five minutes to prepare a statute update on one of the tax returns. She insisted that she needed the case file immediately. When I reached into my cabinet she was very close to me, physically touching me. I asked her to move but still she refused to move. I left her standing in my cubicle and went to speak to the Acting area Compliance Director, Ronald Pinsky, about her unprofessional behavior.

28. (#35) Ms. Stephens denied me the opportunity to act as manager, thus depriving me of the opportunity to satisfy criteria for promotion in the agency. For an agent of my academic and working credentials this is an under utilization of my skills. It is very demeaning. Being a senior agent in the group and I was never given the opportunity to act as manager. Instead my co-workers, Sheryl Templeman and Ivy Chamberlain, (GS12) agents were given the opportunity. To add insult to injury other agents who were not assigned to our group acted as manager over the last year. In September 2001 I had a

19

conversation with Ms. Stephens and indicated my interest in acting as manager. She told me usually when she is out of the she always has a senior agent acting as the manager and I would have the opportunity. In fact my time was made available on the sign-in and sign-out book for at least three weeks in advance. Ms. Stephens was made aware by the president of the National Treasury Employee Union (NTEU), Jack Gregory that providing her a calendar is a change in working condition per USC 5111. Mr. Gregory also told Ms. Stephens that documentation of an agent's whereabouts in the sign-in sign-out book is sufficient. See ROI at page 261-269. Also, Ms. Stephens was well aware that I was working flexi place. ROI at page 14.

TRAVEL

29. (#38) Ms. Stephens refuses to give me cases with international implication that require international travel. An agent is required to visit the taxpayers' place of business for examination of the taxpayer's books and records if they are located abroad. The cases that were assigned to me were domestic cases. There were tax shelter cases with international implications, but none were assigned to me. Thus, Ms. Stephens refused to allow me to do my job in accordance with the IRM.

On February 24, 2003 I submitted a request for travel, to Canada on March 24, 2003. This type of request takes between 3 days to one week to process. Ms Stephens never processed my request. Approximately, two weeks after submission I asked Ms Stephens of the status of request and she told me that she gave the request to Jeannie Fisher, the Territory Manager for approval.

Approximately, three days prior to my travel date she stated that she forgot to give the request to Ms. Fisher. I had to cancel my appointment and the case was delayed.

Possibly, this was a way to punish me and force me to withdraw my EEO complaint a clear and denial of my rights as an employee and my constitutional rights. During the time I was given low-level domestic cases while my lower grade ed co-workers traveled internationally on tax shelter and trust cases.

The case referred to for travel to Canada was closed "Change no Change" meaning there was a tax deficiency but because the taxpayer had a credit which was carried over from previous years there was no tax deficiency. During the fieldwork this could not have determined.

During the fieldwork, I was compiling relevant information from the document that I issued prior to the audit. Conclusions were not drawn. Based on the amount of credit that the taxpayer had available for the present year being audited it was not a "cut and dry" decision that the subsequent year was deemed worthy of audit. After the conclusion of the first year agent made the decision.

If the same pattern is followed, and relevant issues worth of examination are found, an agent will proceed to examine the subsequent year. During the field work there was no consistency that all the adjustments made for the current year was also included in the subsequent year. For the subsequent year, the same issues (as well as new issues) needed to be examined.

See ROI at page 57-58.

30. (# 39 to # 42) Ms. Stephens procrastinated in approving my travel advances, making it difficult for me to do my job. On September 14, I submitted three travel vouchers for her approval but it took Ms. Stephens until September 28, 2001 to notify me that there

21

were errors on two vouchers and that she needed additional information for two of the vouchers.

In March 26, 2001, Ms. Stephens was at a different Post of Duty when I informed by speaking to her on the telephone and through her VMS that I will be submitting a request for an advance for travel to Hong Kong. Ms Stephens told me that she has access to the TRAS system and she will approve the travel once I made the request. When a travel advance is made on the TRAS system the amount is available within three to five working days.

