Equal Employment Opportunity Commission
Washington Field Office
1400 L. Street, NW, Suite 200
Washington, D.C.  20005

| | | |
|---|---|---|
| **BERNADETTE S. BILLY-LERA** | ) | |
| Complainant | ) | EEOC No.  100-A2-8013X |
| | ) | |
| vs. | ) | |
| | ) | Agency No.  01-1139 |
| **PAUL H. O'NEILL**, Secretary | ) | |
| U.S. Department of the Treasury, | ) | Administrative Judge: |
| Agency | ) | Jeannette Walters-Marquez |
| | ) | |

## AGENCY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### PROCEDURAL BACKGROUND

Complainant, Bernadette Billy-Lera, filed her original *INDIVIDUAL COMPLAINT OF EMPLOYMENT DISCRIMINATION* on April 27, 2001. Investigative File, p.002.  The original complaint alleged discrimination on the basis of "National Origin." Investigative File, p.003. The following December, Billy-Lera requested that her Complaint be modified to include race and sex as additional bases of discrimination. Investigative File, p. 154-E.  On January 4, 2002, Billy-Lera's request was granted, and her Complaint was modified. Investigative File, p.154-A.  The final claim, now pending before this Commission, raises the following issues for determination:

> "*Whether the Complainant was harassed with regard to work assignments and work conditions due to discrimination based on her race (African-American), sex (female), and National Origin (West Indian) and retaliation for her involvement in the EEO complaint process.  In support of the claim, the Complainant states that:*
>
> (1)    on February 6, 2001, she received a numerical rating for the critical

element "Workload Management" on the Workload Survey that did not accurately reflect the level of work she performed;[1]

(2)     on December 21, 2000, while working flexiplace, management insisted on conducting case reviews at her home;

(3)     in December 2000, management required the Complainant to complete weekly ATAO reports when the reports were due on a monthly basis;

(4)     from October 2000 through December 2000, management interfered with the Complainant's audit procedures, and

(5)     management continually denied the Complainant an opportunity to act in a managerial position for an extended time period.

Whether the Complainant was retaliated against because of her prior EEO involvement (sought EEO counseling on February 6, 2001) when:

(1)     beginning in February 2001, management caused the suspension of the Complainant's issued government credit card by delaying approval of travel vouchers; and

(2)     on October 10, 2001, management lowered the Complainant's departure rating."

Investigative File, pp. 154A-154B

---

1.     Significantly, in her response to a Request for Admission propounded by Agency counsel, Billy-Lera has now abandoned her claim that Mosley's rating of her performance was discriminatory.  Specifically, Billy-Lera — a "highly educated female" — who had benefit of counsel at the time — denied that the ratings she received for the job elements "Workload Management" and "Customer Relations" arose out of Mosley's discrimination against her because she is a black American, highly educated female of West Indian origin. **Exhibit E: Request #6.**  She has also abandoned her claim that she was rated lower by Mosley in retaliation for filing her EEO complaint. **Exhibit E: Request #4.**

## UNDISPUTED FACTS

The undisputed, material, dispositive facts in this case are as follows:  Bernadette Billy-Lera is a black, female. Investigative File, p.168.  She was born in Trinidad, West Indies and immigrated to the United States in 1979. Answers to Interrogatory, #14, 15. She describes herself numerous times in the Record as "*a black American, highly-educated female of West Indian origin.*" See, e.g., Investigative File, p.169, 171; Answer to Interrogatory, #1  At all times relevant to this action, Billy-Lera was an employee of the Internal Revenue Service. Investigative File, p.168.  In 1997, she became a member of Group 1110. Investigative File, p. 170.  She states that she was "*the only black female with a GS/512-13 series in my group.*" Investigative File, p. 005; Answer to Interrogatory, #9.

At all times relevant to this action, Billy-Lera was supposed to work out of her home four (4) days per week, and in the office one (1) day per week under an arrangement known as "Flexi-place." Tillotson Affidavit, ¶5.  When Billy-Lera worked "flexi-place" in her home, the only means her supervisor had to communicate with her directly was by telephone. Tillotson Affidavit, ¶8. E-mail communication was also available, but it did not constitute a direct form of communication.

Mr. Manual Brown served as Acting Manager of Group 1110 from approximately May 2000 to October 2000. Investigative File, p. 203.  When Brown took over, the previous manager of Group 1110 assigned him the task of performing workload reviews on each member of the group. Investigative File, pp. 183, 204.  The "Workload Review," which consists of a manager's review of the work done in all cases assigned to an employee, is a tool which provides management with an overall picture of the employee's productivity and technical skills, as well as enabling the manager to evaluate employee performance, provide direction when needed, and identify training needs. Investigative File, pp. 179-180; 183-184.  It is a procedure provided for in the *Internal Revenue Manual*. Investigative File, pp. 179-180; 184, fn. 1.  Although Brown completed the workload reviews for all the other members of Group 1110 (Investigative File, p.184), two scheduled attempts to do a review of the cases assigned to Billy-Lera never took place. Id.

Παγε ]3]

In October 2000, Tess Tillotson became Acting Manager of Group 1110 for a period which ended in January,2001. Tillotson Affidavit, ¶2; Investigative File, p.007. Billy-Lera states that "*Tess Tillotson, as a Grade 12 agent did not have the experience or background to evaluate my work, since most of my cases are at the Grade 13 level.*" Investigative File, pp. 005; Investigative File, p.169. Mr. Manual Brown assisted Tillotson with her management duties during a portion of this time. Tillotson Affidavit, ¶2; Investigative File, p.008.

Tillotson attempted to complete the workload reviews for Group 1110. Tillotson Affidavit, ¶3, 6, 8-10; Investigative File, p.183. Billy-Lera's problems with Tillotson began as soon as she stepped in as Billy-Lera's manager. Investigative File, p.007. According to Billy-Lera the root of her problems with Tillotson was not discrimination, but a spurned luncheon invitation. Id. Billy-Lera claims that Tillotson invited her to have lunch and she refused. Id. Consequently, according to Billy-Lera —

> "*Ever since then Tess began to ignore me and issue directions to me through third parties, telephone, even when I'm in the office and VMS. The situation gradually became more Culminating* [sic] *in a series of onerous request* [sic] *for workload reviews.*"
> Investigative File, p.007

On or about October 30, 2000, Tillotson sent an e-mail to Billy-Lera, attempting to schedule a workload review:

> "*Hi Bernadette:*
>
> "*Your workload review needs to be completed this week.  It can either be Thursday, 1:00 PM, or Friday, 9:00AM.  Please get back to me by 10-31-00 which time you would like.  Thank you. Tes*"
> Tillotson Affidavit, ¶6; Investigative File, p.193.

Tillotson's e-mail was delivered almost instantly. Tillotson Affidavit, ¶6; Investigative File, p.194. Billy-Lera did not contact Tillotson to schedule the review. Tillotson Affidavit, ¶6; Investigative File, p.187

On November 8, 2000, Manual Brown sent Billy-Lera an e-mail:

*"Bernadette:*
*"Your workload review is due.  It was originally scheduled on August 24th,*
*2000.  Bring in all of your inventory on Thursday October [sic] 9th, 2000 so it*
*can be done. "* Investigative File, p.198.  *See also:* Investigative File, p.187.

