Equal Employment Opportunity Commission
Washington Field Office
1400 L. Street, NW, Suite 200
Washington, D.C.  20005

| | |
|---|---|
| BERNADETTE S. BILLY-LERA )<br>Complainant )<br> )<br>vs. )<br> )<br>PAUL H. O'NEILL, Secretary )<br>U.S. Department of the Treasury, )<br>Agency )<br> ) | EEOC No.  100-A2-8013X<br><br>Agency No.  01-1139<br><br>Administrative Judge:<br>Jeannette Walters-Marquez |

## Affidavit of
## Robert Mosley

*Robert Mosley*, being first duly sworn upon his oath, and under penalties for perjury, states as follows:

1.    That my name is Robert Mosley. I am an adult of competent age and an employee of the Internal Revenue Service, with my post of duty currently located at L'Enfant Plaza in Washington, D.C. I have personal knowledge of the facts set forth in this Affidavit, and the facts set forth herein are true.

2.    That I became the Acting Manager of Group 1110 in early January of 2001. I was temporarily promoted to grade level 14 agent during the time that I supervised Bernadette Billy-Lera. I served continuously as Billy-Lera's manager until she was transferred out of my unit in August 2001. Prior to my becoming Acting Manager of Group 1110, I had a cordial relationship with Ms. Billy-Lera.

3.    That one of my first duties as Acting Manager of Group 1110 was to perform a workload review for Bernadette Billy-Lera which had been scheduled for January 8, 2001 by her outgoing Acting Manager, Tess Tillotson. I carefully reviewed the cases

## Exhibit C
Agency Motion For Summary Judgment

*AFFIDAVIT OF ROBERT MOSLEY*

Ms. Billy-Lera was working on, and in doing so, it became very apparent to me that she was having difficulty managing her workload. For example, my review disclosed that Ms. Billy-Lera had a significant and unacceptable number of over-age cases, and cases which she had allowed to run perilously close to the statute of limitations. (Once a statute of limitations passes, the Government loses its right to audit the taxpayer's return.) She had priority cases that she did not even start working on, despite having been assigned them for long periods of time. She failed to follow up on document requests from taxpayers or their representatives in a timely fashion. I also found instances where she had failed to review and consider evidence and/or additional information received from taxpayers and their representatives. As a result of my review, I gave Ms. Billy-Lera a "Fully Successful" (3) performance rating in the area of "Workload Management," and in the area of "Customer Relations," which I determined was appropriate and accurate based on her performance. I assigned a numerical rating to Ms. Billy-Lera's workload review because, in my experience, all workload reviews I had ever seen had numerical ratings. The attribution of a numerical rating did not change the substance or meaning of the workload review ratings in any way.

4.   That the workload review is a management tool which, among other things, gives a manager a "snapshot" of what the employee is doing, and how well she is doing it. It is used to identify problems, notify the employee of any deficiencies or areas where improvement is needed, and generally communicate management's performance expectations to the employee. It is, at bottom, *advisory*, and does not — barring discovery of egregious circumstances — constitute a basis for employment action, such as promotion, demotion, pay increases or decreases, loss of benefits, *etc*. The employee's annual *Performance Evaluation* constitutes the basis for such employment actions.

I considered the Workload Review I prepared for Ms. Billy-Lera to be an interim report on her job performance, and written notice to her of areas where her performance

required improvement. Consistently with this view, when I prepared Ms. Billy-Lera's annual *Performance Appraisal* at the end of that same month, I did not lower her ratings in the areas of *Workload Management* or *Customer Relations* because I felt that she had not been given sufficient time to improve her work in those areas since receiving the Workload Review.

Ms. Billy-Lera's Workload Review resulted in no adverse employment action by the Agency, and she suffered no diminution of salary, or benefits, or grade, or title as a consequence of the Review. I affirmatively state that considerations of Ms. Billy-Lera's race, gender or national origin played no part in the assessments I expressed in Ms. Billy-Lera's Workload Review, and that the ratings reflected my impartial assessment of the quality and quantity of Ms. Billy-Lera's work. A true and accurate copy of my Workload Review pertaining to Ms. Billy-Lera is found in the <u>Investigative File</u> at pages 079-091 and is incorporated herein by reference.

5.     That on or about September of 2001, Ms. Billy-Lera submitted for my approval a "voucher" seeking reimbursement of expenses relating to a business trip she made to San Francisco. Upon reviewing the voucher and speaking with Ms. Billy-Lera, I learned that she had driven to New York on a Friday, stayed the weekend, and then flown to San Francisco from New York for an appointment there the following Monday. She conducted no business in New York and, although she stayed in New York for two days, she submitted no hotel expenses. (I know that Ms. Billy-Lera has family in New York.) After she completed her business in San Francisco, Ms. Billy-Lera flew back to New York, and then took a shuttle flight back to Washington, D.C. In addition to other, unobjectionable expenses, Ms. Billy-Lera's travel voucher sought reimbursement for her "car ride" to New York, plus tolls, cab fare in New York, *per diem* compensation for the two days she stayed in New York, plus the airfare for the shuttle flight. The expenses of Ms. Billy-Lera's New York "side trip" may be summarized as follows:

*AFFIDAVIT OF ROBERT MOSLEY*

| | |
|---|---|
| $ 22.43 | Car ride to New York on Sunday (8-5-01) |
| $  3.00 | Tolls (8-5-01) |
| $ 46.00 | Full day per diem (8-5-01) |
| $ 35.00 | Cab Fare in New York on Friday |
| $ 46.00 | Full day per diem on Friday |
| $ 45.75 | Airfare on Saturday |
| $198.00[1] | |

6.   That I saw no business purpose or savings to the Government in the New York side trip, and I determined that the itinerary chosen by Billy-Lera was costlier to the Government than if she had flown directly to San Francisco from Washington. When I discussed the claimed expenses with Ms. Billy-Lera, she stated that she flew out of New York because the airfare to San Francisco was approximately $20 cheaper than if she had flown out of Washington. I tried to explain that her $20 "savings" were more than offset by the $198 in additional expenses which she incurred in the side trip to New York.