I submitted the travel request via TRAS, not on Form SF 1038, on March 28, 2002 and spoke to Ms. Stephens on that day. She assured me that she will make the approval that day. On Tuesday April 2, 2002 I was working flexi place I called Ms. Stephens regarding the request and she told me that she made the approval on the Tuesday I spoke to her.

I was on Government travel in the Far East and, before my departure, I did not receive an advance of funds. Therefore, I used my personal credit card for cash and incurred a transaction fee of $56.00. After I had filed my manual voucher, and unknown to me, Ms Stephens wrote a memo to the travel office disallowing the fee amount although she knew that I did not receive the Government advance until after I returned to the United States. In addition, in accordance to the travel manual the fees are reimbursable. See e-mail from Debra Carr from the travel office in West Virginia.

Ms. Stephens had previously cited that the transaction fees I incurred was not reimbursable she cited the TRAS Coordinator Mr. Ellis Moss. But, Mr. Moss only inputs on the TRAS system and he does not audit or pay manual vouchers for the travel office.

On September 17, 2002, I submitted a travel advance that Ms. Stephens denied on

September 18, 2002, without giving me an opportunity to respond to any questions she

may have.  Ms. Stephens had prior knowledge of those appointments schedule for

September 23 to September 27, 2002 and September 30 to October 4, 2002.  Ms Stephens

and I discussed the appointments during a 4502 time (i.e., inventory) review on August

27, 2002.

Ms. Stephens claimed that she denied the travel because she wanted additional

information from me.  The additional information was a comparison of driving my

personal vehicle to Harrisburg Pennsylvania as compared to the airfare on my travel

advance. See ROI at pages 207 to 212 and pages 217-220, 222-227.

31.  (#43) I was never rude, unprofessional or boisterous to Ms. Stephens.  I have

always treated her with respect.  In contrast, Ms Stephen's communications to me are

bullish and rife with bias. For example, page 207, the topic "Request for S Case file

Directive." page 195 the first paragraph  " I prefer face to face discussion..." ROI at

page 202, 209 to 210.  I have never told Ms. Stephens that the travel and relocation

advance due was none of her business.  I provided her with the information she

requested.  See ROI at page 225-227 and pages 199 & 200.

In reference to the travel and the handbook referenced on ROI at pages 326-328, please

refer to my note on ROI at page 226-227.

Per IRM travel manual an advance will be considered taxable to the employee if the

amount is not paid within 120 days or four month.  I have liquidated all advances and

none was deemed taxable.

32. (#44) On October 1, 2001 Ms. Stephens and I had a meeting to discuss three travel vouchers I submitted on September 14, 2001. During that meeting she asked me to refrain from going to New York when traveling to London or to the east cost and I agreed. In addition to the e-mail she sent to Jeannie Fisher and copied to me she issued a memorandum. See page 191. I sensed this as an act of mistrust and deceit. I responded to her memo. See page 193

33. (#45 & #46) As stated in my responses to Ms. Stephens, the issue is being resolved. See ROI at pages 199 and 200.

34. (#47) In reference to Ms. Stephens' memo see ROI at page 205 -206. Ms. Stephens had already prepared my evaluation and she told me that it was given to Jeannie Fisher, the Territory Manager for approval. I thought it was pointless to prepare a self assessment at that time. Ms. Stephens was unfamiliar with Form SF 1035, I provided her with the procedures and the telephone number and location and name of the imp rest fund cashier. Regarding communication with the Representative Ms. Stephens and I had two conferences with the same Representative. On one occasion she instructed me not to contact the representative or the issue specialist with whom I was working. She further advised me to close the case "for the good of the service," since the taxpayer refused to sign Form 872 to extend the statute of limitation. On the other occasion we had two managerial conferences with the other representative. On one occasion Ms. Stephens told me that she spoke to the representative for 56 minutes in my absence, even though she did not have the case file to refer to.

35. (#48) The case referred to for travel to Canada was closed "Change no Change" meaning there was a tax deficiency but because the taxpayer had a credit it was carried

over from previous years as a result. During the fieldwork this could not have
determined.