On November 9, when Billy-Lera failed to appear at the office for her review as directed, and after the Agency e-mail system notified Tillotson that Billy-Lera had just deleted her October 30 e-mail concerning the workload review, Tillotson called Billy-Lera (who working at home) and stated that she needed to come in for a review of her workload. Tillotson Affidavit, ¶8; Investigative File, p. 195. Billy-Lera refused to set a date for a review, and angrily told her supervisor never to bother her at home again. Id. And then Billy-Lera hung up on her supervisor. Id.

On or about December 21, 2000, Tillotson telephoned Billy-Lera at her home-workplace in a further attempt to schedule the long-delayed workload review. Tillotson Affidavit, ¶9; Investigative File, p.187. Tillotson suggested the date of December 27 — a date when Billy-Lera was scheduled to be working in the office. Tillotson Affidavit, ¶9. Billy-Lera rejected that date, on grounds that she was working on a "priority case." Tillotson Affidavit, ¶9. When Billy-Lera's supervisor asked her employee the name of the "priority case," Billy-Lera refused to disclose it. Tillotson Affidavit, ¶9. Once again, the telephone conversation ended when Billy-Lera abruptly hung up on her manager. Id.

By the end of December, 2000, Billy-Lera's allegedly "inferior" managers had been attempting — without success — to conduct a review of her workload for more than four (4) months. At the end of December, Tillotson drafted a *Memorandum* directing that Billy-Lera bring her cases into the office for a workload review. Tillotson Affidavit, ¶10; Investigative File, p. 184. *See Also:* Memorandum, Investigative File, p. 187. Tillotson warned that Billy-Lera's continued disregard of management's instructions would be treated as insubordination and could subject her to disciplinary action. Tillotson Affidavit, ¶10. Tillotson also warned that if Billy-Lera persisted in her  refusal to permit management to

review her workload, she would jeopardize her continued privilege of working at home ("*flexi-place*"). Id.

Tillotson sent the *Memorandum* to Billy-Lera by express courier, and then tracked it's delivery. Tillotson Affidavit, ¶10.  The courier made three unsuccessful attempts to deliver the *Memorandum* to Billy-Lera's home. Tillotson Affidavit, ¶ 10. Finally, when Billy-Lera was in the office on December 27, 2000, Tillotson handed her a copy of the *Memorandum*. Tillotson Affidavit, ¶10.  The courier eventually returned the original *Memorandum* to Tillotson as undeliverable. Id.

Tillotson avers that she never "insisted" on performing a workload review at Billy-Lera's home.  Rather, after the failure of repeated attempts to have Billy-Lera submit to a workload review at the office, Tillotson offered — as a convenience to Billy-Lera — to conduct the review at her home. Tillotson Affidavit, ¶11.  She made the offer, Billy-Lera rejected it, and that was the last time a review at the flexi-place workplace was discussed. Tillotson Affidavit, ¶11.

Billy-Lera's flexi-place arrangement made her home her workplace, and under those circumstances, the telephone was the only means management had to speak directly with their employee. Tillotson Affidavit, ¶8. Tillotson avers that the only calls she *ever* made to Billy-Lera's home were made during normal business hours, and pertained only to IRS business. Tillotson Affidavit, ¶8.

Since the filing of her Complaint, Billy-Lera has apparently withdrawn her claim that Tillotson's offer to do the Workload Review at her home constituted discrimination.  In response to an Agency Request for Admission, Billy-Lera — with benefit of counsel — denied that "*management's request to conduct a workload review at her flex-place workplace was based upon her race, gender and/or national origin.*" Exhibit E, Response to Request for Admission #8.

**Interference With Audits.** During Tillotson's tenure as Acting manager of Group 1110, the only complaints she received concerning the agents she supervised were complaints about Billy-Lera. Tillotson Affidavit, ¶12. Taxpayers or their representatives are free to contact an agent's supervisor with complaints, and one of the manager's responsibilities is to try to resolve such complaints. Tillotson Affidavit, ¶12. Tillotson received complaints on four or five of the cases Billy-Lera was handling. Tillotson Affidavit, ¶12. All expressed displeasure with Billy-Lera's delay and lack of attention to their case. Tillotson Affidavit, ¶12. Tillotson's practice was to take down the name of the complaining taxpayer (or that of his representative), the complaints expressed, and any other information given her. Tillotson Affidavit, ¶12. She then called Billy-Lera and directed her bring the taxpayer's file in so that she could review it with Billy-Lera, contact the taxpayer and resolve the matter. Tillotson Affidavit, ¶12. Billy-Lera not only refused to bring her cases in as directed, but in at least one such instance abruptly hung up on Tillotson. Tillotson Affidavit, ¶12. The foregoing instances constitute the only involvement Tillotson had with Bernadette Billy-Lera's cases ("audits") as Acting Manager. Tillotson Affidavit, ¶12. Tillotson avers that since Billy-Lera maintained the files and she had no access to them, it would have been impossible for her to communicate with, much less identify anyone involved with Billy-Lera's audits unless they first contacted her. Tillotson Affidavit, ¶12. Tillotson's only involvement with Billy-Lera's audits arose out of her attempts to resolve taxpayer complaints pursuant to her responsibilities as Billy-Lera's Acting Manager. Id.

**ATAO Reports.** When Jeannie Fisher became Territory 1 Manager, SB/SE Compliance, Area 15 in September 2000, she directed that all ATAO cases in her unit be identified and reported upon weekly. As Acting Manager of Group 1110, Tillotson required all the agents in Group 1110 to provide weekly ATAO reports. Tillotson Affidavit, ¶13. All the agents in Group 1110 *did* provide weekly ATAO reports — *except* Bernadette Billy-Lera. Id. Although Tillotson specifically instructed her to provide the weekly reports, Billy-Lera refused to comply. Id.

Tillotson's stint as Acting Manager ended in January 2001, and Robert Mosley followed her as the Acting Manager of Group 1110. Tillotson Affidavit, ¶14; Mosley Affidavit, ¶12.   Mosley served as Billy-Lera's manager until she was transferred to a different unit in August 2001. Mosley Affidavit, ¶2; Investigative File, p. 200. Although Billy-Lera admits that she is not familiar with Mosley's background, she concludes that he — like Tillotson — "is not as qualified as I am;" that Mosley's qualifications are "inferior" to her own; and that he was "unqualified" to evaluate her work. Response to Interrogatories, #1; Investigative File, p.169.

Mosley conducted the January 8 workload review scheduled by Tillotson. Mosley Affidavit, ¶3; Investigative File, p. 200. As a result of his review, Mosley rated Billy-Lera's performance rating in the areas of "Workload Management" as "Fully Successful" (3). Mosley Affidavit, ¶3; Investigative File, p.201. Mosley assigned a numerical rating to Billy-Lera's review because, in his experience, all workload reviews he had ever seen had numerical ratings. Mosley Affidavit, ¶3. The attribution of a numerical rating did not change the substance, meaning or effect of Mosley's rating in any material way. Mosley Affidavit, ¶3.

Mosley avers that his review disclosed that Billy-Lera had a number of over-age cases, and cases which she had allowed to run perilously close to the statute of limitations. Mosley Affidavit, ¶3. He found that her inventory of cases consisted of priority cases on which she delayed starting to work on for long periods of time.   Mosley Affidavit, ¶3. Mosley  discovered instances where Billy-Lera had not followed up on outstanding information requests in a timely fashion, and that she had failed to review and consider evidence and/or additional information received from taxpayers and their representatives. Mosley Affidavit, ¶3.