That my decision was in accordance with Government travel regulations, found at IRM 122.1(2), which require traveling federal workers to use the method of transportation which results in the greatest advantage to the government. In selecting the mode of transportation, the regulations specifically state that the employee's personal preferences or minor inconvenience is not a valid criteria for selecting a mode of transportation which is less advantageous to the government. IRM 410 (4)(a). If the employee takes an indirect route, or interrupts her travel for personal reasons, regulations require that she personally bear any additional expense. IRM 410(5). Also, regulations provide that when an employee rides as someone else's passenger, the passenger is not allowed to claim mileage for the trip. Ms. Billy-Lera's voucher

---

1.   <u>Investigative File</u>, p.201-38

*AFFIDAVIT OF ROBERT MOSLEY*

claimed $22.00 reimbursement mileage for a trip in a private auto where she states she "Rode with Someone."

Because Ms. Billy-Lera's chosen itinerary resulted in unnecessary costs to the Government, and because she stated no rational justification for it, I disallowed her voucher, telling her that it would be approved once the expenses of her New York side trip were deleted. My action was in accordance with my responsibility as the official responsible for approving/disapproving her travel voucher under Agency regulations found at IRM 121.1, *et seq.,* and IRM 732.1, *et seq.*

7.    That Government employees whose duties involve travel pay their travel expenses by credit card. The credit card is issued in the employee's name by a financial institution approved by the federal government, and it is the employee's responsibility to timely pay the balance on her card. IRM 122.2(2). When the employee returns from business-related travel, it is her responsibility to promptly submit a correct voucher to her supervisor, requesting reimbursement of her allowable job-related expenses, including expenses charged to the travel card.

Once the traveling employee submits her voucher seeking reimbursement for travel expenses, that voucher is reviewed by her "approving official," who determines the "*propriety of the points visited, time and length of each trip, modes of transportation used, and any special or unusual expenditures.*" IRM 733 (2) prohibits approval of claims for claim travel expenses that appear to have been improperly incurred. If some claimed expenses are disputed by the reviewing official, the employee may submit the undisputed items for prompt payment, and request review of the disputed expenses by a higher authority. Rather than simply submitting a voucher which excluded the disputed New York expenses, obtaining payment, and then appealing my denial of the disputed New York expenses, Ms. Billy-Lera adamantly refused to correct her travel

*AFFIDAVIT OF ROBERT MOSLEY*

voucher, and insisted that I approve payment of all of her claimed expenses. I refused, and she did not receive reimbursement of her expenses before my term as her Acting Manager ended.

Apparently, Ms. Billy-Lera then omitted to pay the bill for her travel credit card when it came due, and the card was suspended. I have no knowledge or control over the policies of the credit card company with respect to suspension of Ms. Billy-Lera's credit card, I do know that government employees are personally obligated to pay their travel card bills when due regardless of whether the government has already reimbursed those expenses.

8.  That in August of 2001, a reorganization led to the transfer of Ms. Billy-Lera and several other employees out of my group. Under such circumstances, Agency regulations require the manager of the departing employee to provide a "Departure Rating" of the employee's job performance. Accordingly, I prepared Departure Ratings for all my exiting employees, including Ms. Billy-Lera. In gave her a rating of "Fully Successful" (3) in the areas of *Inventory Management* and *Customer Relations, and* an overall, summary rating of "Exceeds Fully Successful" (4).

9.  That I stated the reasons for my ratings in the Departure Rating, a true and accurate copy of which is contained in the Investigative File at pages 201-28 through201-37 and incorporated herein by reference. If I were to summarize those reasons, I would say that the case files I reviewed clearly showed that Ms. Billy-Lera was not processing her cases in an efficient, expeditious manner, and was receiving criticism from taxpayer representatives for her lack of diligence. I affirmatively state that considerations of Ms. Billy-Lera's race, gender or national origin played no part in the formulation of the Departure Rating I gave Ms. Billy-Lera. Likewise, no motive of "retaliation" for the filing of her EEO charge ever influenced or colored my evaluation of Ms. Billy-Lera's job

*AFFIDAVIT OF ROBERT MOSLEY*

performance, or any other aspect of my treatment of, or relationship with her in any way.

10.     That, further, the Departure Rating I gave Ms. Billy-Lera resulted in no adverse employment action against her by the Agency. She did not suffer a diminution of salary, or benefits, or grade, or title. In essence, the Departure Rating served a role similar to that played by the Workload Review: It gave Ms. Billy-Lera's new manager a "snapshot" of the status of her cases, and it provided Ms. Billy-Lera with an interim advisement of weaknesses in her job performance.

11.     That at no time during my supervision of Ms. Billy-Lera did she ever voice her claim that I was discriminating against her because of her race, sex or national origin. Neither did she ever inform me of her opinion that anything I did was in "retaliation" for her filing of an EEO complaint.

12.     That during my entire tenure as her manager, I treated Bernadette Billy-Lera with courtesy and respect. No action or decision on my part with respect to her was ever influenced by considerations of her sex, her race, her national origin, or the fact that she had filed an EEO charge.

Dated: 2/27/03

*And Further Affiant Sayeth Not.*

<u>Verification</u>

I affirm under the penalties for perjury that the above and foregoing statements are true.

_____
Robert Mosley, Affiant