During the fieldwork I was compiling relevant information from the document that I
issued prior to the audit. Conclusions were not drawn. Based on the amount of credit
that the taxpayer had available for the present year being audited it was not a "cut and
dry" decision that the subsequent year was deemed worthy of audit. After the conclusion
of the first year agent made the decision.

An agent will proceed to examine the subsequent year if the same pattern is followed.
During the field work there was no consistency that all the adjustments made for the
current year was also included in the subsequent year. For the subsequent year there
were some of the same as well as different issues to be examined. See ROI page
at 57- 58.

36. (#49) The June 27, 2002 memo was entitled " Request for E .. case File Directive"
my response on page 208. I explained to Ms. Stephens that the phone rang out because I
had dial –up and one phone line for my computer. The following day I followed Ms.
Stephens request and worked at my Post of Duty instead of flexi place as planned on the
three week sign-in and sigh-out book

The memorandum Ms. Stephens reference regarding alleged in subornation did not
contain the facts. She never mentioned that while in my cubicle, she was offensive and
spoke to me in an unprofessional and demeaning manner. In fact, she was so close to me
that she physically touched me. Ms. Stephens surreptitiously placed a memo about me in
my EPF and no action was taken by her superiors for this outrageous behavior. The
NORD agreement states that any and all information in an employee's EPF must be

shared with them. Ms. Stephens has clearly violated the NORD agreement. See ROI at page 218-219.

PERFORMANCE EVALUATION

37. (#51) Ms. Stephens violated the NORD Agreement's 52-duration and Termination, Article 12 A, B (2), C, D, E, L, M, N, The IRS Restructuring and Reform Act of 1988, and Section 1203 3 (B)(1) and Section 6, when I was given a late and unfair annual appraisal on April 30, 2002, covering a rating period February 1, 2001 through January 31, 2002 that was not based on prior work load reviews, case reviews or self assessment. See ROI at page 542. I was rated under the old NORD Agreement, Article 52, effective from July 1, 1998 to June 30, 2002. Id.

In Ms. Stephens's affidavit, on page 9, she states: "Work load reviews are required to be done at least once a year. A work load review is done on the entire inventory of cases assigned to the agent." Contrary to her sworn statement, a work load review was never performed on my inventory for the period of my evaluation (i.e., February 1, 2001 to January 31, 2002). Robert Mosley, who was acting manager prior to Ms. Stephens becoming my manager in July 2001, performed a work load review of my inventory on January 10, 2001 for my annual appraisal for February 1, 2000 to January 31, 2001. After that date Mr. Mosley never performed another work load review or a departure review of my inventory as required in the NORD agreement.

Mr. Mosley performed the work load review of my inventory on January 10 2001 that date excludes my annual appraisal for the above period. Also, in October 2001, I gave Ms. Stephens approximately one-month advance notice of my extended sick leave and yet she failed to perform a work load review of my inventory.

Contrary to her sworn statement, during the period Ms. Stephens did not send an e-mail to her employees regarding self-assessment. The old NORD agreement was in effect and an employee's evaluation was based on the date of promotion. I asked Ms. Stephens for a copy of the e-mail and she stated that she did not send one. I asked two members of the group and they both stated that they did not see an e-mail based on self- assessment. See affidavits attached infra.

One would expect that if my work was substandard my manager would counsel me, as required by the NORD agreement. Ms. Stephens has never counseled me. In fact, I was not even aware that my evaluation rating would be decreased, because this was never communicated to me. ROI at pages 448-451 and pages 270-273. My evaluation was covered under the old NORD agreement. Please also see the criteria for work load review in the Management Handbook. See ROI at page 529 (Section M & N) and pages 270-273.