The ratings Billy-Lera received in the Workload Review were used for "informational" purposes by management, and were intended as an informal advisory to Billy-Lera of problem areas in her performance, and of management's expectations for her. Mosley

Affidavit, ¶4; <u>Tillotson Affidavit</u>, ¶4. Mosley's Workload Review did not adversely affect any term, condition or privilege of Billy-Lera's employment. <u>Mosley Affidavit</u>, ¶4. Her salary was not affected. <u>Id.</u>
Her benefits were not affected. <u>Id</u>. Her title, grade and duties were not affected. <u>Id</u>.

Perhaps in recognition of the obvious, Billy-Lera has now abandoned her claim that Mosley's rating of her performance was discriminatory. Specifically, Billy-Lera , with benefit of counsel, has <u>denied</u> that the ratings she received for the job elements "Workload Management" arose out of Mosley's discrimination against her because she is a black American, highly educated female of West Indian origin. Exhibit E: <u>Response to Request for Admission</u> #6. She has also abandoned her claim that she was rated lower by Mosley in retaliation for filing her EEO complaint. Exhibit E: <u>Response to Request for Admission</u> #4.

"DELAYED" TRAVEL VOUCHERS. Government employees whose duties involve travel pay their travel expenses by credit card. <u>Mosley Affidavit</u>, ¶7. The card is issued in the employee's name by a financial institution approved by the federal government, and it is the employee's responsibility to timely pay the balance on her card. <u>Mosley Affidavit</u>, ¶7; <u>IRM</u> 122.2(2). When the employee returns from business-related travel, it is her responsibility to promptly submit a voucher to her supervisor, requesting reimbursement of her job-related expenses, including expenses charged to the travel card.[2] <u>IRM</u>, 122.3(1)[3]; 731[4] Approved expenses are then reimbursed to the employee. <u>Mosley Affidavit</u>, ¶7.

---

2.    In addition to expenses charged to the travel card, the government employee is allowed a fixed amount of spending money ("*per diem*") for each day of travel. Mileage and other allowances may also be available, where appropriate. *See:* <u>IRM</u> 511 at <u>Investigative File</u>,

p.201-10

3.    <u>Investigative File</u>, p.201-7

4.    <u>Investigative File</u>, p.201-18

The government's travel regulations require the traveling federal worker use the method of transportation which results in the greatest advantage to the government —

> "*Travelers are responsible for exercising prudence and economy when incurring reimbursable travel expenses in the performance of official travel. Traveler shall use the method of transportation that results in the greatest overall advantage to the Government. . . . Travelers should plan travel to minimize per diem expense to the service. . . .*" IRM 122.1(2); Mosley Affidavit, ¶6. *See also:* IRM 410 (4).[5]

IRS regulations further specifically state that the traveler's personal preference is not a valid criteria for selecting a mode of transportation which is less advantageous to the government. Mosley Affidavit, ¶6; IRM 410 (4)(a).[6] IRM 410(5) states:

> "*Employees should travel by a usually-traveled route. Employees may travel by another route if there is an official need.* **Travelers who travel by an indirect rout or interrupt travel by a direct route for personal reasons will personally bear any additional expense. . .**" *{Emphasis Added}* Investigative File, p. 201-9

Once the traveling employee has submitted her voucher seeking reimbursement for travel expenses, that voucher is reviewed by her "approving official." Mosley Affidavit, ¶7; Investigative File, p. 201-18. The approving official determines the "*propriety of the points visited, time and length of each trip, modes of transportation used, and any special or unusual expenditures.*" Mosley Affidavit, ¶7; Investigative File, p. 201-18. Agency regulations found at IRM732.2(2)(a) specifically provide that —

> "*The mode of transportation must be consistent with the assignment, and not chosen for personal preference or convenience.*" Investigative File, p.201-20.

---

5.    Investigative File at 201-8

6.    Investigative File, p. 201-8

IRS travel regulations also provided a procedure for situations involving "questionable" expenses. <u>IRM</u> 733 (2)[7] provides that travelers should not claim travel expenses that appear to have been improperly incurred; undisputed items may be submitted for prompt payment, and employees disputing disallowed travel claims may request review by a higher authority than the authority which originally disallowed the claim. <u>Id</u>.

In the year 2001, Billy-Lera's business-related travel included trips to London (07/19/01 to 08/03/01), San Francisco (08/05-11/01), and Hawaii (08/19-31/01). <u>Investigative File</u>, p.204-11.   Billy-Lera submitted a voucher to Mosley claiming reimbursement for travel expenses relating to the San Francisco trip involving a Monday audit. <u>Mosley Affidavit</u>, ¶5.  In Billy-Lera's voucher, Mosley found that she had chosen to travel by automobile (as a passenger) from Washington, D.C. to New York on the Friday before her audit, stay in New York on Saturday and Sunday, and then fly to San Francisco the following Monday. <u>Mosley Affidavit</u>, ¶5; <u>Investigative File</u>, p.201-1. Billy-Lera had no business to conduct in New York on Saturday, Sunday or Monday, but nonetheless sought $92 in <i>per diem</i>, together with mileage and tolls attendant to the drive from Washington to New York. <u>Mosley Affidavit</u>, ¶5, 6.  Mileage reimbursement is not available to automobile passengers. <u>Mosley Affidavit</u>, ¶6.   Significantly, Billy-Lera submitted no claim for reimbursement of lodging expenses while in New York, and Mosley was aware that Billy-Lera has family in that state. <u>Mosley Affidavit</u>, ¶5. Her return flight brought her back to New York, and she took a shuttle flight back to Washington. <u>Mosley Affidavit</u>, ¶5.  Billy-Lera also expected the government to pay the cost of her shuttle airfare. <u>Id</u>.

When Mosley questioned Billy-Lera's decision to fly out of New York, she stated that she did so because the airfare for the New York-San Francisco flight was $20 cheaper than the Washington-San Francisco fare. <u>Mosley Affidavit</u>, ¶6.  Mosley found that the itinerary

---

7.      <u>Investigative File</u>, p. 201-21

chosen by Billy-Lera was costlier to the Government than a direct flight from Washington to San Francisco, notwithstanding the $20 Billy-Lera "saved" on airfare. Mosley Affidavit, ¶6; Investigative File, p.201-1. The expenses to which Mosley objected amounted to just $198.18, and consisted of the following:

| | |
|---|---|
| $ 22.43 | Car ride to New York on Sunday (8-5-01) |
| $  3.00 | Tolls (8-5-01) |
| $ 46.00 | Full day per diem on 8-5-01 |
| $ 46.00 | Full day per diem on Friday |
| $ 35.00 | Cab Fare in New York on Friday |
| $ 45.75 | Airfare on Saturday |
| $198.18[8] | |

Mosley Affidavit, ¶5;  Investigative File, p. 201-18.

Seeing no business purpose or savings to the Government in the New York trip, Mosley disallowed Billy-Lera's voucher, telling her that she needed to correct and resubmit it for payment. Mosley Affidavit, ¶6; Investigative File, p. 201-18; Investigative File, pp. 201-1, 204-2. In doing so, Mosley acted in accordance with his responsibility as the official responsible for approving/disapproving Billy-Lera's travel voucher under Agency regulations found at IRM 121.1, et seq., and IRM 732.1, et seq.