39. It is not unusual that a taxpayer or a Representative will call an agent's manager to complain about an agent if the taxpayer or the Representative does not want to fully comply with the agent's document request. Sometimes the information requested can lead into other issues on the tax return that the agent may deem unrelated at that time. I have always protected the Government's interest by being mindful of the statute of limitation to assess any tax deficiency that may occur. I have never "Blown" a statute. On April 30, 2002 I received an annual appraisal for the period February 1, 2001 through January 31, 2002. This evaluation misrepresented my performance on two critical elements: Employee Satisfaction and Business Results; in both elements I received a numerical rating of a 3. My evaluation on both elements under my regular manager was

a 4. In addition to misrepresenting my performance, Ms. Stephens procrastinated until April 30, 2002 before giving me my evaluation. This delay occurs in spite of repeated requests to my manager both orally and by way of memo that I needed the evaluation to apply for job opportunities then available.

40. The NTEU chapter president informed me that he was never notified that my evaluation was late. During the rating period I never received a work load review. Ms. Stephens officially became my manager on or about September 1, 2001. On Thursday March 7, 2002, Ms. Stephens informed me by telephone that my appraisal was completed and was awaiting the territory manager Jeannie Fisher's signature. I asked her what information she used to evaluate my performance and she told me she used the information in my EPF and that the matter was in dispute. Moreover, I had an EEO complaint pending against the acting manager, Mr. Mosley, who prepared the information Ms. Stephens used to prepare my evaluation.

Before giving me my evaluation, Ms. Stephens asked me for an annual self-assessment on March 7, 2002. I had responded with a memo dated March 14, 2002, in which I explained to her since she had already made up her mind and prepared the evaluation based on unobjective information it was pointless to give her a self-assessment. Her assessment had already been made and was already awaiting the territory manager's signature. See ROI page 532 (Section D) NORD Agreement

41. It came to my attention later that Ms. Stephens had signed the evaluation on March 4, 2002, three days subsequent to her asking me for a self-assessment and. Territory manager Jeannie Fisher signed it on March 14, 2002, even before receiving my response. Even though Ms. Stephens was reminded and knew that my evaluation was due, she

never performed a work load review of my inventory. She instead asked me to produce two case files and I complied with her request. Ms. Stephens never informed me that she was going to perform a work in progress and used that as a basis to write a review of my performance.

42. Usually, managers advise agents in advance to prepare for a work load review then a date is set for the review. In fact Ms. Stephens has done this with other agents in the group, but never gave me a chance to prepare for my review. Ms. Stephens took concrete steps to malign me, as are evident on two counts, relative to my evaluation.

Employee satisfaction: Criteria 1A, being a Revenue Agent for more than fourteen years I have always treated my peers in a courteous and professional manner to foster excellent working relationship. I have always maintained good working relationship with peers across the country, as well as issue specialists with whom I am often in contact to support issues on my cases. My evaluation does not reflect this performance. Employee satisfaction: Criterion 1B, this is a new critical element given the time frame of implementation, this element could not be observed. This element is therefore not valid, but instead calculated to cause me harm. See ROI Page 532 (Section 11 & 12) NORD Agreements. During the rating period, there were cases in my inventory with activity codes of 221 to 225. These types of cases are now worked in Large and Midsize Business (LMSB). These cases are usually worked with a team of agents including issue specialists. These cases were successfully closed as "agreed." In addition, during the last four months of my rating period my inventory consisted of seven cases. No work load review was performed. I reiterate that Ms. Stephens performed two case reviews without my knowledge. On one occasion the case was given to her for a statute update.

Instead of the statute update she performed an evaluation, which was completely without

foundation and totally disregard information contained in the file in the electronic form.

Ms. Stephens never even looked at the electronic file, basing her evaluation instead on an

otherwise empty file.  This particular episode was an egregious act of retaliation.

43.  During the rating period and during my career as an agent, I have consistently

prioritized cases and identified issues, with the necessary pre-audit analyses.   Because of

the nature of some of the cases I have had on occasion to consult with issue specialists

and counsel to ensure adequate case development and expedite closure.  I have

consistently visited the taxpayer's place of business where the books and records are kept

to perform fieldwork.  An example of an exception of this would be Ms. Stephens'

refusal to approve my travel, to examine the taxpayer's records located in Canadian.