Government regulations provide for the appeal of disputed travel expense claims. Essentially, the regulations provide that when an item of travel expense claimed by an employee is disallowed by the reviewing official, the employee may submit a voucher claiming the undisputed items for prompt payment, and then request review of the disputed expenses by a higher authority. Mosley Affidavit ¶7. Rather than simply submitting a voucher for her non-New York expenses, obtaining payment for the bulk of her travel expenses, and then appealing the denial of the $198 attributable to her New York side trip, Billy-Lera refused to correct her voucher, and insisted that Mosley approve payment for the itinerary that she had chosen. Mosley Affidavit, ¶7. She then apparently attempted to shift

---

8.    Investigative File, p.201-38

the burden of her obstinacy onto the credit card company by omitting to pay her monthly statement when it came due.  And the credit card company suspended her credit card. Mosley Affidavit, ¶7.

Evelyn M. Stephens succeeded Mosley as Billy-Lera's Acting Manager. Investigative File, p.204-1; Stephens Affidavit, ¶2. Stephens recalls attending a meeting between Billy-Lera and Mosley. Investigative File, p.204-2; Stephens Affidavit, ¶3.  One of the topics was the status of Billy-Lera's travel vouchers. Id.  In that meeting, Mosley again advised Billy-Lera that she needed to submit a voucher with the disallowed New York expenses excised to obtain payment of her San Francisco travel expenses. Id.  Stephens — who has served in management since 1987 immediately recognized that the expenses of the New York side trip were improper, and she also advised Billy-Lera to make the corrections Mosley required.  Stephens Affidavit, ¶4, 5.

Despite this clear admonition from a second manager, Billy-Lera re-submitted her voucher for the San Francisco trip to Stephens without excising the disallowed expenses. Investigative File, p.204-2; Stephens Affidavit, ¶6.  Stephens refused to endorse the improper expense claims. Id.  She also sent Billy-Lera a memorandum which expressly directed her to use local airports for government travel whenever possible, or obtain management's approval before departing from a non-local airport. Stephens Affidavit, ¶7. In response, Billy-Lera informed her manager that 'you cannot dictate to me regarding which airport I fly out of," further stated that she rejected Stephens admonishment. Stephens Affidavit, ¶8. See also: Investigative File, p.204-11.

**London Expenses.** Billy-Lera's voucher for the expenses of her travel to London sought double payment for certain expense items. Investigative File, p. 204-9. In addition, Billy-Lera again chose to fly from Washington to London by way of New York. Information File, p.204-8, 204-9.  Once again, approval of the vouchers was delayed pending Billy-Lera's submission of corrected vouchers and/or explanations for questioned items. Investigative File, p.204-9. See generally: Stephens Affidavit, ¶9.

**Hawaii Expenses.**  The voucher Billy-Lera submitted for her travel to Honolulu (09/10/01 - 10-05-01) likewise claimed questionable items, duplicate expenses and expenses that were not reimbursable. Investigative File, p.204-3.  In addition to the delay attendant to resolving such issues, Billy-Lera submitted the voucher three days after the deadline for it to be processed in September. Information File, p.204-3. *See generally:* Stephens Affidavit, ¶9.

Stephens avers that during the time she has managed Billy-Lera, the latter has persistently submitted vouchers claiming reimbursement of expenses which are incorrect, or incomplete, or claim items of expense which are questionable or outright disallowed under Agency regulations, and that the submission of such defective or deficient travel vouchers, together with Billy-Lera's combative attitude toward correction of such vouchers, has been the cause of any delay Billy-Lera may have experienced in approval of her travel vouchers while  Stephens has been her manager. Stephens Affidavit, ¶9.

**Departure Rating.**  In August 2001, a reorganization resulted in several employees being moved out of Group 1110. Mosley Affidavit, ¶8. Pursuant to Agency regulations, Mosley prepared a *"Departure Rating"* for all of the employees leaving his group. Mosley Affidavit, ¶8; Investigative File, p.201-2. In his *Departure Rating* of Billy-Lera, Mosley gave her a rating of "Fully Successful" (3) in the areas of *Inventory Management* and *Customer Relations.* Investigative File, p. 201-2, 201-28; Mosley Affidavit, ¶8. Mosley gave Billy-Lera an overall, summary rating of "Exceeds Fully Successful" (4). Investigative File, p.201-28; Mosley Affidavit, ¶8. In her last annual *Performance Evaluation*, Billy-Lera had been rated "Exceeds Fully Successful" in both of the foregoing critical elements of her job. Investigative File, p. 201-2.

Mosley stated his reasons for his ratings.  In his narrative on the *Customer Relations* rating, Mosley noted that —

> *"You generally present yourself well to customers, both within and without the service.  However, you sometimes fail to respond timely to customer*

Παγε ]15]

*inquiries. You are cognizant of offering taxpayers a managerial conference where appropriate. Although it was noted in one conference that the fact pattern laid out to our counsel resulted in an incorrect determination. This disagreement between the taxpayer and you was resolved once this fact pattern was framed appropriately. However, this representative complained about the lack of attention given to the case. It has also been noted in other correspondence from representatives a lack of attention or responsiveness on cases. If this practice continues it will result in a lowering of this aspect. I do believe you will be able to easily correct this.*

Mosley Affidavit, ¶9; Investigative File, p.201-36

With respect to the rating he gave in *Workload Management*, Mosley noted that, of nine "overaged" cases Billy-Lera was handling, Billy-Lera had spent "minimal time" on six of them, focusing on the other three. Mosley Affidavit, ¶9; Investigative File, p.201-30. "*Some of those cases have no additional time placed on them leaving the cases virtually untouched for seven months. The cases in your inventory are extremely old running from 600 days to 1100 days old.*" Investigative File, p.201-30. Mosley further found that Billy-Lera let her cases run perilously close to their statute of limitations date before requesting an extension. Id. Said Mosley, "*Throughout this time period memos were issued to remind you of the upcoming statutes on each case. The statute reports were a reminder of the pending statutes, which were not secured within an acceptable time period.*" Id. Mosley also critiqued Billy-Lera's lack of diligence in attending to her case inventory:

"*In reviewing your cases throughout this time period, it is clear that you are having trouble managing your caseload. You are allowing cases to continually sit extended periods of time before reacting to the various needs of the case file. You are allowing document request* [sic] *to remain outstanding extended periods of time before taking any action. It was my belief that the January workload review would be used as a guide to bring the workload back under control. If you continue this practice it will result in lowering this aspect...*" Mosley Affidavit, ¶9; Investigative File, p.201-30.

Mosley avers that his Departure Rating for Billy-Lera were based entirely on the foregoing factors, and that considerations of her race, sex, national origin, and/or "retaliation" had nothing to do with the ratings he gave her. Mosley Affidavit, ¶9.

Mosley's preparation of a Departure Rating for Billy-Lera and the other departing employees was mandated by Agency regulations. Mosley Affidavit, ¶8. Mosley avers that

his Departure Rating had no effect on Billy-Lera's rate of pay, grade, benefits, or any other term, condition or privilege of employment. Mosley Affidavit, ¶10.