44.  Not only does my evaluation not reflect this performance; it also misrepresented my

performance.  Ms. Stephens violated NORD Agreement Article 12 (P) and the IRS

Restructuring Act, and Reform Act 1998 Section 1203 3(B) (1) and Section 6, when I

received an unfair mid year evaluation with no narratives.  In August 2002, I received my

mid year evaluation, my ratings were decreased and there were no narratives attached

rendering the evaluation incomplete.  Ms. Stephens refused to give me a complete

evaluation, only the memo dated July 30, 2002 was received in my mailbox on 8/6/02.

On August 20, 2002 I had a conference with Ms. Stephens I asked Union Stewart Dianne

Regear to accompany me to the meeting to discuss my mid year evaluation and to ask

Ms. Stephens specifically why my rating was decreased.  Ms. Stephens did not answer

my specific question.  I was never counseled nor was I aware that Ms. Stephens intended

to decrease my evaluation because this was never communicated to me.

Under the NORD Agreement when a rating is decreased for the mid year evaluation the manager must counsel the employee to help that employee increase their rating prior to the employee's annual appraisal. For the period my rating fell under the old NORD agreement. ROI pages 270-273.

Ms Stephens stated that the information she used for my mid year evaluation was from her assessment and from an acting manager, Maximino Rosado. Mr. Rosado, acted for one week (1) during the week of July 4, 2002. The case he criticized was a closed case. Ms. Stephens was involved with this case and had on occasion written in the activity record. Ms. Stephens was aware of the issues and the difficulty I had in obtaining the information from the Representative. The information I requested was not translated in English when I received it. Nevertheless, she asked Mr. Rosado to critized the case. That was not a case review it was not constructively done for learning experience.

It is unheard of that an employee from another group who acts for a manager for only one week will complete a case review on his fellow employee and it would be used against the fellow employee for evaluation purposes.

45. (#57) Ms. Stephens violated the IRS Restructuring Act of 1998 Section 1203 3(B) (1), & Section 6, and the IRS Personal Handbook, when she refused to grant me permission to speak with an Employee Assistance Program (EAP) counselor in March 2002. Ms. Stephens lied when she stated "I have no knowledge or memory of her requesting administrative leave to speak to a counselor in March 2002. I do have notes of a discussion in August 2002 on EAP, see ROI pages at 311-13. ROI at page 63 is the documentation regarding EAP, which I gave Ms. Stephens in March 2002. This page was also given to my EEO counselor prior to May 2002 when my complaint was

31

officially filed. Ms. Stephens stated that during our conversation in August she gave me the citing for administration time for EEO, ROI Page 312, if one look carefully one would see it was the same cite I have given Ms. Stephens. What Ms. Stephens did was to accentuate the star next to the paragraph and altered the bottom portion to denote that it was taken from the web site on 7/23/02. If indeed Ms. Stephens got the citing on July 23, 2002 why didn't she inform me that she made a mistake?

Ms. Stephens also indicated ROI page 313, however Ms. Stephens omitted the full conversation that occurred Ms. Stephens purposely omitted my response to her see ROI pages 280 & 281. During a conference with Ms. Stephens on February 14, 2002 I informed her that I would be meeting with an EAP counselor and she told me that I would need to take annual leave or sick leave for that purpose. I indicated to her that I am entitled to have two hours of administrative time. She disagreed. On March 4, 2002 and on April 2, 2002, Ms. Stephens refused to grant me administrative time to keep an appointment with an EAP counselor, suggesting instead that I take personal time or sick leave. On March 14, 2002 I gave Ms. Stephens the citation denoting that I am entitled to the administrative time to attend the conference with an EAP counselor. As a result, I took credit hours that I earned plus my lunchtime. My appointment with the counselor was to discuss the stressful, hostile working environment. The rules and regulation clearly states that I am allowed the time two hours of administration time for four visits with my counselor.