"**DENIED**" **MANAGEMENT OPPORTUNITIES**. Jeannie Fisher was Billy-Lera's second-level manager at all times relevant to this action. Investigative File, p.173. Between April and September of the year 2000, Fisher solicited employees to fill available acting manager positions. Id. Billy-Lera expressed no interest. Id. In early November, 2000, Billy-Lera advised Fisher that Fisher had appointed the wrong individual (Tillotson) as acting manager of Examination Group 1110, and that she (Billy-Lera) wanted to be acting manager of that Group. Id. Fisher thanked Billy-Lera, but stated that she had already made arrangements to cover the acting group manager needs for Examination Group 1110. Id. The individuals Fisher selected, Tillotson and Mosley, were assigned to the Technical Section, and consequently did not have in-process inventories that required re-assignment. Investigative File, pp. 178-170. This meant that moving them to the acting manager position would not require the re-assignment of their open cases to others. <Authority>

Fisher then informed Billy-Lera that she might require someone to serve as acting manager for the Tax Examiner Group. Investigative File, p.178. The discussion then turned to consideration of what could be done with Billy-Lera's in-process inventory should she take the position. Fisher concluded that, since there were only two other GS-13 examiners available to accept Billy-Lera's inventory, and since they both had as many cases as they could handle, it would not be possible to re-assign Billy-Lera's inventory to them. Id. Fisher also advised that the additional responsibilities Billy-Lera would have serving in the available acting manager positions would not result in any additional compensation, since Billy-Lera was already a GS-13 and all available positions were rated at GS-13 or below. Id.

Ultimately, Fisher did not appoint Billy-Lera as acting manager in the Tax Examination group for two reasons: First, it would not have been possible to re-assign Billy-Lera's in-process inventory to the other two GS-13 examiners, and second, Fisher

concluded that placing Billy-Lera — a GS-13 examiner — in a GS-11 management position was not an effective use of resources. Id.

## LEGAL DISCUSSION

### Summary Judgment Analysis

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See:* Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995). In responding to a properly-supported motion for summary judgment, the burden is upon the non-moving party to demonstrate that there are material facts in dispute. Celotex, *supra* at 324. There is a genuine issue of material fact "*if the evidence is such that a reasonable jury could return a verdict for the non-moving party.*" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248(1986). Material facts are in dispute if they are capable of affecting the outcome of the suit under governing law. Id. In considering a motion for summary judgment, all evidence and inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). The "*evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in* [her] *favor.*" Anderson, *supra,* at 248; *see also:* Bayer v. United States Dept. of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992). The non-moving party may not rely upon mere allegations as support for its position but must come forth with specific facts and affidavits based upon personal knowledge to show that there is a genuine issue for trial. *See:* Matsushita, *supra,* at 587; FED. R. CIV. P. 56(e).

Here, Billy-Lera contends that she was discriminated against because (a) she is black, (b) she is West Indian, and (c) she is female. She also contends that she was given a lower Departure Rating, and that approval of her travel vouchers was delayed in

"retaliation" for pursuing relief through the EEO offices. The undisputed facts and the law do not support her contentions.

### Disparate Treatment / Discrimination (Substantive Law).

Billy-Lera contends that she was treated differently than other employees because of her race, her gender and her national origin. Information File, p.___. She offers no direct evidence of discriminatory intent on the part of any of her managers, so she is obliged to establish her claim by circumstantial evidence. In McDonnell Douglas v. Green, 411 U.S. 792 (1973), the Supreme Court established a method of establishing a prima-facie case of race discrimination circumstantially. To do so here, Mr. Billy-Lera must show, by a preponderance of the evidence, that:

1. She is a member of a protected class;

2. She was performing to her employer's legitimate expectations;

3. She suffered a personal loss or harm with respect to a term, condition or privilege of employment; and

4. Similarly situated others not in the protected class were treated more favorably by not experiencing a similar change in a term, condition or privilege of employment.

Oxman v. WLS-TV, 846 F.2d 448, 454-55 (7th Cir., 1988); see also: Woerner v. USPS, EEOC Appeal No. 01920366 (July 20, 1992)

If (and only if) Billy-Lera were to establish a prima facie case of discrimination under McDonnell-Douglas, the Agency would have the burden "to articulate some legitimate, non-discriminatory reason" for the "adverse employment action" taken against her. See: St. Mary's Honor Center v. Hicks, 509 U.S. 502. If the Agency meets this burden of production, the presumption of unlawful discrimination created by Billy-Lera's prima facie proof "drops from the case." Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981) at 255 n.10; See also: Hicks, supra. At that point, Billy-Lera's burden is to prove, by a preponderance of the evidence, that the legitimate reasons offered by the Defendant were not its true reasons, but were merely a pretext for discrimination. Burdine, 450 U.S. at 253.

### Discussion: Disparate Treatment

Addressing the foregoing elements *seriatim*, it is clear that Billy-Lera, "*a black American, highly-educated female of West Indian origin*" belongs to a protected class under Title VII.    Her case founders at the second, third, and fourth elements of the paradigm, however.  The undisputed facts demonstrate that Billy-Lera was <u>not</u> meeting her employer's performance legitimate expectations, that she did <u>not</u> suffer a personal loss or harm with respect to a term, condition or privilege of employment; and that Billy-Lera was treated the same as similarly situated others not in the protected class.

FAILURE TO MAKE PRIMA FACIE CASE:  BILLY-LERA WAS NOT MEETING HER EMPLOYER'S LEGITIMATE EXPECTATIONS.

That Billy-Lera was not meeting her employer's legitimate expectations is beyond cavil.  Even a casual review of the Investigative File in this case — including materials furnished by Billy-Lera in support of her case — disclose a sullen, combative, uncooperative, insubordinate and arrogant employee.  The affidavits of Mosley, Tillotson, and Stephens resonate to the common theme of Billy-Lera's refusal to take direction from her supervisors.  Tillotson tells of numerous complaints she received about Billy-Lera's performance from taxpayer representatives.  Mosley details the objective deficiencies he personally observed as a result of reviewing Billy-Lera's files with her.  Stephens relates Billy-Lera's persistent submission of travel vouchers seeking compensation for unpermitted claims.    Clearly, Billy-Lera was not satisfying her employer's legitimate performance expectations.  She therefore cannot establish the second element of her *prima facie* case. Failure to establish one necessary element of a *prima facie* case warrants the grant of summary judgment. <u>Celotex</u>, *supra.*

FAILURE TO MAKE PRIMA FACIE CASE: THE ALLEGED ACTS BY MANAGEMENT DID NOT CONSTITUTE "*ADVERSE EMPLOYMENT ACTIONS.*"

In <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1999), the Supreme Court reviewed  the case law on adverse employment actions —

*"The concept of a tangible employment action appears in numerous cases in the Courts of Appeals discussing claims involving race, age, and national origin discrimination, as well as sex discrimination. . . .* **A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits**. *Compare:* Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (C.A.7 1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"), with* Flaherty v. Gas Research Institute*, 31 F.3d 451, 456 (C.A.7 1994) (a "bruised ego" is not enough);* Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 887 (C.A.6 1996) (demotion without change in pay, benefits, duties, or prestige insufficient) and* Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (C.A.8 1994) (reassignment to more inconvenient job insufficient). {Emphasis Added}*

The Court of Appeals for the Federal Circuit has likewise held an "adverse employment action" is "*a tangible change in working conditions that produces a material employment disadvantage* [such as] *termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.*" Haddon v. Exec. Residence, 313 F.3d 1352, at 1363 (2002). The undisputed facts in the Record make clear that the "wrongs" asserted by Billy-Lera do not constitute "adverse employment actions" within the meaning of the above cases.