During a group meeting on May 30, 2002, I introduced the topic of taking administration time to an EAP counselor. Jack Gregory, the NTEU President, was at the meeting. He clearly emphasized that we are entitled to the administration time and not to have to take

sick or annual leave.  Ms. Stephens said she was unaware of that it was her understanding

that an employee has to take annual or sick leave.  See ROI page 63 dated 3/14/02.

46. (# 58-59)  August 2002, restricted the amount of time I was allowed to review my

Employee Performance Folder (EPF) and include memoranda I the file which was never

discussed with me.  Ms. Stephens violated IRS Restructuring and Reform Act of 1998,

Section 1203 3 (B) (1) and Section 6 and NORD Agreement Article 7 Section (A), (B),

Section 2 Section 4, when in August 2002, restricted the amount of time she allowed me

to review my Employee Performance Folder (EPF) and included memoranda in the file

that was never discussed nor given to me.

47.  My manager's retaliatory measures have now progressed to the point where she

engages in power play and unethical conduct in furtherance of her malicious intent to

undermine me.  On August 20, 2002 I asked to view my EPF.  I wanted to view my EPF

because I had just discussed my mid year performance with Ms. Stephens wanted to

know what information she used since my specific questions were not answered.  Union

Stewart, Representative Diane Regar was present with me.  She had never discussed this

with me and I was never aware of the insubordination act.  In any event the territory

manager rejected her recommendation, but Ms. Stephens nevertheless, maliciously placed

the letter in my EPF.  When I confronted her regarding the memo, she told me that it was

never approved.  Ms. Stephen then restricted the review to half an hour, stating that she

had a 2:00 PM meeting.  We then scheduled an appointment to continue the review the

following day at 1:00 PM.  On the following day when I called to continue the review,

Ms. Stephens told me that she had a 1 p.m. lunch appointment and she will call me upon

her return.  At approximately 2:25 p.m. she called stating that I can my file but she will

be leaving the office at 3 p.m. This effectively restricted the review to thirty minutes. I scheduled another appointment with her the following day, and she told me that she would call me on that day (8/22/02) to confirm a time. That day I went to Ms, Stephen's office at least oh three occasions but each time she was out of her office. Believing that Ms. Stephens was deliberately trying to stall me, I sent her an e-mail with two proposed dates to conclude the viewing of my files. That same day (8/22/02) at 4:04 p.m., Ms. Stephens sent me a VMS stating she was in and out of the office all day and could not meet with me. On Monday August 27, 2002 I received a VMS from Ms. Stephens stating that that she wanted to perform a 4502, which is a inventory time report review AFTER the review I can conclude viewing my EPF. On Wednesday August 28, 2002, MS. Stephen did a 4502 review as she stated in a prior VMS AFTER the review; Ms. Stephens gave me 40 minutes to view my EPF. She then told me that my time was over and if I wanted more time to view my EPF, I can get the information from my EEO counselor. During the review of my EPF I discovered memos in the file that were never given to me. In addition, some of my responses to her memos were not included in the EPF. See ROI at pages 83, 84, 88, 90, and 208.

48. Ms. Stephens appeared to be selectively placing misinformation including fictitious memos in my EPF in furtherance of her retaliation against me  See ROI at pages 279-286. Reading Ms. Stephen's affidavit one would think that at the first opportunity that I had to leave the group that she would be happy. However this is not the case. I have asked to leave the group and Area 15 for the past four years but it fell upon deaf ears. I have had the opportunity to most recently to Large and Midsize Size Business in an International Group. However, the Area Director refused to sign my release.

I am being harassed verbally, physically and mentally and am working in a hostile, intimidating environment. My manager's retaliatory measures have progressed to the point where there is managerial abuse. The above actions are causing me stress and mental anguish. Track record plays a very important part of one's career within the IRS. With low evaluation and selected information being placed in my EPF this has harmed my career to move up within the IRS.


Bernadette Billy-Lera


Sworn to and subscribed before me this 2_8_ day of July 2006.

Notary Public
My Com Exp 4/16/06