**Workload Review & Departure Rating Not Adverse Actions.** In Brown v. Brody, 339 U.S. App. D.C. 233 (1999), the Plaintiff contended that the lowering of her rating in her annual performance appraisal from "Exceeds Fully Successful" to "Fully Successful" constituted an "adverse employment action" for purposes of establishing a *prima facie* case under McDonnell-Douglas. Finding that it did not, the District of Columbia Court of Appeals noted that —

*"While Brown's evaluation may have been lower than normal, it was not adverse in an absolute sense. The overall "fully satisfactory" rating is the*

*middle of five grades and Brown was rated "superior" in three of five specific areas."* Brown, *supra,* at 458.

Here, Billy-Lera complains that her rating in one critical element of her Workload Review ("*Workload Management*") and two critical elements in her Departure Rating (*Workload Management* and *Customer Relations*), were lowered from "Exceeds Fully Successful" to "Fully Successful." <Authority> As was the case in *Brown,* the ratings assigned to Billy-Lera are in the middle of five possible grades. *See* Investigative File, p. ___. Further, Mosley gave her a rating of "Exceeds Fully Successful" in ___ of ___ her critical elements on her Departure Rating. Mosley Affidavit, ¶ ___; Investigative File, p. ___. *Un*like the situation in Brown, where the ratings appeared in the Plaintiff's formal, annual performance appraisal, the ratings of which Billy-Lera complains did not.   The function of the Workload Review and the Departure Ratings was not to assess Billy-Lera's entitlement to raises or promotions, but, *inter alia,* to advise both her and management of any deficiencies in her performance that were correctable *before* her next annual performance evaluation. Indeed, it is undisputed that neither the Workload Review nor the Departure Rating resulted in a diminution of Billy-Lera's grade, salary, title, duties or benefits. Mosley Affidavit, ¶ ___. *See:* Brown, *supra,* at 458. The added factor of Mosley's attribution of numerical ratings in his Workload Review did not change that fact. Brown, *supra.* In the end, both the Workload Review and the Departure Rating constituted nothing more than an informal, interim admonition to Billy-Lera of her strengths and deficiencies. Tillotson Affidavit, ¶ ___.

**Offer to Do Workload Review At Complainant's Home Not Adverse Action.**
While there exists a dispute concerning whether Tess Tillotson "insisted" on conducting a case review at Billy-Lera's home or merely offered to do the Workload Review there as an accommodation to an elusive and combative employee. There is no dispute, however, that no review was ever, in fact, conducted there. Billy-Lera does not contend that a material term, condition or privilege of her employment was adversely affected by her refusal to accede to the alleged request.  It is undisputed that she was not demoted for her refusal. Tillotson Affidavit, ¶ ___. Her salary was not reduced.  Tillotson Affidavit, ¶ ___.    Her

benefits were not affected. <u>Tillotson Affidavit</u>, ¶___. Her duties were not changed. <u>Tillotson Affidavit</u>, ¶___. For purposes of establishing a *prima facie* case of discrimination or retaliation, then, the only "adverse employment action" of which Billy-Lera can complain is that management (unsuccessfully) asked to do something which she found unacceptable and refused. This does not, by any stretch of the definition, constitute "*a tangible change in working conditions that produce*[d] *a material employment disadvantage*" for Billy-Lera. <u>Haddon</u>, *supra.*

**Request for Weekly ATAO Reports Not Adverse Action.** Billy-Lera contends that Tillotson asked her to prepare the weekly ATAO reports because Billy-Lera is "*a black American, highly educated female of West Indian origin.*"[9] She does *not* assert that she complied with Tillotson's request and, indeed, the Tillotson affirmatively states that Billy-Lera flatly <u>refused</u> to prepare the weekly reports and never submitted them. <u>Tillotson Affidavit</u>, ¶___. Likewise, Billy-Lera does not assert that either Tillotson's request, or her own refusal, resulted in a diminution of pay, change in status, loss or reduction of benefits, reduction in grade or any other tangible, adverse employment action. Tillotson confirms that Billy-Lera suffered no adverse employment action. <u>Tillotson Affidavit</u>, ¶___. Once again, then, the sum total of the "discrimination" for which Billy-Lera seeks relief is a request by management which she refused. Clearly, Tillotson's spurned request for weekly ATAO reports was not, it itself, "*a tangible change in working conditions that produce*[d] *a material employment disadvantage*" for Billy-Lera. <u>Haddon</u>, *supra.* Absent evidence of a tangible, adverse employment action, Tillotson's request for the ATAO reports provides no foundation for a *prima facie* case of either discrimination or retaliation. <u>Id</u>.

**"Interference" With Audits Not Adverse Action.** Billy-Lera alleges that Tillotson "interfered" with her audits because Billy-Lera is "*a black American, highly educated female of West Indian origin.*" The undisputed facts show that, Billy-Lera maintained custody of the files on her cases, and consistently obstructed or evaded efforts by her IRS managers

---

9.   <u>Investigative File</u>, p.169

to review the files she claimed to be working on. As a consequence, Tillotson had no capacity to do any work on those cases, to know who was representing the taxpayers, or to know how to contact them. Tillotson Affidavit, ¶___. The only involvement Tillotson had with the Billy-Lera's "audits" was fielding complaints about Billy-Lera's handling of the case, and contacting Billy-Lera in an effort to resolve the dispute. Tillotson Affidavit, ¶___. In this, she acted entirely within her duties as manager. Tillotson Affidavit, ¶___.

Even if it were granted that Tillotson's innocuous efforts to resolve complaints against Billy-Lera somehow improperly "interfered" in Billy-Lera's audits and that such interference was grounded on considerations of race, gender and/or national origin, Billy-Lera has failed to offer any evidence that what Tillotson did adversely affected some term, condition or privilege of her employment. Absent evidence that the alleged "interference" resulted in an adverse employment action, Tillotson's actions do not support a *prima facie* case of discrimination or retaliation. Brody, *supra*; Haddon, *supra*.

Thus, at least with respect to the Workload Review, the Departure Rating, the request for weekly ATAO reports, the proposal to conduct the Workload Review at Billy-Lera's flexi-place workplace, and the alleged "interference" with Billy-Lera's audits, the undisputed facts establish that these incidents were not in themselves "adverse employment actions," and further, that they did not *lead to* adverse employment actions against her. Accordingly, any claims of race/gender/national origin discrimination based on these occurrences fails, and the Agency is entitled to summary judgment upon such claims as a matter of law.

### FAILURE TO MAKE PRIMA FACIE CASE: FAILURE TO DEMONSTRATE THAT SIMILARLY SITUATED OTHERS NOT IN THE PROTECTED CLASS WERE TREATED MORE FAVORABLY.

The final element which Billy-Lera must establish by a preponderance of evidence to establish a *prima case* of discrimination is that other similarly-situated people with whom she worked who were not female, or West Indian, or black did not experience the "adverse

employment action" she did. Oxman, *supra*; *see also:* Woerner v. USPS, EEOC Appeal No. 01920366 (July 20, 1992). In this regard, Billy-Lera has not offered a single piece of direct or circumstantial evidence to support her claim that she has been treated differently than non-blacks, women, or non-West Indiana similarly situated to herself.

**Workload Review & Departure Rating.** Billy-Lera has offered no evidence that anyone in her office — black or white, male or female, West Indian or not — did not have to undergo the same Workload Review and Departure Rating process she did. Indeed, the Agency has affirmatively shown that all the other agents in Billy-Lera's Group 1110 were given a Workload Review by Manual Brown, and that all the other agents departing from Mosley's supervision due to the reorganization were given Departure Ratings. Nor has Billy-Lera brought forth <u>any</u> evidence of "comparators" outside her protected class who received higher ratings on their Workload Review or Departure Rating while producing the same quality and quantity of work product as Billy-Lera. In sum, she has utterly failed to demonstrate that her job performance warranted ratings other than those given by Mosley in the Workload Review and Departure Rating.

**Weekly ATAO Reports.** Billy-Lera has similarly failed to demonstrate that she was the only agent in Tillotson's Group 1110 who was asked to prepare a weekly ATAO report. The Agency has affirmatively shown that such reports were required of all the other agents in Billy-Lera's group by Jeannie Fisher, the Territory Manager, and that all the other agents in Billy-Lera's group provided such reports. There is no basis for a claim of "disparate treatment" in connection with the request for the weekly ATAO reports.

**"Interference" With Audits.** The undisputed facts disclose that Billy-Lera went out of her way to frustrate management's efforts to access her cases. Tillotson affirms that she had no access to Billy-Lera's files, and that her only contact with the principals in Billy-Lera's cases occurred when they called her, as Billy-Lera's manager, to complain about Billy-Lera. When Tillotson then summoned Billy-Lera to the office to review the particular case involved with Billy-Lera and attempt to resolve the complaint, Billy-Lera refused to cooperate. Billy-Lera has offered no evidence that Tillotson did not respond to complaints

about other similarly situated agents in her group in a similar manner.  Indeed, such proof would be difficult in light of the undisputed fact that the only complaints Tillotson received were about Billy-Lera.  Once again, the undisputed facts do not support Billy-Lera's claim of "disparate treatment."

**Travel Vouchers.**  Billy-Lera's claim that the processing of her travel vouchers was "delayed," causing a suspension of the credit card she uses for travel, because she is *"a black American, highly-educated female of West Indian origin"* is utterly unsupported by any comparative evidence.  Billy-Lera's manager's specifically deny that their conduct with respect to Billy-Lera was colored by considerations of her race, or her gender, or her national origin, or her color.  The Agency has, further, put forth positive evidence showing that any "delays" in the processing of Billy-Lera's travel expense vouchers has been due to her submission of vouchers which are incorrect or incomplete, or which seek reimbursement for items which are questionable or specifically prohibited under Agency regulations. Stephens Affidavit, ¶9.

Billy-Lera, for her part, offers no evidence that similarly-situated agents in her group submitted vouchers which were unsigned, or contained claims for duplicate expenses, or sought reimbursement for personal travel.  Nor has she offered any evidence that, if any such vouchers *were* submitted, they were processed differently than her vouchers were processed.  Finally, Billy-Lera offers no evidence demonstrating that other, similarly situated agents who refused to pay their credit card bill did not have their credit card suspended.  Absent any evidence that Billy-Lera was treated differently than anyone else, the processing of her travel vouchers provides no support for her claim of "disparate treatment."

The foregoing analysis makes clear that undisputed facts in the Record preclude Billy-Lera from making a *prima facie* case of race/gender/national origin discrimination based upon —

X      The performance grade she received in her *Workload Review;*

X    Tillotson's offer to travel to Billy-Lera's home to do her *Workload Review;*

X    Tillotson's request for weekly ATAO reports;

X    Tillotson's alleged "interference" with the Billy-Lera's audit procedures; and

X    The performance grade she received in her *Departure Rating.*

Since the undisputed facts preclude Billy-Lera from making out a *prima facie* case of discrimination with respect to the foregoing occurrences, the Agency is entitled to summary judgment as a matter of law on the foregoing claims as a matter of law.

THE AGENCY HAS DEMONSTRATED LEGITIMATE, NON-DISCRIMINATORY REASONS FOR THE "ADVERSE EMPLOYMENT ACTIONS " OF WHICH BILLY-LERA COMPLAINS.

Even assuming that Billy-Lera were able to make out a *prima facie* case of discrimination, any presumption of discrimination so created "drops away" by virtue of the fact that the Agency has articulated legitimate, non-discriminatory reasons for its so-called "adverse employment actions," *to-wit:*

1.    The *Workload Review* was required of all agents in Billy-Lera's Group 1110. It was ultimately performed by Mosley because Billy-Lera had avoided/evaded submitting to a review by at least two prior managers.

2.    The ratings in the *Workload Review* were based on objective findings contained in Billy-Lera's files;

3.    Tillotson's offer to conduct the *Workload Review* at Billy-Lera's home was based on Tillotson's intent to accommodate Billy-Lera's persistent refusal to make herself and her files available for review;

4.    Tillotson's request for weekly ATAO reports was made to <u>all</u> the agents in Billy-Lera's group pursuant to a directive from the Territory Manager;

5.    Tillotson's communication with persons connected with Billy-Lera's audits was the result of *their* calls to Tillotson complaining about Billy-Lera, and Tillotson's efforts to have Billy-Lera into the office with the case to investigate and resolve the complaint;

6.    Billy-Lera's non-selection as Acting Manager of Group 1110 was based on the fact that she applied late; that such management duties would have required the reassignment of some of Billy-Lera's cases; and there were only two other GS-13 examiners available to accept Billy-Lera's inventory, and they both had as many cases as they could handle, making it impossible to re-assign Billy-Lera's inventory to them.    Tillotson and Mosley were qualified for the position and their appointment did not require re-assignment of their cases.

7.    Billy-Lera's non-selection as Acting Manager in the Tax Examination group was based on management's determination that (a) it would not have been possible to re-assign Billy-Lera's in-process inventory to the other two GS-13 examiners, and (b) the conclusion  that placing Billy-Lera — a GS-13 examiner — in a GS-11 management position was not an effective use of resources.

8.    Delays in processing Billy-Lera's travel vouchers were based on (a) her submission of vouchers which were incorrect, or incomplete, or claimed items of expense which were questionable or prohibited under Agency regulations,  and/or her combative and uncooperative attitude toward correction of such vouchers.  Billy-Lera's decision to forgo payment of her travel card bill pending management's capitulation to her demand for payment of her improper vouchers was the proximate cause of any suspension of her travel card.

9.    The *Departure Rating* was required of all agents who were re-assigned out of Billy-Lera's Group.

10.    The ratings contained in the *Departure Rating* are supported by objective findings contained in Billy-Lera's files.

BILLY-LERA HAS FAILED TO DEMONSTRATE BY A PREPONDERANCE OF THE EVIDENCE THAT THE REASONS ARTICULATED BY THE AGENCY ARE PRETEXT.

Billy-Lera's burden, in the face of the foregoing articulation of non-discriminatory reasons for the "wrongs" of which she complains, is to demonstrate by a preponderance of the evidence, that the Agency's reasons are false, and that discrimination was the real reason for the actions taken. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993) Billy-Lera offers nothing, in this regard.  Accordingly, the Agency is entitled to summary judgment upon Billy-Lera's claim of race/gender/national origin discrimination.

## II. Reprisal / Retaliation

### 1. SUBSTANTIVE LAW

Billy-Lera further alleges that the grade she received in her Departure Rating, and the problems she experienced getting approval for her travel vouchers constituted "retaliation" for her exercise of her EEO rights. Investigative File, p.___. Title VII proscribes retaliation against employees based upon their involvement with the EEO process. Haddon v. Exec. Residence, 313 F.3d 1352 (DC Cir. 2002); *see also:* Ayon v. Sampson, 547 F.2d 446, 449-50 (9th Cir. 1976); Hale v. Marsh, 808 F.2d 616, 619 (7th Cir. 1986).

Billy-Lera's threshold burden, when faced with a properly supported Motion for Summary Judgment, is to establish a *prima facie* case of retaliation. *See:* St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). Billy-Lera may satisfy this burden in one of two ways. The first method requires Billy-Lera to present *direct evidence* that her prior involvement in the EEO process caused the adverse employment consequences of which she complains. See, *e.g.,* Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 643, 644 (7th Cir. 2002). Direct evidence, however, usually does not exist in retaliation cases (*See:* Webster v. Department of the Army, 911 F.2d 679, 689 (Fed. Cir. 1990)), and Billy-Lera has presented none. Accordingly, she must satisfy her burden through the indirect method of proof, which creates a presumption that the employer intended to retaliate.

To establish a *prima facie* case of retaliation by indirect proof, Billy-Lera must present evidence that —

(1)    She participated in a **statutorily protected activity**,

(2)    The Agency took **adverse action** against her, and

(3)    There was a "**causal connection**" between her protected activity and the Agency's adverse action against her.
Brown v. Brody, 199 F.3d 446, at 452 (D.C. Cir. 1999)

If Billy-Lera is unable to satisfy *any* of the foregoing elements, her retaliation claim must fail. Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir., 2002) Celotex, *supra*.   If she is successful in showing a *prima facie* case, however, the burden shifts to the Agency to articulate a legitimate nondiscriminatory reason for the grades given in the Departure Rating and the "delays" in processing her travel vouchers.   Haddon, *supra*; McDonnell Douglas, 411 U.S. 792 (1973), at 802.

If the Agency meets this burden of production,   the presumption of unlawful discrimination "*drops from the case*" and is no longer relevant. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, at 255 n. 10.   At that point, Billy-Lera's burden is to prove, *by a preponderance of the evidence*, that the reasons offered by the Agency were not its true reasons, but were merely a pretext for discrimination." McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984); Burdine, *supra*, at 253.

### 2. DISCUSSION: REPRISAL / RETALIATION

While the Agency does <u>not</u> dispute that Billy-Lera's involvement with EEO procedures was a "statutorily protected activity," it <u>does</u> dispute that Billy-Lera suffered any "adverse employment action," and the discussion beginning at page ___, *supra* is incorporated herein by reference.   Although the absence of any "adverse employment action," destroys Billy-Lera's *prima facie* case, even if it were granted, *arguendo*, that she suffered an adverse employment action, her *prima facie* case of retaliation founders on her inability to establish a causal connection between her EEO activity and her problems with the Departure Rating and travel vouchers.

**Departure Ratings.**   The undisputed facts disclose that Billy-Lera was not diligently working the files she was assigned. Specifically, she had permitted the accumulation of a significant and unacceptable number of over-age cases in her inventory; she had allowed many of her cases to run perilously close to the statute of limitations; she had not even begun work on a number of her "priority" cases despite having been assigned them for

long periods of time; she had failed to follow up on document requests from taxpayers or their representatives in a timely fashion; and she had failed to review and consider evidence and/or additional information received from taxpayers and their representatives. The identification of these performance deficiencies by Billy-Lera's supervisor, and her communication of them to Billy-Lera and to her new manager by means of the was entirely appropriate and, indeed, required under Agency regulations.

**Vouchers.** The undisputed facts likewise show that the travel voucher Billy-Lera submitted to Mosley contained items of expense pertaining to a side-trip Billy-Lera took to New York which not only was <u>not</u> business-related, but also increased the cost of her trip to the Government.

The mere fact that a disgruntled employee contacts an EEO counselor does not magically transform every subsequent management action which displeases that employee into "retaliation."

> "[I]n order to determine whether the adverse action is causally connected to the alleged retaliatory motive, it is necessary to balance the intensity of the motive to retaliate against the legitimate basis for the agency's action."
> <u>Warren v. Dept. of the Army</u>, 8-4 F.2d 654, at 658 (Fed. Cir. 1986)

Billy-Lera offers no evidence of the existence or weight of any "motive to retaliate" attributable to the Agency. Indeed, Billy-Lera's supervisors attest that retaliation was not a factor in the decision to take the action of which Billy-Lera complains. Balanced against the utter absence of evidence of a "motive to retaliate" is the preponderant weight of evidence showing the need to correct Billy-Lera's lack of diligence in processing her cases, and the need to have her submit correct vouchers seeking allowable travel expenses. Based on these facts, the scales declare decidedly against the existence of any "causal connection" between Billy-Lera's EEO activity and the "adverse employment actions" of which she complains. In the absence of a causal connection, there is no *prima facie* case. And in the absence of even a *prima facie* case of retaliation, the Agency is entitled to summary judgment as a matter of law. <u>Celotex</u>, *supra.*

### THE AGENCY HAS ARTICULATED LEGITIMATE BUSINESS REASONS FOR THE ACTIONS OF WHICH BILLY-LERA COMPLAINS.

The foregoing discussion demonstrates that Billy-Lera has failed to make a *prima facie* case of retaliation. Assuming, however, for the sake of completeness, that Billy-Lera did, somehow, make out a *prima facie* case of retaliation, the Agency is still entitled to summary judgment since it has met its burden of articulating legitimate, non-discriminatory reasons for the each of the "retaliatory" actions of which Billy-Lera complains. *See supra* at ____. Having met that burden, any presumption of unlawful discrimination by the Agency "*drops from the case*" and is no longer relevant. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, at 255 n. 10. Accordingly, Billy-Lera's burden is to prove, *by a preponderance of the evidence*, that the reasons offered by the Agency were not its true reasons, but were merely a pretext for discrimination. McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984); Burdine, *supra*, at 253.

### BILLY-LERA HAS FAILED TO DEMONSTRATE BY A PREPONDERANCE OF THE EVIDENCE THAT THE REASONS ARTICULATED BY THE AGENCY ARE PRETEXT.

Billy-Lera's burden, in the face of the foregoing articulated non-discriminatory reasons, is to demonstrate by a preponderance of the evidence, that the reasons articulated by the Agency are false, and that discrimination was the real reason for the actions taken. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993) Billy-Lera has offered nothing, in this regard. Accordingly, the Agency is entitled to summary judgment upon Billy-Lera's claim of retaliation.

## *Conclusion*

The undisputed facts in the record demonstrate that Billy-Lera's complaint of retaliation and discrimination is empty of merit. She has failed to establish a *prima facie* case of either retaliation or discrimination. The Agency has advanced legitimate, non-discriminatory reasons for the actions of which Billy-Lera complains. Billy-Lera has failed

to establish that those reasons are not genuine. Accordingly, the Agency is entitled to, and prays for the entry of, Summary Judgment upon Billy-Lera's Complaint herein.

OFFICE OF AREA COUNSEL (Washington)
General Legal Services
For the Internal Revenue Service


By: _____
Robert M. Mirkov, Attorney
P.O. Box 44369
Washington, D.C. 20026-4369
Telephone: (202) 283-7915
Facsimile: (202) 283-7978